# 25-2487-cv(L), 25-2503-cv(XAP)

# United States Court of Appeals
### *for the*
# Second Circuit

———— ·•· ————

LIANG WANG,

*Plaintiff-Appellant-Cross-Appellee,*

– v. –

SAMMY SUSSMAN, VOX MEDIA, LLC, NEW YORK MEDIA, LLC,

*Defendants-Appellees-Cross-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

## BRIEF FOR PLAINTIFF-APPELLANT-CROSS-APPELLEE

ALAN S. LEWIS
MADELYN K. WHITE
CARTER LEDYARD & MILBURN LLP
*Attorneys for Plaintiff-Appellant-
Cross-Appellee*
28 Liberty Street, 41st Floor
New York, New York 10005
(212) 732-3200

CP COUNSEL PRESS    (800) 4-APPEAL • (388077)

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................iii

JURISDICTIONAL STATEMENT .........................................................................1

ISSUE PRESENTED FOR REVIEW .....................................................................2

STATEMENT OF THE CASE .................................................................................2

    Introduction and Local Rule 28.1 Statement .........................................................2

    The Defamatory Article ........................................................................................3

    The Defamatory Podcast.....................................................................................12

    The Lawsuit..........................................................................................................13

    The Motion to Dismiss........................................................................................15

    The Dismissal Decision ......................................................................................16

    The Motion Pursuant to Rules 59(e) and 60 ......................................................19

SUMMARY OF ARGUMENT...............................................................................19

ARGUMENT
THE CHALLENGED STATEMENTS AND THE GIST OF THE
ARTICLE AND PODCAST ARE REASONABLY CAPABLE OF
COMMUNICATING A DEFAMATORY MEANING ......................................22

    A.   This Court Applies the Deferential Standard for the Facial Sufficiency
        of a Complaint on a Rule 12 Motion to Dismiss *de Novo*............................23

    B.   The Complaint Plausibly Alleges Its Claims of Defamation by
        Implication .................................................................................................24

    C.   The Contents of the Article and Podcast Make Each of Them
        Capable of Being Understood as Communicating the Defamatory
        Innuendos that Wang Drugged Kizer and Was Fired on that Ground.
        Accordingly, District Court Erred When It Dismissed the Complaint..........28

i.     Members of the Public who Read and Listened to the Publications Could Have Reasonably Understood Each As Intentionally Conveying Such Innuendo, Making the Publications Cognizably Defamatory Under the *Stepanov* Standard ..............................................28

ii.    Because the Podcast's Defamatory Innuendo Flows from a Mix of True and False Statements, the District Court Should Have Looked to the Elements of a Claim of Express Defamation— Which Elements Were Pled Plausibly ...................................................46

iii.   The Correct New York Standard for Wang's Claim Is that Stated by the New York Court of Appeals in November v. Time. Under that Standard, Which District Court Failed to Apply, It Is Beyond Dispute that Wang's Complaint Is Sufficient. If the Court Does Not Reinstate the Claims as Satisfying the Stepanov Standard, It Should Consider Certifying to the New York Court of Appeals the Question of Whether to Modify the *November* Standard. ...............48

CONCLUSION ...........................................................................................54

CERTIFICATE OF COMPLIANCE....................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armbruster Capital Mgt., Inc. v. Barrett*,
  2025 N.Y. App. Div. LEXIS 6608 (4th Dep't Nov. 21, 2025) ....................29, 36

*Armstrong v. Simon & Schuster*,
  197 A.D.2d 87 (1st Dep't 1994).................................................................51

*Armstrong v. Simon & Schuster, Inc.*,
  85 N.Y.3d 373 (1995).................................................................*passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................23

*Biro v. Conde Nast*,
  883 F. Supp. 2d 441 (S.D.N.Y. 2012) .......................................29, 38

*Celle v. Filipino Reporter Enters.*,
  209 F.3d 163 (2d Cir. 2000) .................................................................48

*Cianci v. New Times Pub. Co.*,
  639 F.2d 54 (2d Cir. 1980) .................................................................42

*Coliniatis v. Dimas*,
  965 F. Supp. 511 (S.D.N.Y. 1997) .......................................................40

*Davis v. Brown*,
  2024 WL 4555128 (Sup. Ct. N.Y. Co. Oct. 11, 2024) ................................35, 38

*Davis v. Brown*,
  211 A.D.3d 524 (1st Dep't 2022).......................................................35, 36, 41

*Davis v. Ross*,
  754 F.2d 80 (2d Cir. 1985) .................................................................27

*DiBella v. Hopkins*,
  403 F.3d 102 (2d Cir. 2005) .................................................................52

*Elias v. Rolling Stone LLC*,
    872 F.3d 97 (2d Cir. 2017) ................................................................42

*Goldfarb v. Channel One Russia*,
    663 F. Supp. 3d 280 (S.D.N.Y. 2023) ..............................................46

*Green v. Dep't of Educ. of the City of New York*,
    16 F.4th 1070 (2d Cir. 2021) ............................................................23

*Gross v. Rell*,
    585 F.3d 72 (2d Cir. 2009) ...............................................................24

*James v. Gannett Co.*,
    40 N.Y.2d 415 (1976) .......................................................................24

*Kesner v. Dow Jones & Co., Inc.*,
    515 F. Supp. 3d 149 (S.D.N.Y. 2021) .................................39, 45, 47

*Levin v. McFee*,
    119 F.3d 189 (2d Cir. 1997) ........................................................18, 24

*Michalski v. Home Depot, Inc.*,
    225 F.3d 113 (2d Cir. 2000) .............................................................51

*November v. Time, Inc.*,
    13 N.Y.2d 175 (1963) ................................................................*passim*

*Nunes v. Lizza*,
    12 F.4th 890 (8th Cir. 2021) .......................................................29, 38

*Partridge v. State*,
    173 A.D.3d 86 (3d Dep't 2019) ...................................................43, 44

*Qureshi v. St. Barnabas Hosp. Center*,
    430 F. Supp. 2d. 279 (S.D.N.Y. 2006) .........................................25, 47

*Satanic Temple, Inc. v. Newsweek Mag. LLC.*,
    661 F. Supp. 3d 159 (S.D.N.Y. 2023) ..............................................39

*Stepanov v. Dow Jones & Co.*,
    120 A.D.3d 28 (1st Dep't 2014) ................................................*passim*

iv

*Tah v. Global Witness Publishing, Inc.*,
    413 F. Supp. 3d 1 (D.D.C. 2019)..................................................................35

*Watson v. NY Doe 1*,
    439 F. Supp. 3d 152 (S.D.N.Y. 2020) ..............................................29, 38, 44

*White v. Fraternal Ord. of Police*,
    909 F.2d 512 (D.C. Cir. 1990).................................................................35, 43

**Statutes**

N.Y. Civ. R. § 76-a .......................................................................................52

**Other Authorities**

F. Harper, *et al.*, *The Law of Torts* § 5.4 (1986).........................................35

# JURISDICTIONAL STATEMENT

**Jurisdiction**.  The District Court had jurisdiction pursuant to 28 U.S.C. § 1332.  This Court has jurisdiction because the appeal is from a final order or judgment that disposes of all claims.  *See* 28 U.S.C. § 1291.

**Timeliness**.  The appeal is timely because the 30-day deadline to appeal the District Court's dismissal order did not begin to run until September 9, 2025, the date of the District Court's order denying Appellant's timely Rules 59 and 60 motions, and the Notice of Appeal was filed within 30 days thereafter, on October 8, 2025.  *See* Rule 4(a) of the Federal Rules of Appellate Procedure.

## ISSUE PRESENTED FOR REVIEW

Whether the District Court erred by dismissing Plaintiff-Appellant's claims of defamation on the ground that neither of the publications alleged to be defamatory were reasonably susceptible of being understood to have an intended defamatory meaning.

## STATEMENT OF THE CASE

### *Introduction and Local Rule 28.1 Statement*

Liang Wang appeals from: (1) an order and final judgment of the United States District Court for the Southern District of New York (Subramanian, J.) granting the Rule 12(b)(6) motion to dismiss of Appellees Sammy Sussman; Vox Media, LLC; and New York Media LLC (the "Decision"); and (2) a second order adhering to dismissal by denying Wang's Rules 59(e) and 60(a) motion.

Wang asserted two causes of action for defamation, one against all Defendants arising from an article in an online magazine, Vulture.com ("Vulture"), and one against Defendant Sussman arising from the content of a podcast. As alleged in the Complaint, both publications falsely implied that Wang, an 18-year veteran of the New York Philharmonic orchestra: (a) committed specific misconduct against another player in the orchestra; and (b) was fired based on that allegation.

After District Court granted Defendants' motion to dismiss, Wang filed a motion pursuant to Rules 59(e) and 60(a) to alter, amend, and/or correct the Decision, which the District Court denied.

2

### *The Defamatory Article*

Liang Wang was hired as the first oboe of the New York Philharmonic in 2006 and is widely recognized as one of the world's most accomplished classical musicians. A16 (Complaint dated May 23, 2024 "Compl." ¶8). The Philharmonic recently described Wang as a "premiere member of the orchestra" whose "musical contribution is critical to [the Philharmonic's] success." *Id.*

Wang's reputation suffered immediate, catastrophic harm as a result of Defendants' April 12, 2024 publication of the magazine article that is the subject of Wang's first cause of action. On that date, Defendants published, on New York Magazine's online "Vulture" platform, an article titled "A Hidden Sexual-Assault Scandal at the New York Philharmonic: two musicians were fired for sexual misconduct. Why are they back with the orchestra?" (the "article"). A14 (Compl. ¶1), A44-52 (Compl. Ex. A, article).[1] Sammy Sussman, a freelancer with relatively modest experience as a journalist, wrote the article. As the Complaint recounts, his "specialty as a reporter is to report sexual assault or harassment by persons of prominence—he never reports that such an accusation of sexual misconduct was unfounded." A37-38 (Compl. ¶70). Defendants New York Media, LLC ("New York") and Vox Media, LLC, ("Vox") (together, the

---

[1] Citations preceded by "A" are to the Joint Appendix filed with this appeal. Citations preceded by "CA" are to the Confidential Joint Appendix filed with this appeal.

"Corporate Defendants"), who own and control Vulture, contracted with Sussman to write the article, were responsible for editing it, and made the decision to publish it on their platform. A24-26, 31 (Compl. ¶¶32, 34-37, 51).

The article instantly and visually plants the false impression that Wang was fired by the Philharmonic in 2018 for complicity in a specific instance of sexual misconduct whose purported occurrence is the main subject of the article: an alleged assault in Vail, Colorado, in 2010, of Cara Kizer—then a probationary orchestra member. As the Complaint explains, the article conditions readers to reach the conclusion that Wang (and another musician) were *both* fired due to Kizer's allegations beginning "with a photo of the Philharmonic in performance, marked up with red-lines linking Wang to Matthew Muckey (the other musician) and also to Cara Kizer (the purported victim), that is placed immediately adjacent to the headline's reference to the 'Hidden Sexual-Assault Scandal at the New York Philharmonic' and to the sub-headline: 'two musicians were fired for sexual misconduct.'" A27 (Compl. ¶41). While the Philharmonic indisputably fired *Muckey* based on allegations from Kizer, contrary to the impression given by the article, the Philharmonic did not make any findings of misconduct *by Wang* having anything to do with Kizer, much less fire Wang on such basis. A21-22 (Compl. ¶24).

4

Kizer, who Sussman accurately described as his "main subject" A27 (Compl. ¶40), was once a probationary (non-tenured) member of the Philharmonic. The article is about her contention that, while in Vail, Colorado in 2010 to perform with the Philharmonic, she was sexually assaulted—an accusation Colorado law enforcement investigated but declined to pursue. *See, e.g.*, A47 (article) (the article states that it is "based on interviews with Kizer, her friends and colleagues, and law-enforcement officials … more than 200 pages of documents from the Vail Police Department and Colorado's Fifth Judicial District Attorney's Office").

While both Wang and Muckey were fired by the Philharmonic in 2018 after they were each accused of assault (and each later rehired after successfully challenging their terminations), the Philharmonic's accusations against and purported grounds for termination of Wang and Muckey involved different events, people, times and places of occurrence. For a number of reasons, the Philharmonic's basis for firing Wang was much more dubious than its reason for firing Muckey. *See* A23, 33-34 (Compl. ¶¶28, 59). *First*, Muckey's accuser (Kizer) went to the police immediately after the alleged incident with Muckey, seeking to have Muckey (but not Wang) arrested and prosecuted *and* also immediately contacted the Philharmonic regarding her accusation against Muckey. A48 (article). By contrast, Wang's "accuser," who was unaffiliated with the Philharmonic at the time of the alleged incident involving Wang, *never* made a

5

complaint to law enforcement (and, in contrast to Kizer, waited *twelve years* after the alleged incident to communicate anything to the Philharmonic about the purported occurrence). A21-22, 33-34 (Compl. ¶¶24, 59). *Second*, Kizer insisted that she would never have voluntarily engaged in sexual conduct with Muckey, whereas Wang's accuser *admitted* to having repeatedly *voluntarily* engaged in sexual conduct with Wang—*over the course of almost a decade*, including on the night immediately following the alleged assault. A33-34 (Compl. ¶59). *See also* CA107-108 (Arbitration Decision dated April 4, 2020 "Arb. Dec."). *Third*, Kizer sought an order of protection that would require Muckey to stay away from her after the alleged incident.[2] A48 (article) In contrast, Wang's accuser never sought an order of protection against Wang, and her behavior after her alleged assault could not have been more different than Kizer's: *one day* after that purported assault, she reached out to Wang and proposed to stay overnight with him at his home, where she engaged in sexual conduct with him—which she acknowledged in her subsequent arbitration testimony to have been voluntary. A21-22, 33-34 (Compl. ¶¶24, 59). *See also* CA 107-108 (Arb. Dec.) *Fourth,* while the article emphasizes Muckey's "refusal to testify" at his arbitration due to the potential for "self-incrimination" and emphasizes that his "refusal" was the subject of a request for the drawing of the "strongest possible adverse inference," Wang *did* testify in

---

[2] Kizer never sought an order of protection against Wang.

his defense.  Defendants, having emphasized the "refusal to testify" in the article to suggest Muckey's guilt—made the conscious editorial choice *not* to reveal to readers that *Wang testified*.  A23 (Compl. ¶28).  Thus, while Wang and Muckey were each fired for an alleged assault and each reinstated after prevailing at arbitration, the accusation faced by Wang, which was not the subject of the article, was substantially dissimilar to the Kizer story.  Accordingly, had the article reported accurately about the particular accusation Wang actually faced instead of falsely tying Wang to Kizer's allegations, the harm to Wang's reputation, if any, would have been comparatively minor.

The accusation that actually led to Wang's firing in 2018 (and for which he was subsequently vindicated) was *not* the subject of the article: aside from a glancing reference to the fact that Wang had faced a "sexual misconduct" allegation that was "unrelated" to Kizer's accusation, the article did not report *anything* about the actual underlying circumstances of Wang's 2018 termination or provide any details regarding the "unrelated" allegation against Wang. A50 (article).

Instead, the twin themes of the article as to Wang were that: (1) he was purportedly complicit in assaulting *Kizer* (by drugging her); and (2) the Philharmonic terminated Wang based on Kizer's allegations.  The article substantially relies on the author's present-day interview of Kizer as well as his

7

demonstrably biased decisions about what facts to report—and which to omit—from the two sets of documents the author said he reviewed: the confidential 2020 arbitration decision and internal documents Sussman obtained from the Vail Police Department regarding its 2010 investigation of Muckey. According to the article: (a) Kizer was in bed with Muckey when she awoke one morning in Vail; (b) she had "no memories" of getting into bed with Muckey the night before or regarding what happened between her and Muckey; (c) it became apparent to Kizer that she had had sexual intercourse with Muckey; (d) Kizer concluded that her inability to remember having sex with Muckey meant that she was "incapacitated" and unable to consent. The article also implies that Kizer was drugged and portrays Kizer as suggesting that the only possible explanation for her lack of memory was a glass of wine that she remembers being handed to her by Wang (in Muckey's presence) and which Kizer thinks was spiked with a drug intended to cause her incapacitation. A28 (Compl. ¶44). Finally, the article suggests that Kizer's hunch that she was drugged was supported by forensic drug testing—but the article ignores the detailed explanation in the arbitration decision about how Kizer's effort to obtain forensic corroboration was "wholly unavailing." A20 (Compl. ¶18).

In service of the article's goals to falsely tie Wang's firing *to Kizer's accusations* and to condition readers to think Wang committed misconduct against Kizer, the article groups Wang and Muckey together, linking them in negative

8

ways, even when not directly elaborating on what purportedly happened to Kizer. For example, it recounts unattributed gossip directed at Wang and Muckey in the same breath, quoting an anonymous source that in that person's opinion each would be "capable" of drugging another person. *See* A28-29 (Compl. ¶44-45) (detailing these facts and additional ways in which the article is structured to condition readers to assume Wang is guilty of and was fired for having drugged Kizer).

Reinforcing the article's intention to create this misimpression are its selective omissions. While the article touts the author's review of hundreds of pages of Vail Police Department records, the article *never* mentions several crucial facts those records reveal, including that Kizer, when talking about the glass of wine purportedly handed to her by Wang, told the police that she had consumed "very little of the wine"—a "couple of sips." A31 (Compl. ¶53). The article also omits that she told the police she did not see who poured the wine. A31-32 (Compl. ¶54). The article also makes no mention of the fact that prior to going to Muckey's condominium, Kizer was drinking alcohol and that according to the arbitrator, the evidence regarding how much Kizer had on the night in question (as well as at other times) was "'mixed' and 'more troubling' than what she self-report[ed]." A17-18 (Compl. ¶13). *See also* CA 91(Arb. Dec.). But the article does not reveal these facts, which if reported could have diminished the force of the

9

article's suggestion that Kizer's claimed incapacitation was a consequence of drinking from the glass she says Wang handed her. A28, 32-33 (Compl. ¶¶44, 56). These deliberate mischaracterizations and omissions were repeated 16 days later by Sussman on the podcast. A36-38 (Compl. ¶¶65-72).

In any event, the article's false suggestion that Liang Wang had been fired by the Philharmonic *because of and based on* the Kizer/Vail incident, an impression generated initially by the title and featured marked-up photo, is also reinforced by various aspects of the text, as the Complaint lays out in detail. *See, e.g.,* A28-29 (Compl. ¶45). That suggestion was entirely false, which Defendants knew, given that (as disclosed in the article) Defendants had a copy of the 2020 arbitration decision *before* publication—in which it is made clear that *Wang was not accused, by either the Philharmonic or Kizer, of any misconduct involving Kizer.* When the Defendants published an article suggesting otherwise, they knew that such suggestion was false. *See, e.g.*, A15-16, 35 (Compl. ¶¶4, 63).

But as the Complaint also recounts, "the article was understood by readers as reporting that Wang had credibly been accused of Kizer's drugging by Kizer." A29 (Compl. ¶46). For example, "a website ('the Violin Channel') characterized the article's theme as: 'outlining allegations of misconduct by … Liang Wang against former NY Philharmonic horn player, Cara Kizer, in 2010.'" A29 (Compl. ¶46).

10

Underscoring that the article was understood in exactly this way, just *one day* after its publication, the Philharmonic banished Wang, prohibiting him from performing or rehearsing with the Philharmonic, or even from entering its premises without advance permission.  A39 (Compl. ¶¶76, 77).  Although the Philharmonic *knew* that it had *never* accused Wang of any misconduct directed against Kizer, it also knew that the article had generated the contrary and widespread misimpression. Thus, in two emails sent to the Philharmonic community in the days immediately after the article came out, its CEO explained that Wang's banishment from the orchestra was *because of the article*, that is, the "strong feelings" against Muckey *and Wang* that the article had generated by its portrayal of Kizer's story. A39 (Compl. ¶76).  In short, the Philharmonic's *only* reason for suddenly making its star performer a pariah in April 2024 was that *the article* had painted a picture of Wang that made him suddenly radioactive—by misleadingly tying his 2018 termination to Kizer and suggesting that he had been accused of misconduct relating to her.

The article not only devastated Wang's career but also inflicted irreparable harm on Wang personally.  He is the married father of two young children and now has to raise them in an environment bitterly toxic to his personal reputation—a circumstance that would not have happened, but for the publication of the misleading article. A38-39 (Compl. ¶74).

11

***The Defamatory Podcast***

Sixteen days after publication of the article, Sussman made statements in a podcast[3] that again falsely but clearly suggested that Wang had drugged Kizer and was fired by the Philharmonic in 2018 on that basis. *See* A36-38 (Compl. ¶¶65-72); see also A79-118 (Exhibit 3 to the Declaration of Katherine Bolger ("Bolger Decl."), podcast transcript ("podcast")). In the podcast, Sussman doubled down on the defamatory innuendo of the article that Wang was guilty of misconduct against Kizer and was fired for it. First, after being asked to start with "Cara's allegations," Sussman identifies Muckey and Wang as the "two people I'm going to speak about," noting that they "deny all allegations against them" (at a point in the podcast when no other allegations had been mentioned). Sussman then proceeds "to go into the allegations." A82-83 (podcast at 6:10-7:46). For the next fifteen minutes, the only allegations he discusses are Kizer's Vail allegations. And as with the article, when Sussman ultimately mentions that there are other "unrelated" allegations against both musicians, he gives no details whatsoever and could reasonably be understood to be implying that the "unrelated allegations" against Wang are in addition to Kizer's allegations. A91-92 (*see* podcast at 22:17-23:33). Thus, like the article, the defamatory meaning of the podcast was the result

---

[3] The podcast is available at the following link: NY Philharmonic Assault Scandal with Sammy Sussman | Episode #44 | The Inline G Flute Podcast - YouTube (last accessed Jan. 20, 2026).

of Sussman's choices to emphasize certain facts but omit others inconsistent with his preconceived story, and to then structure and emphasize the artificially selected facts in a fashion to cause listeners to come away with the same misimpressions about Wang that readers got from the article.

But the podcast also built its defamatory theme on top of a blatantly false statement that did not appear in the article; Sussman stated in the podcast that Kizer told the police "that she saw Wang pour the wine." *See* A84 (podcast at 9:07); *see also,* A91 (podcast at 23:15). That statement was false. As revealed in the Vail Police reports, which Sussman claimed to have obtained and reviewed, Kizer told the Vail police that she "did not see Muckey or Wang pour the red wine in front of her." CA9 (Bolger Decl., Ex. 4, Vail Police Department Documents). The purpose and effect of Sussman's false statement in the podcast that Kizer "saw Wang pour the wine" (repeated later) was to reinforce, in the minds of listeners, the idea that Wang had drugged Kizer with that wine.

### *The Lawsuit*

On May 23, 2024, Wang filed a complaint with two causes of action for defamation. Count one, against all Defendants, is based on the article, and count two, against Defendant Sussman, arises from his podcast. *See generally* A14-43.

The Complaint explains how the article chooses selectively from and assembles facts for the purpose of creating the false impression that the

13

Philharmonic had treated Wang as committing sanctionable misconduct in connection with the purported sexual assault of Cara Kizer. The Complaint explains how the article selectively chooses and links its components—the title, featured and edited photograph, and various statements in the text, to create the false insinuation that Wang aided in the assault of Kizer and was fired for such. The Complaint also details how the article consistently omits facts inconsistent with that preconceived story line.

The Complaint also points to specific facts that make *the falsity* of the article's insinuations *at least* plausible. Thus, the Complaint points out that when, in 2018, Kizer was interviewed by former Judge Barbara Jones in connection with the Philharmonic's internal investigation, Kizer said that she "always thought Matt [Muckey] was the perpetrator and she wasn't trying to bring *anyone else* down." A34 (Compl. ¶61). The Complaint also points to the Philharmonic's own statement made after firing Muckey in 2018 that it was not accusing Wang of anything in relation to Kizer's purported assault. As the Philharmonic's lawyer expressly stated: "We don't say that [Wang] engaged in misconduct in Vail." A34 (Compl. ¶60). Likewise, when the Arbitrator rendered his Opinion, he too echoed the point that Wang's termination had been for reasons "wholly independent" of the claim Kizer and the Philharmonic had made against Muckey. A23, 33-34. (Compl. ¶¶28, 59).

14

Thus, and as the Complaint details, prior to the publication of the article, the Philharmonic had never punished Wang for misconduct *against Kizer* nor even accused him of such, but those insinuations are obviously intended by the article, which was widely understood in that way.

In the second of its two causes of action attacking the podcast, the Complaint notes that in the podcast Sussman gives the clear impression that the wine Kizer drank had purportedly been "poured by Wang." A36 (Compl. ¶66), as if this had been Kizer's recollection and allegation. But as noted in the Complaint (earlier in the narrative but then incorporated into the second cause of action), Kizer told the police she "did not see" who poured the wine. A31-32 (Compl. ¶54). The Complaint otherwise details how Sussman repeats the article's defamatory meaning in the podcast, provides "even more evidence that he was aware of the misleading nature of his own article" and further "drag[ged] Wang into an accusation he did not even face" through misrepresentations and omissions. A36-38 (Compl. ¶¶65-72).

### *The Motion to Dismiss*

Defendants moved to dismiss, contending that neither the article nor podcast had even "implied" that Wang had been "fired for conduct with Kizer." *See, e.g.*, Defendants' Memorandum of Law in Support of Motion to Dismiss (ECF25) at 13. Defendants also contended that Wang had failed to plausibly plead Defendants'

actual malice, that the defamatory statements were privileged as purportedly fair and accurate reports on an official government proceeding, and that the article was "substantially true".

### *The Dismissal Decision*

Analyzing the causes of action as asserting claims of defamation by implication, District Court granted the motion to dismiss as to both of Wang's claims (relating to the article and podcast). It looked to New York's lower courts for the standard for Wang's claims, taking it primarily from a 2014 decision of the Appellate Division for the First Department, which posits two requirements: that the challenged publication "can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." A221 (Opinion and Order dated January 13, 2025 "Decision", at 11) (quoting *Stepanov v. Dow Jones & Co.,* 120 A.D.3d 28, 37-38 (1st Dep't 2014).

The District Court concluded that the article "can't be reasonably read to imply" that Wang "drugged Kizer." A221. For that conclusion, the Decision gave decisive weight to the article's insertion of the word "alleged" in relation to Kizer's claim and its "inclusion of Wang's denial" that he had handed Kizer a glass of wine as enough to "refute[]" that implication in the minds of readers.[4] A222. In

---

[4] As discussed, infra, the court did *not* discuss many of the article's editorial choices flagged by the Complaint, which the Complaint alleges support that implication.

16

this vein, the District Court said that since "the article explicitly includes that Wang told the police Kizer poured her own glass of wine, there's not enough here to show that Sussman wanted his readers to think Wang drugged Kizer." A222

Turning to the article's second alleged defamatory implication—its *tying of Wang's firing* to a purported role in Kizer's assault—the court appeared to find that the first prong of defamation by implication *was* satisfied. That is, the court did *not* take issue with the conclusion that the article *was* readily capable of being understood as conveying that the Philharmonic fired Wang *based on* a purported role in Kizer's alleged assault. *See, e.g.*, A223. But the court reasoned that the article and podcast lacked any indicia that such a misimpression was *intended*. To reach that conclusion, the Decision starts by acknowledging that in "the article's discussion of *Wang's firing*" the article uses the phrase "[i]n addition to *Kizer's claims*"—a point on which the court said the article "could have been clearer"— but the court nevertheless concluded that this was "not an *intended* defamatory innuendo," and instead "at worst a sloppy sentence." A223. For that conclusion, the Decision places decisive weight on the article's statement that there were "'unrelated allegations' against Wang"—and then categorically rejects the idea that a defamatory implication could have been intended where, as *purportedly* occurred here, the challenged article also "relayed true statements that undercut the false suggestion." A223-224. The Decision never explains why or how the article's

17

glancing reference to "unrelated allegations" faced by Wang "in addition to *Kizer's claims*" would have completely "undercut" for readers the article's strong suggestion that Wang was a subject of "Kizer's claims." A223-224.

The court relied on a similar rationale to conclude that the podcast did not suggest a defamatory innuendo. In so doing, the District Court overlooked that the podcast's defamatory implications that Wang drugged Kizer and was fired for it, flowed in part from "false statements of verifiable fact." *See Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.3d 373, 381 (1995). Specifically, as Wang's counsel had pointed out at oral argument, Sussman stated falsely in the podcast that Kizer told the Vail police that she saw Wang pour the glass of wine that she claims caused her incapacitation, even though the Vail investigative files reveal that Kizer told police she did not see who poured the wine. A150-151 (Redacted Transcript of Oral Argument Nov. 20, 2024). Yet, instead of taking that false statement into account in its legal analysis and applying the express defamation standard (which the court acknowledged would apply where an implication arises in part from false facts, *see* A219 (citing *Levin v. McFee*, 119 F.3d 189, 195 (2d Cir. 1997) (quoting *Armstrong*, 85 N.Y.3d at 381), the court erroneously repeated that falsehood as if Sussman had been telling the truth and Wang had never challenged it:

> The same goes for the podcast interview, where Sussman specifically notes that "[Kizer] and Wang dispute who poured a glass of wine." Dkt. 26-3 at 8:56. Once again, when addressing Kizer's allegation that Wang poured the wine, Sussman frames it as her allegation—an

18

allegation Wang doesn't dispute Kizer made. *Id.* at 8:56-9:07….
A222

The District Court did not address Defendants' alternative arguments that Wang failed to plead actual malice or that the publications were substantially true or privileged.

### *The Motion Pursuant to Rules 59(e) and 60*

Wang moved to alter, amend and/or correct the Judgment. On September 9, 2025, the District Court denied that motion.

### SUMMARY OF ARGUMENT

As of April 11, 2024, Liang Wang was the first oboe of the New York Philharmonic and a tenured member of its orchestra. Four years earlier, Wang had successfully defended against a threat to his career: after being accused of misconduct and terminated due to an allegation by someone unaffiliated with the orchestra regarding an incident that allegedly occurred in 2006, an arbitrator concluded that the evidence to support that accusation was neither clear nor convincing—and resultingly Wang was reinstated. Wang then re-claimed his prominent position as the orchestra's first oboe. In his personal life, Wang got married and was devoted to his wife and two toddler-age children. The Philharmonic was publicly supportive of Wang, i.e., featuring his performances and describing him as a "premiere member of the orchestra" whose "musical contribution is critical to [the Philharmonic's] success." A16-17 (Compl. ¶8).

19

Consistent with the reputational rehabilitation he had achieved, beginning on May 8, 2024, Wang was slated to give a series of career defining performances at the Philharmonic—solos from a Mozart concerto considered the most important piece of music written for the oboe. A23 (Compl. ¶29).

All that came crashing down without warning when, on April 12, 2024, Defendants published the article. A44-52. *See also* A66-77 (Bolger Decl. Ex. 1). The article falsely portrayed Wang as a target of Kizer's accusations and suggested that Wang's success in the arbitration was for reasons *other than* the merit of Wang's defense to the accusation against him. The headline rhetorically asked, "why are they [Wang and Muckey] back [at the Philharmonic]." In suggesting an answer to its own question, the article implied that Wang was "back" because the arbitrator who vindicated Wang, a "magician," had failed to apply "common workplace evidentiary standards" in favor of a standard that unfairly favored Wang. Further inflaming the perception Wang had gotten away with terrible misconduct, the article's criticism of the arbitrator inaccurately portrays the issue as purportedly presented to the arbitrator—without distinguishing between Wang and Muckey—as concerning whether a sex act whose context is a purported "refusal to take 'no' for an answer" is consensual. But Wang's termination and the resulting arbitration concerned events *on a single evening in 2006* as to which there

20

was no testimony whatsoever about Wang being told "no," much less his "refusing" to respect that answer.

And as also detailed in the Complaint, the article made a series of deliberate editorial choices, beginning with the featured and edited photograph, circling and enlarging the faces of Wang, Kizer, and Muckey, and describing a single "sexual-assault scandal," whose effect was to affirmatively but falsely suggest that Wang was implicated in the purported assault of Kizer, just like Muckey.

The article was thus *widely* understood to suggest Wang had victimized Kizer, that the Philharmonic had tried to fire Wang in 2018 on that ground, and that Wang (and Muckey) remained in the orchestra despite Kizer's accusations. The Complaint explains that as a result of the misperceptions *caused by the article*, Wang faced a firestorm of instant hostility. Most importantly, because of the negative public perception of Wang created by the article, the Philharmonic banished him *one day* after its publication, explaining to the public that its reason for doing so was the negative perception the article had created about Wang—by portraying him as a culprit in a crime purportedly committed against Kizer.

Contrary to the lower court's decision, it is *at least plausible* to understand the article and podcast as conveying the intended but false implications that: (1) in 2018 the New York Philharmonic accused Wang of and fired him for the alleged 2010 drugging of Cara Kizer; and (2) Wang had committed that misconduct.

21

Because both publications are readily capable of being understood to intentionally communicate those defamatory implications, the Complaint is facially sufficient and must therefore be reinstated. And while Wang's claim based on statements made in the podcast plausibly pleads the elements of a claim of defamation by implication, because the podcast includes a false statement that materially contributes to the podcast's defamatory innuendo, the facial sufficiency of the second cause of action should be assessed against the standard for express defamation, which it easily satisfies.

## ARGUMENT

### THE CHALLENGED STATEMENTS AND THE GIST OF THE ARTICLE AND PODCAST ARE REASONABLY CAPABLE OF COMMUNICATING A DEFAMATORY MEANING

As outlined above and detailed below, the publications were widely understood to convey the false and defamatory suggestions about Wang alleged in the Complaint, i.e., that the Philharmonic, when terminating Wang in 2018, did so based on a finding by the Philharmonic against Wang pertaining to the alleged sexual assault of Kizer, and further suggesting to readers that Wang was complicit in misconduct against Kizer. District Court, in concluding that neither publication was reasonably susceptible of being understood to communicate that Wang was complicit in misconduct against Kizer and that any implication Wang was terminated on that basis was neither endorsed nor even intended, gave short shrift

to features of the publications that more than plausibly permitted them to be understood as communicating that intended defamatory meaning. And with respect to the podcast, it misrepresented the facts and applied the wrong legal standard.

## A. This Court Applies the Deferential Standard for the Facial Sufficiency of a Complaint on a Rule 12 Motion to Dismiss *de Novo*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 557) (internal citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Appellate review of the grant of a Rule 12 motion to dismiss is *de novo*. *See Green v. Dep't of Educ. of the City of New York*, 16 F.4th 1070, 1076 (2d Cir. 2021) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations

23

in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.") (quotation omitted).

Because jurisdiction is based on diversity, state law—here, New York's defamation law—controls. *See Gross v. Rell*, 585 F.3d 72, 80 (2d Cir. 2009).

## B. The Complaint Plausibly Alleges Its Claims of Defamation by Implication

Under New York law, when it is disputed whether a publication communicates a defamatory meaning, the narrow question for the court is limited to whether the publication is merely "reasonably susceptible" to such an understanding. A216 (Decision at 6) (citing *Levin* 119 F.3d at 195). Thus, so long as the defamatory publication "is reasonably susceptible to the defamatory meaning imputed to it" the court must allow the lawsuit to proceed. *Id.* (*quoting Levin*, 119 F.3d at 195); *see also James v. Gannett Co.*, 40 N.Y.2d 415, 419 (1976) (so long as publication is merely "reasonably susceptible" to a defamatory meaning, it is "the jury's function" to determine how "the words were likely to be understood by the ordinary and average reader") (quotation omitted). A court, in making its assessment of whether or not a publication is "reasonably susceptible" to a defamatory meaning, is prohibited from affording a publication an artificial construction, and thus must not "strain to interpret [] writings in their mildest and most inoffensive sense to hold them nonlibelous." *November v. Time, Inc.*, 13 N.Y.2d 175, 178 (1963) (internal citation omitted). This principle applies

24

regardless of whether a complaint alleges express defamation or defamation by implication. *See id.* (applying these principles in a case of defamation by implication). *See also Qureshi v. St. Barnabas Hosp. Center*, 430 F. Supp. 2d. 279, 287 (S.D.N.Y. 2006) (courts should neither "render statements actionable by giving them a strained or artificial construction nor are they to interpret potentially defamatory statements in their mildest and most inoffensive sense to hold them nonlibelous.") (internal quotation omitted).

The District Court, in dismissing Wang's Complaint, nevertheless strained to interpret the article and podcast as not objectively susceptible to the defamatory meaning the Complaint attributes to the publications, in the process being dismissive of how the article was actually understood by readers and ignoring the features of those publications that reasonably permitted that understanding.

The Complaint pleads both the truth of the matter and the way in which the article distorted that truth to leave readers with the false impression that immediately transformed and devastated Wang's life. *First*, in pleading that truth, the Complaint avers that: (a) Wang did *not* facilitate an assault by Muckey against Kizer; (b) neither the Philharmonic nor Kizer ever made such an accusation against Wang; and (c) Wang defeated the Philharmonic's effort to fire him (for unrelated alleged misconduct) because an esteemed arbitrator selected by the Philharmonic saw that the evidence presented by the Philharmonic did not show clearly or

25

convincingly that Wang had committed a crime or any other conduct warranting termination. A15-16, 22-23, 29-30, 33-34 (Compl. ¶¶3, 4, 25-28, 47, 59-61). *Second*, the Complaint then avers that the article conveyed an impression in the mind of readers that the truth was otherwise: as pled, the article goes to great effort to intentionally imply that Wang drugged Kizer *and* was fired based on such a finding, and also to suggest that Wang's vindication at arbitration was not a reflection of the absence of clear proof that Wang had committed misconduct warranting termination but instead because a "magician" arbitrator—who did not understand that "no always means no"—failed to apply the "common" workplace evidentiary standard to his evaluation of the Philharmonic's case against Wang (and Muckey). *See, e.g.*, A27-30 (Compl. ¶¶39-47).

The defamatory meaning Wang attributes to the article is hardly a strained or fanciful understanding of what it conveys—not only does that meaning flow naturally from the article's editorial choices, but it is also how the article was widely understood by its readers—to such an extent that *by itself* the article suddenly made Wang a pariah and caused him to be instantly banished from the Philharmonic and his profession. A16, 29 (Compl. ¶¶5, 46).

District Court nevertheless dismissed Wang's lawsuit, straining to give both the article and the podcast an innocuous interpretation (as to Wang), thus violating the legal standard under which a publication's meaning is up to a jury when, as

26

here, the defamatory publication not only permits a defamatory connotation, but has been well understood to communicate that defamatory meaning. In doing so, District Court placed disproportionate weight on each publication's glancing reference to Wang's denial (of drugging Kizer). By contrast, it gave insufficient weight to the fact that the clear overarching theme of both the article and the podcast as to Wang is to tie his conduct and termination by the Philharmonic to Kizer's purported drugging. Indeed, the publications convey this theme in a variety of ways, such as: (a) pointing to Wang *and nobody else* as the person who could have been responsible for Kizer's self-described symptoms she attributed to being drugged; (b) tying Wang to Kizer's alleged assaulter (Muckey) in a variety of ways even outside of the direct story of what allegedly happened in Vail; and (c) suggesting the Philharmonic itself reached the conclusion that Wang drugged Kizer with such confidence as to fire him on that basis—a suggestion that is made not only with words but also imagery. In short, in order to conclude that neither the article nor the podcast conveyed an intended defamatory meaning, the District Court engaged in a technical reading of isolated sentences and phrases used in the article and the podcast, (*see, e.g.* A223 (parsing two or three sentences to evaluate whether a reader would have understood the article to falsely imply that Wang was fired over Kizer's allegations), rather than considering each publication as a whole. *Davis v. Ross*, 754 F.2d 80, 84 (2d Cir. 1985) ("it is only by erroneously focusing

on certain isolated statements and phrases in the letter, rather than construing it as a whole, as required by New York case law, that the District Court was able to conclude that the letter is susceptible of only a non-defamatory interpretation").

District Court was required but failed to ground its decision on whether the publications were *even merely susceptible* to the impression, actually taken by readers and listeners, that Sussman *intended* to suggest Wang drugged Kizer and to tie his firing to such an accusation from the Philharmonic.

Thus, and as elaborated below, the Complaint easily states a plausible claim of defamation by implication.

C. **The Contents of the Article and Podcast Make Each of Them Capable of Being Understood as Communicating the Defamatory Innuendos that Wang Drugged Kizer and Was Fired on that Ground. Accordingly, District Court Erred When It Dismissed the Complaint**

i. *Members of the Public who Read and Listened to the Publications Could Have Reasonably Understood Each as Intentionally Conveying Such Innuendo, Making the Publications Cognizably Defamatory Under the Stepanov Standard*

The District Court took its understanding of the elements of a claim of defamation by implication from New York's intermediate courts, as first articulated in *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28 (1st Dep't 2014). That Decision holds that a publication is cognizably defamatory by implication when "as a whole [it] can be reasonably read both to impart a defamatory inference," and

28

where it can rationally be inferred that the "author intended or endorsed that inference." *Stepanov*, 120 A.D.3d at 37-38. This "objective" standard "asks whether the plain language of the communication itself suggests that an inference was intended or endorsed." *Stepanov*, 120 A.D.3d at 37; *accord Armbruster Capital Mgt., Inc. v. Barrett*, 2025 N.Y. App. Div. LEXIS 6608, at *7 (4th Dep't Nov. 21, 2025).[5] When making this assessment, the entire publication is considered to see if it can "reasonably be read to suggest that [the speaker] intended to endorse the alleged defamatory statement." *Watson v. NY Doe 1*, 439 F. Supp. 3d 152, 162 (S.D.N.Y. 2020); *see also Biro v. Conde Nast*, 883 F. Supp. 2d 441, 467 (S.D.N.Y. 2012) ("an article that linked the key statements together, with the obvious (albeit unstated) insinuation that the public figure committed the crimes, would potentially be actionable."); *Nunes v. Lizza*, 12 F.4th 890, 899 (8th Cir. 2021) ("The manner in which the article presents the discussion of the farm's use of undocumented labor permits a plausible inference that [defendants] intended or endorsed the implication.").

---

[5] The New York Court of Appeals, which *has* articulated a standard for the elements of a claim of defamation by implication, has never adopted "intend or endorse" as one of its elements. The three other departments of the Appellate Division, following *Stepanov*, have likewise adopted "intended or endorse" as an element, which would ordinarily be a strong basis for predicting that the New York Court of Appeals will in the future itself incorporate "intend or endorse" as an additional element of a claim of defamation by implication. However, and as explained below, given recent legislative amendments in New York subsequent to the development of this law by New York's intermediate level courts, it is less than clear that the New York Court of Appeals would adopt this additional element today, potentially warranting certification of this issue, but only if the Court deems this question essential to the determination of the appeal.

The conclusion that the article can reasonably be understood to convey defamatory innuendo is overwhelming and flows naturally from the structure and content of the article. It opens with the headline: "A Hidden Sexual-Assault Scandal at the New York Philharmonic: Two musicians were fired for sexual misconduct. Why are they back with the orchestra?" accompanied by a photo of the orchestra with the photos of Muckey, Wang, and Kizer circled and enlarged. A45. Thus, the obvious (and intended) implication of the headline and photo is that there is a *single* "sexual-assault scandal" involving those three named individuals (in which Kizer is the victim). The article itself reinforces this implication. For example, it details Kizer's allegations regarding the night of July 24, 2010 in Vail, Colorado, which appear from the article to include allegations against Wang, while otherwise tying Wang and Muckey together by emphasizing anonymous characterizations of their friendship and quoting people about their purported reputations. It emphasizes Kizer's complaints of misconduct made to the police and to the Philharmonic, Muckey and Wang's 2018 terminations, and the subsequent arbitration—with only a passing reference to the fact that Wang faced separate allegations (not described and mentioned only in passing for the first time in the forty-eighth paragraph) and never stating that Wang did not face the Kizer allegations that are the subject of the article. Wang's name appears in fifteen of the sixty-seven paragraphs in the article. The clear but false implication

30

of the article is that Wang was involved with Muckey in the alleged incident regarding Kizer and fired on that basis.

As the Complaint also alleges, the article *was in fact understood* to suggest that Wang was involved in misconduct committed against Kizer and fired on that ground. *See, e.g.*, A29 (Compl. ¶46) (alleging that third-party website "characterized the article's theme as: 'outlining allegations of misconduct by … Liang Wang against former NY Philharmonic horn player, Cara Kizer, in 2010,'" and that readers left comments on the article lumping Wang and Muckey together as "'rapists who drug their coworkers,' 'widely-known predators,' and 'DateRapeDrugBros.'"). Significantly, the Philharmonic itself made clear its own awareness that in the Philharmonic community the article was widely understood to convey this defamatory implication, as the Philharmonic revealed in a public communication when it explained its decision to *banish Wang* had been related to the fact that the article had "prompted a lot of strong feelings." A39 (Compl. ¶76).

Many aspects of the article render entirely reasonable the widespread understanding taken by the Philharmonic and other readers identified in the Complaint, under which Wang's termination, alleged misconduct and success at arbitration are all linked to and perceived as about the Kizer incident. For example, the article gives no concrete explanation for why Kizer would have no memory of having sex with Muckey except for the fact that she was drugged and

31

relatedly makes the glass of wine purportedly delivered by Wang the only source of what might have caused Kizer's purported involuntary drugging. Thus, by stating that Kizer alleged that Wang brought her a glass of wine but remembers nothing thereafter, the article implied to readers that Kizer had at some point accused Wang as one of the persons guilty of her assault, when in fact she never did and over the succeeding years (including through the internal investigation and subsequent arbitration) consistently limited her accusation to Muckey. Similarly, the article also lumps Wang together with Muckey in relation to Kizer in respect of the police investigation and as to how their continued employment at the Philharmonic purportedly survived an accusation from Kizer: "[w]ith no new action from the police or DA's office [regarding Kizer's allegations], the Philharmonic seemed to treat the issue as resolved. Muckey and Wang remained in the orchestra." A50. The clear implications, which are at least reasonable, is that, since there was no new action from the police or District Attorney stemming from Kizer's allegations *regarding* Wang (as well as Muckey), the police and District Attorney were investigating Wang and that Kizer had also made allegations against Wang to the Philharmonic.

Further supporting that the suggestion Wang drugged Kizer was an intentional implication of the article was the decision to include in the article a quote from another member of the Philharmonic who purportedly answered "yes"

32

when asked whether Wang was capable of drugging someone. As readers would easily understand, there was no reason to include this anonymous quote *about Wang* if Sussman did not intend to suggest that Wang was involved in the only purported drugging mentioned in the article—of Kizer. Indeed, the District Court acknowledged the article's inclusion of this disparaging quotation to be "relevant" to the article's potential defamatory meaning. A222.

The conclusion that the podcast could be understood to intentionally convey negative innuendo about Wang is at least as strong as that conclusion about the article. For example, in the podcast Sussman linked Wang's fate to Kizer and the Vail investigation by introducing Wang (and Muckey) as "the two people I'm going to be talking about" right after the interviewer asks him to dive into "Cara's allegations." He immediately notes that the two have "denied all allegations" and then proceeds to discuss Kizer's, and only Kizer's, allegations for the next 15 minutes. Sussman again made plausible the understanding that Wang was terminated due to Kizer's allegations when he suggested during the podcast that Wang faced "multiple allegations, separate allegations," and that "besides being present for [Kizer's allegation], there are at least two allegations against him." A91-92 (podcast at 22:59; 23:15). At no point did Sussman state that Wang faced *only* allegations unrelated to Kizer, leaving in place the distinct impression Wang had been investigated and terminated by the Philharmonic, at least in part, because

33

of Kizer's allegations.  As in the article, Sussman repeats gratuitous gossip about Wang and Muckey in the same breath, in the context of discussing Kizer's allegations.  *See* A85 (podcast at 11:57).

Finally, Sussman also made an overtly false statement in the podcast, with practical and legal implications.  He stated twice that Kizer told the police that she saw Wang pour her the same wine she claims caused her to be "incapacitated," A84 (podcast at 9:07); A91 (podcast at 23:15); A95 (podcast at 28:07), which is yet another reason that readers could plausibly have understood the podcast as conveying the defamatory meanings Wang alleges.  This was inaccurate because the police records Sussman reviewed revealed that Kizer told the police she did not see who poured the wine.  But it also changes the applicable legal standard; where a defamatory implication flows from a mix of true and false statements, the claim is to be analyzed under the standards for express defamation.  *See Armstrong*, 85 N.Y.3d at 380-81.

In dismissing Wang's claims, District Court made numerous errors. *First,* District Court declined to give weight to the actual "reader reactions" to the article, rejecting that such reactions are legally "probative to this inquiry" of intended defamatory innuendo.  A241 (Reconsideration Order dated 9-9-25).  That was incorrect, as in New York and elsewhere, courts undertaking this inquiry consider and give substantial weight to how actual readers in fact understood the

34

publication. *See, e.g., Davis v. Brown*, 211 A.D.3d 524, 525 (1st Dep't 2022) (reversing grant of motion to dismiss and reinstating claim for defamation by implication based on the reasonable defamatory meaning of a letter based on "*other sources that interpret the [challenged] letter* as placing the blame on plaintiff and deeming her leadership inexcusable and irresponsible")(emphasis added); *Davis v. Brown*, 2024 WL 4555128, at *3 (Sup. Ct. N.Y. Co. Oct. 11, 2024) ("if a reasonable factfinder … read the letter to imply [the defamatory allegation]…, a jury may further reasonably conclude that defendants intended the average reader to make that inference or otherwise endorsed that inference"); *Tah v. Global Witness Publishing, Inc.*, 413 F. Supp. 3d 1, 10 (D.D.C. 2019) ("The most compelling evidence that the Report could reasonably be read to suggest bribery is that the Liberian government *actually* understood the Report that way."); (emphasis in original); *White v. Fraternal Ord. of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990) ("When one uses language, one is held to the construction placed on it by those who hear or read, if that construction is a reasonable one.") (quoting F. Harper, *et al.*, *The Law of Torts* § 5.4 (1986)). Here, the construction placed on the article by those who read it was that it portrayed Wang as complicit in the purported drugging of Kizer (and as having been fired on that ground). Unless that

35

widespread understanding of the article was also unreasonable—which it was not—Defendants are held to that construction.[6]

Reinforcing the flawed basis of the District Court's refusal to accord any weight to "reader reactions," it characterized the reader reactions here as "generalized web comments." A241. But the reader reactions cited in the Complaint are not limited to "generalized web comments" and instead encompass an article written by another publication (the Violin Channel) and the reaction of the New York Philharmonic itself, as a reader of the article and holder of a front row seat to how the article was actually understood. *See* A29 (Compl. ¶46); A39 (Compl. ¶76). The Philharmonic is surely capable of a reasonable understanding

---

[6] That a defamatory implication was conveyed and intended is also evident from facts which were omitted from the article. For example, as alleged in the Complaint, the investigation revealed that Kizer might have drunk more alcohol than she disclosed *prior* to going to Wang and Muckey's condominium. *See* A17-18, 32-33 (Compl. ¶¶13, 56). However, the article says *nothing* about Kizer drinking any alcohol on the night in question other than the glass of wine which the article alleges Wang gave her. Similarly, while Kizer told the police that she "did not see" who poured the glass of wine she drank at the apartment, *see* A31-32 (Compl. ¶54), the article omits this, making Wang the only identified source of the wine Kizer believes was spiked. Likewise, the article omits that Kizer said she drank only one or two sips from the glass of wine that she alleged that Wang gave her. A31 (Compl. ¶53). Together, these omissions leave intact the article's distinct impression, under which readers would and did understand the article to suggest that the only possible reason for Kizer's lack of memory was that Wang drugged her. *See, e.g., Davis*, 211 A.D.3d at 525-26 (defamation by implication claim stated where publication omitted material facts, thus implying that plaintiff bore responsibility); *Armbruster Capital Mgt.*, 2025 N.Y. App. Div. LEXIS 6608 at *7-8 (defamation by implication claim stated where "statements that were made do not tell the whole story and convey a false impression").

All of these omissions also permit the conclusion that the article had a pre-conceived story line which led to its recklessness about reporting facts inconsistent with that story line—likely one of the many reasons that District Court did not dismiss the Complaint for a purported failure to plead actual malice.

36

of what the article conveyed and how it was understood *vis a vis* Wang—and indeed it *banished Wang based on an article about Kizer* because as the Philharmonic itself knew and said, the article had aroused powerfully negative feelings against Wang. A39 (Compl. ¶76). The District Court and Defendants consistently ignored the Philharmonic's reasonable reading of the article as conveying negative innuendo about Wang, when proclaiming the dubious conclusion that *no* reasonable reader could understand the article in that way. In any event, we know of no decision, other than the court below, where the complaint demonstrates that specific readers of the article read it to impart a defamatory implication, but the complaint was nevertheless dismissed for failure to state a claim of defamation by implication.

*Second*, the District Court erred when it rejected as a reasonable implication of the article that it intended to communicate Wang was fired as a result of Kizer's allegations on the theory that the article contained only a single "sloppy sentence, not an intended defamatory innuendo." *See* A223. But contrary to this framing, the defamatory innuendo of the article does not spring from a single ("sloppy") sentence, but rather, from editorial choices made throughout the article, starting with its visual cues and repeated tying of Wang together with Muckey, such as its rhetorically questioning why Wang and Muckey remained in the Philharmonic despite Kizer's allegations and making Wang a main subject of the article whose

37

featured interviewee and entire subject was Kizer. Indeed, and as the lower court recognized elsewhere in its decision, the entire article was focused on Kizer's 2010 accusations against Muckey. *See* A211. And from the beginning to the end, the article is focused on skeptically questioning why not only Muckey, but also Wang remained at the Philharmonic despite Kizer's allegations (even though those allegations were never in fact made against Wang).

*Third*, the District Court also placed excessive reliance on the article's passing reference to the "unrelated allegations" which Wang faced. The single reference to the "unrelated allegations" made against Wang is not enough to undo the obvious defamatory implication of the article and podcast. *See, e.g., Davis v. Brown*, 2024 WL 4555128, at *3 (Sup. Ct. N.Y. Co. Oct. 11, 2024) ("if a reasonable factfinder … read the letter to imply [the defamatory allegation] …, a jury may further reasonably conclude that defendants intended the average reader to make that inference or otherwise endorsed that inference"); *Watson*, 439 F. Supp. 3d at 162 ("In the context of the communication as a whole, [publication] can reasonably be read to suggest that [speaker] intended to endorse the alleged defamatory statement"); *see also Biro v. Conde Nast*, 883 F. Supp. 2d 441, 467 (S.D.N.Y. 2012) ("an article that linked the key statements together, with the obvious (albeit unstated) insinuation that the public figure committed the crimes, would potentially be actionable."); *Nunes v. Lizza*, 12 F.4th 890, 899 (8th Cir.

38

2021) ("The manner in which the article presents the discussion of the farm's use of undocumented labor permits a plausible inference that [defendants] intended or endorsed the implication.").

*Fourth*, the District Court appeared to suggest that so long as a reporter includes a denial, as here, the denial immunizes the publication in question against a claim of defamation by implication. *See* A223 (citing *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149 (S.D.N.Y. 2021) and *Satanic Temple, Inc. v. Newsweek Mag. LLC.*, 661 F. Supp. 3d 159 (S.D.N.Y. 2023)). But in both of those decisions, courts relied on more than just the inclusion of a denial to conclude that no defamatory implication had been intended or endorsed. Specifically, in *Kesner*, the defamation by implication claim was rejected where the article not only included a denial, but also where the article "nowhere adopted" one party's "thesis." *See* 515 F. Supp. 3d at 173. Similarly, in *Satanic Temple*, the court stressed that a publisher can be liable for simply reporting another's allegations, but that liability does not attach "if the article attributes the statement to a source; makes clear that it is a mere allegation; and prints a denial of the allegation, to the extent one has been made." 661 F. Supp. 3d at 175. Here, the article and podcast referred to a single "sexual-assault scandal" which in context was entirely about Kizer's allegation, was devoted to emphasizing a sympathetic portrayal of Kizer as contrasted with its efforts to portray Wang (and the arbitrator who sided with him)

39

negatively throughout such as by reporting anonymous offensive statements about him, and concludes that the Philharmonic's incoming music director "will have a lot of work to do to repair the Philharmonic's culture. But even his best efforts likely won't change the reality that Muckey and Wang remain active in the ensemble." A52 (Compl. Ex. A article). Additionally, while Defendants included Wang's denial regarding handing Kizer the glass of wine, Defendants did not include the equally if not more important denial Wang had also expressed, pre-publication, that he was not investigated for or terminated as a result of Kizer's allegations. *See* A25 (Compl. ¶33) (reciting the statement by Wang to Defendants before publication, which was excluded from the article, that Sussman's pre-publication questions to Wang "assume, incorrectly, that Mr. Wang was accused of misconduct by Cara Kizer (or the New York Philharmonic[)] in relation to Kizer."

Moreover, the lack of weight accorded to denials in the context of assessing actual malice is instructive of the weight that denials should be afforded when assessing defamatory meaning. When a plaintiff alleges that a journalist acted with actual malice based on his awareness of vigorous denials by the accused of the alleged misconduct, the denial is accorded all but no weight since someone accused of misconduct is almost always expected to deny committing that misconduct. *See, e.g., Coliniatis v. Dimas*, 965 F. Supp. 511, 519 (S.D.N.Y. 1997) ("Emphatic denials are part of the landscape of journalism, and a decision to print a

40

story in the face of such a denial, particularly where, as here, it comes from an interested protagonist, does not establish clear and convincing evidence of malice."). Given the skepticism with which courts allow journalists to view denials, it makes little sense to assume that a long article which otherwise communicates defamatory innuendo will be transformed *in the minds of readers* by the inclusion of a perfunctory denial. In short, the idea that denials are dispositive in the context of defamatory meaning is hard to square with the idea that they are close to irrelevant when assessing evidence of actual malice.

Fifth, the District Court also ignored that the decisions it relied upon to dismiss the Complaint, like *Stepanov,* were entirely distinguishable. In *Stepanov*, for example, the challenged article barely mentioned Stepanov or his company. *Stepanov*, 120 A.D.3d at 31 (noting that plaintiff was referenced (directly or indirectly) in only 3 of 40 paragraphs). By contrast, here both the article and the podcast cast Wang as central to Kizer's allegations and the "sexual assault scandal" at the New York Philharmonic, and mention him by name or otherwise (e.g., "the two men") over and over again, as detailed above.

The court also failed to recognize that New York courts have not hesitated to allow defamation claims to proceed even without making any express finding that the defamatory implication was intended or endorsed by the author. *See, e.g., Davis*, 211 A.D.3d at 525-26 (reversing dismissal of defamation claim where

41

article "implied that plaintiff was responsible for the show, was aware of the accessories, could approve them, and failed to respond to student concerns" with no discussion as to whether implication was intended or endorsed); *Elias v. Rolling Stone LLC*, 872 F.3d 97, 110 (2d Cir. 2017) (allowing small group defamation claim to proceed where "Article plausibly implied that all fraternity brothers knew about the alleged rapes," with no discussion as to whether such implication was intended or endorsed); *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60 (2d Cir. 1980) (holding claim legally sufficient where there was "clear [defamatory] implication" with no discussion as to whether that implication was intended or endorsed by author).

Sixth, focusing on the claim that the article and podcast suggested that the Philharmonic had *fired* Wang based on Kizer's accusation, the District Court Decision does *not* appear to reject that the article and podcast can reasonably be understood to impart that misimpression, but rather dismissed the claim based on the notion that the author did not *intend* to create that such a misimpression. A223-24. As discussed above, the District Court gave unwarranted reliance on the article's perfunctory printing of Wang's denial to reach this conclusion. Indeed, the relevant inquiry is not whether Defendants subjectively intended to convey that defamatory inference; it is whether the publications would reasonably be understood by readers to convey and endorse that meaning. As the D.C. Circuit has

42

explained, "[i]t is no defense that the defendant did not actually intend to convey the defamatory meaning, so long as the defamatory interpretation is a reasonable one," because "[t]he meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." *White*, 909 F.2d at 520 (quoting Restatement (Second) of Torts).

In any event, we are aware of no decision where a court applying New York law, other than the District Court here, found that a publication contained a defamatory inference (that the Philharmonic fired Wang based on Kizer's allegation) but then dismissed the claim at the motion to dismiss stage on the grounds that the defamatory inference was not intended or endorsed.

Nor do any of the cases cited in the lower court decision support dismissal. For example, *Partridge v. State*, 173 A.D.3d 86 (3d Dep't 2019), a case in which the claim of defamation by implication survived, says nothing to undermine the sufficiency of Wang's Complaint and the cognizably defamatory meaning of the publications at issue in this case. In *Partridge*, the plaintiff's photograph was shown together with photographs of individuals who had been convicted of or charged with sexually exploiting children (during a presentation regarding online sexual exploitation of children)—even though the plaintiff had never been convicted or charged with any such crime. In holding that the plaintiff *had* established that the defendants intended to imply that plaintiff had been charged or

43

convicted of sexually exploiting a child, the court held that "the very placement of claimant's photo in the array strongly suggested to the public that defendant intended and endorsed the message," and that the inclusion of a "small, unreadable label listing the crime for which claimant was actually arrested" (unlawful possession of marijuana and criminal possession of a controlled substance in the seventh degree) do not obviate this intent. *See id.* at 92, 95. Similarly, here, the article opens with a photograph and caption visually linking Wang, Muckey, and Kizer by name, and the headline references a *single* "sexual-assault scandal." Indeed, *Partridge* supports the conclusion that the edits to the photograph and the decision to reference a single sex-assault scandal in the headline of Sussman's article strongly suggest that Defendants intended to communicate the suggestion that Wang was involved in a single sex-assault scandal involving him, Muckey, and Kizer.

Another case cited by the District Court, *Watson*, 439 F. Supp. 3d 152, also does not support its decision dismissing Wang's claim. In *Watson*, the court held that where the defendant affirmatively responded to speculation on Facebook as to whether the plaintiff had been terminated for sexual harassment with a comment that implied that defendant had been reported for such conduct, the intend/endorse element had been met. *Watson*, 439 F. Supp. 3d at 162. Here, the entire premise of the article was that there was a "hidden sexual-assault scandal" at the

44

Philharmonic involving Muckey, Wang, and Kizer, that Wang and Muckey were terminated following an investigation into Kizer's allegations, and that Wang's involvement in that scandal was that he allegedly gave Kizer a glass of wine that she claimed must have been drugged. Thus, the inclusion of these details in the article allows a finding that the implication that Wang was involved in the purported sex-assault scandal involving Kizer was intended or endorsed.

The District Court also pointed to *Kesner*, 515 F. Supp. 3d 149, a case where a district court rejected defamation by implication claims. *See* A223. However, *Kesner* makes no new law and to the extent the court relied on it (pointing to only one of multiple publications discussed—a "sparse tweet") its facts are not analogous. *Id*. (citing *Kesner*, 515 F. Supp. 3d at 187). The *Kesner* court rejected a defamation by implication claim because the "sparse tweet" did not suggest an endorsement of the defamatory thesis and, to the contrary, "instead linked these events on the different ground that the Buhl's dual misfortunes had prompted her to solicit donations." 515 F. Supp. 3d at 188. Here, in contrast, the defamatory implications that (1) Wang drugged Kizer and (2) Wang was terminated due to Kizer's allegations are contained multiple times in a lengthy article devoted to providing Kizer's version of what she believed occurred in Vail, the Philharmonic's prior unsuccessful efforts to terminate those involved in Kizer's allegations, and portraying Wang as the only source of the alleged drugs,

45

notwithstanding its inclusion of his denial.  Additionally, the references to Wang were not isolated.  Rather, Wang was portrayed as a central character in the story about Kizer's allegations.  Put simply and as reasonable readers would understand, if Defendants had not intended to imply that Wang was involved with misconduct against Kizer or a subject of her allegations, he would not have been a featured subject of an article that is all about Kizer.

> ### ii. Because the Podcast's Defamatory Innuendo Flows from a Mix of True and False Statements, the District Court Should Have Looked to the Elements of a Claim of Express Defamation—Which Elements Were Pled Plausibly

District Court's rejection of Wang's second claim, based on the podcast, fares no better.  It rejected the podcast as not suggesting Sussman's intent to tie Wang's termination to Kizer's accusation because Sussman also referenced "multiple … separate allegations" during the podcast.  *See* A224.  But this conclusion rested on a misapplication of the law and the facts.  As noted above, Sussman twice falsely stated in the podcast that Kizer told the police she had seen Wang pour her the glass of wine that she claims caused her to become "incapacitated."  The New York State Court of Appeals has held that where a false innuendo flows from a mix of false and true statements, courts should analyze the publication under express defamation law, not defamation by implication.  *Armstrong*, 85 N.Y.3d at 380-81.  *See also Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280, 297 at n.7 (S.D.N.Y. 2023) (heightened defamation by

46

implication claim does not apply when defamatory innuendo flows from mix of true and false statements). The false statement, (repeated by the District Court in its decision despite Wang's having pointed out its falsity at oral argument), directly reinforced the podcast's false implication that Wang drugged Kizer and was fired for it.

Moreover, the District Court gave too much weight to Sussman's single vague and sloppy reference in the podcast to "unrelated allegations." Despite acknowledging that this reference is hardly "the model of clarity," District Court nevertheless downplayed (or outright ignored) the extent to which the rest of the podcast implies over and over again that Wang drugged Kizer, was fired for it and got away with it. *See supra* at 12-13, 26-28, 33-34. It is more than plausible that at least some listeners would have understood the podcast in this manner. *Qureshi*, 430 F. Supp. 2d. at 287 (courts are not "to interpret potentially defamatory statements in their mildest and most inoffensive sense to hold them nonlibelous") (quotation omitted). Under New York law, where "the challenged statements are 'susceptible of multiple meanings, some of which are not defamatory,' the court may not conclude, as a matter of law, that the statements are or are not defamatory." *Kesner*, 515 F. Supp. 3d at 170 (citing *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 178 (2d Cir. 2000).

47

The District Court also ignored that during his podcast interview, Sussman explained that his decision to write and publish the story was motivated by his belief that Kizer's "story obviously felt compelling and just, I have this police evidence. It's one of those rare cases where there's such substantive police evidence, and it's such a specific crime, and you can point to the failures of the criminal process." A100 (podcast at 36:55). Thus, Sussman himself stated that his decision to write the article was because he believed that Kizer had been drugged and raped *and that there was police evidence of this*. Unknown to listeners, there was no police evidence that Wang had committed any misconduct. In this light, only by engaging in an impermissible hyper-technical reading, focused exclusively on less than two minutes of the 60-plus minute podcast, did the District Court fail to conclude that it is reasonable to understand the publications as falsely implying that Wang was fired due to Kizer's allegations.

> ### iii. *The Correct New York Standard for Wang's Claim Is that Stated by the New York Court of Appeals in November v. Time. Under that Standard, Which District Court Failed to Apply, It Is Beyond Dispute that Wang's Complaint Is Sufficient. If the Court Does Not Reinstate the Claims as Satisfying the Stepanov Standard, It Should Consider Certifying to the New York Court of Appeals the Question of Whether to Modify the November Standard.*

District Court appeared to make a threshold error when it looked to *Stepanov*, rather than to the controlling New York Court of Appeals decision, *November*, to identify the elements of a claim of defamation by implication in New

48

York.  Because as established above, the Complaint easily satisfies the test for defamation by implication as articulated by *Stepanov*, it is unlikely that the Court will need to reach this point, but in any event, District Court's choice to bypass the standard as enunciated by the state's highest court in favor of a stricter standard enunciated by its intermediate courts is questionable, and to the extent this question requires resolution, it should be through certification of the issue to the New York Court of Appeals.

In *November*, the Court of Appeals held that a claim for defamation by implication is stated where, although a single paragraph or sentence might not be defamatory when viewed in isolation, "a reading of the whole" publication could leave a reasonable reader "with the impression that plaintiff had indulged in" the false and defamatory conduct.  *See November*, 13 N.Y.2d at 178.  Thus, a claim for defamation by implication is stated where "[t]he gloss or interpretation which plaintiff would have the jury apply is derived not from external facts but is one which a reader *might not irrationally* attach to the article as written.  The jury will be asked not to alter or expand the meaning of the actual words but to adopt a possible construction of them and it will be for the jurors to determine in which of two possible senses the words were used." *Id.* at 179 (emphasis added).  Applying that standard, the Court of Appeals held that "a jury should decide whether a libelous intendment would naturally be given to [the challenged article] by the

49

reading public" where although the article did not contain a specific charge of professional misconduct, that "suggestion lurks in [multiple] statements." *Id.* at 179 (quotation omitted). At no point in *November* did the Court of Appeals hold that a second finding need be made that the defamatory implication was intended or endorsed.

Applying *November*'s holding to Wang's case, because the suggestion that Wang had been accused of and fired for allegedly drugging Kizer "lurks" in the publications and is thus something that "a reader *might not irrationally*" conclude, the Complaint states a claim for defamation by implication.

Beginning in 2014, New York's intermediate appellate courts have moved away from the *November* standard by pointing to *dicta* in a Court of Appeals decision subsequent to *November* which suggested that the Court *might* at an unspecified time be open to re-considering or modifying *November*. *See Stepanov*, 120 A.D.3d at 30 ("Nearly two decades ago, the Court of Appeals acknowledged that there existed an open question under New York law regarding which test to apply to claims of defamation by implication.") (citing *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373 (1995)). But not only did *Armstrong* involve a claim of *express* defamation—not a claim of defamation by implication, in *Armstrong* the Court of Appeals only hinted that it might re-evaluate the *November* holding and expressly did *not* reach that question. *See Armstrong*, 85 N.Y.2d at 381

50

(contention that *November* "is today an incorrect standard for claims of defamation by implication" must "await another day"). Thus, in *Armstrong*, the Court of Appeals did nothing to disturb *November*'s holding as to the elements of defamation by implication.[7] *November*, not having been overruled, remains the New York standard this Court must continue for use for assessing the sufficiency of defamation by implication claims. By taking the standard from New York's lower court, District Court erred. *See, e.g., Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000) (holding that decisions from an intermediate state appellate can be a "helpful indicator[]" of how the Court of Appeals might rule, as *"[a]bsent law from a state's highest court*, a federal court sitting in diversity has to predict how the state court would resolve an ambiguity in state law.") (emphasis added).

While the decisions from the New York intermediate appellate courts might ordinarily be persuasive evidence that the Court of Appeals would adopt the *Stepanov* test and impose a higher standard for a defamation by implication claims than that set forth in *November*, they are much less persuasive here because of the

---

[7] In affirming the trial court's decision denying a motion to dismiss a defamation action, the appellate division in *Armstrong* cited *November* in support of its statement that the statement was actionable where "[c]ontrary to defendants' assertions that plaintiff seeks to put his own 'spin' on the meaning of the complained-of passages, such 'spin,' we think, is not dependent upon external facts, but is 'one which a reader might not irrationally attach to the passages as written.'" *Armstrong v. Simon & Schuster*, 197 A.D.2d 87, 91 (1st Dep't 1994) (quoting *November*, 13 N.Y.2d at 179).

51

intervening amendments to New York's anti-SLAPP law.  Specifically, *after* the intermediate courts developed a heightened test for defamation by implication claims, the New York legislature amended its anti-SLAPP law to bring almost all defamation claims within its purview.  Now, almost all defamation claims under New York law must meet an actual malice fault burden (and those filed in state court face additional procedural hurdles).  *See* N.Y. Civ. R. § 76-a.  Accordingly, while courts might at one time have believed a heightened standard for claims of defamation by implication was necessary to balance the competing First Amendment concerns involved with a defamation by implication claim against the right to sue for defamation, the need for any heightened standard was fundamentally altered by the amendments to New York's anti-SLAPP legislation; a heightened standard is no longer necessary to achieve that balance given how the anti-SLAPP Act provides significant additional First Amendment protections to defamation defendants.  To the extent the Court is unsure whether the New York Court of Appeals would abrogate *November* and follow *Stepanov*, or would decline to do so given the current legal landscape, it should certify the question to the New York Court of Appeals.  *See, e.g., DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005) ("In the absence of authoritative law from the state's highest court, we must either (1) predict how the New York Court of Appeals would resolve the state law question, or, if state law is so uncertain that we can make no reasonable prediction,

52

(2) certify the question to the New York Court of Appeals for a definitive resolution.").

At no point have Defendants or District Court suggested that Wang failed to meet the *November* standard, and it is abundantly clear that the Complaint does so. Indeed, even while engaging in its hyper technical reading, District Court acknowledged that the article implied that Wang was terminated due to Kizer's allegations. Indeed, it was all but impossible for District Court to avoid reaching this conclusion as the defamatory implication is clear: Defendants wrote an article devoted to airing Kizer's allegations, gave credence to those allegations, and questioned why Muckey *and Wang* remained with the Philharmonic following those allegations. Since the actual allegations Wang faced and for which he was initially terminated prior to the publication of the article were far more dubious, and Wang (unlike Muckey) had not been afraid to testify on his own behalf and to defend those allegations on the merits during the arbitration (a fact deliberately omitted from the article), the harm to Wang's reputation caused by the article implying that he was terminated due to Kizer's allegations was immense.

53

## **CONCLUSION**

For the foregoing reasons, the Court should, respectfully, reverse the

Decision and the Rule 59 Order and reinstate the Complaint.

Dated: New York, New York
         January 21, 2026

                                        CARTER LEDYARD & MILBURN LLP

                    By:          _/s/ Alan S. Lewis_____
                                 Alan S. Lewis
                                 Madelyn K. White
                                 28 Liberty Street
                                 New York, NY 10005
                                 Tel.: (917) 533-2524

                                 *Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P.

32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the

parts of the document exempted by Fed. R. App. P. 32(f), this document contains

12,872 words.

This document complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

document has been prepared in a proportionally spaced typeface using Microsoft

Word in 14-point font Time New Roman.

Dated: New York, New York
      January 21, 2026

                                  CARTER LEDYARD & MILBURN LLP

      By:        */s/ Alan S. Lewis*
                  Alan S. Lewis
                  28 Liberty Street
                  New York, NY  10005
                  Tel.:  (917) 533-2524

                  *Attorneys for Plaintiff-Appellant*