# 25-2487-cv(L), 25-2503-cv(CON)

# United States Court of Appeals

*for the*

## Second Circuit

LIANG WANG,

*Plaintiff-Appellant-Cross-Appellee,*

– v. –

SAMMY SUSSMAN, VOX MEDIA, LLC, NEW YORK MEDIA LLC,

*Defendants-Appellees-Cross-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES-CROSS-APPELLANTS

KATHERINE M. BOLGER
MARY E. GOETZ
DAVIS WRIGHT TREMAINE LLP
*Attorneys for Defendants-Appellees-*
  *Cross-Appellants*
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 489-8230

CP COUNSEL PRESS  (800) 4-APPEAL • (392142)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee-Cross Appellants state that New York Media LLC is a wholly-owned subsidiary of Vox Media, LLC.  Vox Media Holdings, Inc. is the parent corporation of Vox Media, LLC.  Ten percent or more of the stock of Vox Media Holdings, Inc. is owned by Versant Media Holdings, Inc., which is publicly traded.

i

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................1

COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .........4

COUNTER-STATEMENT OF THE CASE ..........................................................4

    A. The Parties .............................................................................................4

    B. The Article .............................................................................................5

    C. The Podcast............................................................................................7

    D. Filing and Dismissal of this Action ......................................................8

    E. Reconsideration ...................................................................................11

    F. Fee Application.....................................................................................12

SUMMARY OF ARGUMENT ..........................................................................13

STANDARD OF REVIEW ................................................................................14

ARGUMENT .....................................................................................................15

    I. The Dismissal Order Should Be Affirmed ..........................................15

    A. Wang Has Not Pled Defamation by Implication...........................................15

        1. The Law of Implied Defamation ............................................15

        2. Neither the Article Nor the Podcast Implies Wang Drugged Kizer.........18

        3. Neither the Article nor the Podcast Implies the Philharmonic Fired Wang Due To Kizer's Allegations.........................................................................20

        4. Wang's Counterarguments Are Unavailing ............................................22

    B. The Complaint May Be Dismissed on Independent Grounds.......................30

        1. The Article is a Fair Report of Official Proceedings .............................31

2. Wang Cannot Plead Falsity As To the Firing Implication ........................36

3. Wang Cannot Plead Actual Malice as to the Article or the Podcast ........39

II. Cross-Appeal: Section 70-a Entitles Appellees to Attorneys' Fees ............44

A. Section 70-a Applies in Federal Diversity Cases ..........................................45

B. The District Court's Analysis Is Mistaken ....................................................51

C. Appellees Are Entitled To Fees Under Section 70-a ....................................54

CONCLUSION ............................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*215 W. 84th St. Owner LLC v. Bailey*,
217 A.D.3d 488 (1st Dep't 2023) ...................................................................52, 54

*Aboutaam v. Dow Jones & Co.*,
180 A.D.3d 573 (1st Dep't 2020) ...................................................................24

*Adelson v. Harris*,
774 F.3d 803 (2d Cir. 2014) ...........................................................................49

*Air Wisconsin Airlines Corp. v. Hoeper*,
571 U.S. 237 (2014)........................................................................................17

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
421 U.S. 240 (1975).........................................................................................48

*Aristocrat Plastic Surgery, P.C. v. Silva*,
206 A.D.3d 26 (1st Dep't 2022) .....................................................................52, 54

*Armbruster Cap. Mgmt., Inc. v. Barrett*,
243 A.D.3d 1356 (4th Dep't 2025)..................................................................30

*Armstrong v. Simon & Schuster, Inc.*,
85 N.Y.2d 373 (1995)......................................................................................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).........................................................................................14

*Berk v. Choy*,
146 S. Ct. 546 (2026).......................................................................................45, 46

*Biro v. Condé Nast*,
883 F. Supp. 2d 441 (S.D.N.Y. 2012) .............................................................15, 23, 35

*Biro v. Conde Nast*,
963 F. Supp. 2d 255, 283 (S.D.N.Y. 2013) .....................................................27, 42, 43

*Biro v. Conde Nast*,
807 F.3d 541 (2d Cir. 2015) ............................................................................40

*Bisimwa v. St. John Fisher College,*
194 A.D.3d 1467 (4th Dep't 2021)......................................................16, 23, 24

*Blouin v. Conde Nast,*
2026 WL 276119 (S.D.N.Y. Feb. 3, 2026) ......................................................16

*Bobulinski v. Tarlov,*
758 F. Supp. 3d 166 (S.D.N.Y. 2024) .......................................................*passim*

*Bose Corp. v. Consumers Union of U.S., Inc.,*
466 U.S. 485 (1984)...............................................................................40, 42

*Brimelow v. New York Times Co.,*
2021 WL 4901969 (2d Cir. Oct. 21, 2021) ..................................................42, 43

*Bustos v. A&E Television Networks,*
646 F.3d 762 (10th Cir. 2011) ...........................................................................37

*BYD Co. v. VICE Media LLC,*
531 F. Supp. 3d 810 (S.D.N.Y. 2021) .........................................................31, 42

*Carroll v. Trump,*
49 F.4th 759 (2d Cir. 2022) ...............................................................................51

*Carroll v. Trump,*
590 F. Supp. 3d 575 (S.D.N.Y. 2022) ...............................................................48

*Chambers v. NASCO, Inc.,*
501 U.S. 32 (1991).............................................................................................49

*Chambers v. Time Warner, Inc.,*
282 F.3d 147 (2d Cir. 2002) ..............................................................................14

*Chapin v. Knight-Ridder, Inc.,*
993 F.2d 1087 (4th Cir. 1993) ...........................................................................23

*Chau v. Lewis,*
771 F.3d 118 (2d Cir. 2014) ..............................................................................36

*Cheng v. Neumann,*
106 F.4th 19 (1st Cir. 2024)...............................................................................52

*Cholowsky v. Siviletti*,
 69 A.D.3d 110 (2d Dep't 2009)................................................................32

*Cianci v. New Times Pub. Co.*,
 639 F.2d 54 (2d Cir. 1980) ......................................................................28

*Coleman v. Grand*,
 523 F. Supp. 3d 244 (E.D.N.Y. 2021) ....................................................39

*Compuware Corp. v. Moody's Investors Servs.*,
 499 F.3d 520 (6th Cir. 2007) ..................................................................23

*Cummings v. City of New York*,
 2021 WL 1163654 (S.D.N.Y. Mar. 26, 2021)....................................31, 35

*Daleiden v. Planned Parenthood Fed'n of Am.*,
 2022 WL 1013982 (2d Cir. Apr. 5, 2022) ...............................................32

*Davis v. Brown*,
 211 A.D.3d 524 (1st Dep't 2022) .......................................................28, 30

*Devlin v. Transp. Commc'ns Int'l Union*,
 175 F.3d 121 (2d Cir. 1999) ....................................................................14

*Dodds v. Am. Broad. Co.*,
 145 F.3d 1053 (9th Cir. 1998) .................................................................23

*Edwards v. Nat'l Audubon Soc'y, Inc.*,
 556 F.2d 113 (2d Cir. 1977) ....................................................................42

*Elias v. Rolling Stone LLC*,
 872 F.3d 97 (2d Cir. 2017) ......................................................................28

*Erie R. Co. v. Tompkins*,
 304 U.S. 64 (1938)............................................................................*passim*

*Freeze Right Refrigeration & Air Conditioning Servs. v. City of New York*,
 101 A.D.2d 175 (1st Dep't 1984) ............................................................32

*Friedman v. Bloomberg L.P.*,
 884 F.3d 83 (2d Cir. 2017) ......................................................................31

*Golan v. Daily News, L.P.*,
214 A.D.3d 558 (1st Dep't 2023) ...........................................................52

*Goldman v. Abraham Heschel Sch.*,
227 A.D.3d 544 (1st Dep't 2024) ...........................................................54

*Goldman v. Reddington*,
2021 WL 4099462 (E.D.N.Y. Sept. 9, 2021) .......................................52

*Gottwald v. Sebert*,
40 N.Y.3d 240 (2023) .............................................................................44

*Grifols, S.A. v. Yu*,
2026 WL 836657 (S.D.N.Y. Mar. 26, 2026)...................................45, 47

*Guaranty Trust Co. v. York*,
326 U.S. 99 (1945)..................................................................................49

*Gunduz v. N.Y. Post Co.*,
188 A.D.2d 294 (1st Dep't 1992) ..........................................................28

*Hanna v. Plumer*,
380 U.S. 460 (1965)..........................................................................45, 49

*Haynes v. Alfred A. Knopf, Inc.*,
8 F.3d 1222 (7th Cir. 1993) ...................................................................37

*Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*,
49 N.Y.2d 63 (1979)...............................................................................31

*Howard v. Antilla*,
294 F.3d 244 (1st Cir. 2002)..................................................................23

*In re Terrorist Attacks on Sept. 11, 2001*,
714 F.3d 109 (2d Cir. 2013) ..................................................................30

*James v. Gannett Co., Inc.*,
40 N.Y.2d 415 (1976) .............................................................................39

*Karp v. Hill & Knowlton, Inc.*,
631 F. Supp. 360 (S.D.N.Y. 1986) ........................................................31

*Kavanagh v. Zwilling*,
578 F. App'x 24 (2d Cir. 2014) ........................................................16, 29

*Kesner v. Dow Jones & Co.*,
2023 WL 4072929 (2d Cir. June 20, 2023).........................................28

*Kesner v. Dow Jones & Co.*,
515 F. Supp. 3d 149 (S.D.N.Y. 2021) ........................................*passim*

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011) ...............................................................14

*La Liberte v. Reid*,
966 F.3d 79 (2d Cir. 2020) ...................................................39, 48, 52

*Lindell v. Mail Media Inc.*,
575 F. Supp. 3d 479 (S.D.N.Y. 2021) .................................................17

*Marom v. Pierot*,
2020 WL 1862974 (S.D.N.Y. Jan. 16, 2020) .....................................17

*Masson v. New Yorker Mag.*,
501 U.S. 496 (1991).............................................................................17

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007) ...............................................................14

*McDonald v. E. Hampton Star*,
10 A.D.3d 639 (2d Dep't 2004).........................................................35

*McDougal v. Fox News Network, LLC*,
489 F. Supp. 3d 174 (S.D.N.Y. 2020) ...............................................40

*Metabolife Int'l, Inc. v. Wornick*,
72 F. Supp. 2d 1160 (S.D. Cal. 1999)................................................24

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
418 F.3d 168 (2d Cir. 2005) ...............................................................49

*Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*,
551 F. Supp. 3d 408 (S.D.N.Y. 2021) ................................................47

*New York Times v. Sullivan*,
  376 U.S. 254 (1964)......................................................................................22

*November v. Time*,
  13 N.Y.2d 175 (1963) ..................................................................................22

*Palin v. N.Y. Times Co.*,
  510 F. Supp. 3d 21 (S.D.N.Y. 2020) ...........................................................39

*Partridge v. State*,
  173 A.D.3d 86 (3d Dep't 2019)..............................................16, 23, 27, 28

*Reeves v. Associated Newspapers, Ltd.*,
  232 A.D.3d 10 (1st Dep't 2024) ..................................................................54

*Reliance Ins. Co. v. Barron's*,
  442 F. Supp. 1341 (S.D.N.Y. 1977) ............................................................41

*Richey v. Showtime Networks Inc.*,
  2026 WL 867264 (D. Del. Mar. 30, 2026) ......................................45, 47, 52

*Rodriguez v. Daily News, L.P.*,
  142 A.D.3d 1062 (2d Dep't 2015)................................................................32

*Saenz v. Playboy Enters., Inc.*,
  841 F.2d 1309 (7th Cir. 1988) .....................................................................23

*Satanic Temple, Inc. v. Newsweek Mag. LLC*,
  661 F. Supp. 3d 159 (S.D.N.Y. 2023) ...................................18, 26, 27, 28

*Scarangella v. Grp. Health, Inc.*,
  731 F.3d 146 (2d Cir. 2013) ........................................................................15

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010).....................................................................................46

*Shuman v. N.Y. Mag.*,
  211 A.D.3d 558 (1st Dep't 2022) ................................................................40

*Stepanov v. Dow Jones & Co.*,
  120 A.D.3d 28 (1st Dep't 2014)............................................................*passim*

*Sweigert v. Goodman*,
  2021 WL 1578097 (S.D.N.Y. Apr. 22, 2021) ......................................................39

*Swiezy v. Investigative Post, Inc.*,
  87 Misc. 3d 1209(A), (Sup. Ct. Erie Cty. 2025).................................................50

*Tah v. Glob. Witness Publ'g*,
  413 F. Supp. 3d 1 (D.D.C. 2019)..................................................................25, 41

*Tannerite Sports, LLC v. NBCUniversal News Grp.*
  864 F.3d 236 (2d Cir. 2017) ...........................................................................36

*Thyroff v. Nationwide Mut. Ins. Co.*,
  460 F.3d 400 (2d Cir. 2006) ...........................................................................30

*Tomblin v. WCHS-TV8*,
  434 F. App'x 205 (4th Cir. 2011) ....................................................................25

*Udell v. NYP Holdings, Inc.*,
  169 A.D.3d 954 (2d Dep't 2019)................................................................16, 23

*Watson v. NY Doe 1*,
  439 F. Supp. 3d 152 (S.D.N.Y. 2020) .........................................................27, 28

*Weiner v. Doubleday & Co.*,
  74 N.Y.2d 586 (1989) .....................................................................................40

*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990)........................................................................23

*Woods v. Evansville Press Co., Inc.*,
  791 F.2d 480 (7th Cir. 1986) ..........................................................................23

*Zeitlan v. Cohan*,
  220 A.D.3d 631 (1st Dep't 2023) ....................................................................18

**Statutes**

N.Y. Civ. Rights Law § 70-a ...................................................................*passim*

N.Y. Civ. Rights Law § 74 .............................................................13, 30, 31, 34

N.Y. Civ. Rights Law § 76-a ...................................................................*passim*

x

**Other Authorities**

CPLR 3211 ...................................................................................*passim*

CPLR 3212 ....................................................................................44, 51

Fed. R. Civ. P. 11 ................................................................................46

Fed. R. Civ. P. 12 ..........................................................................*passim*

Fed. R. Civ. P. 54 ......................................................................3, 12, 44

Fed. R. Civ. P. 56 ................................................................................48

Restatement (Second) of Torts § 566 cmt. c(2) (1977) ...........................................34

## PRELIMINARY STATEMENT

All parties agree that, although the reason for his termination was not public at the time, Plaintiff-Appellant Liang Wang ("Wang") was fired by the New York Philharmonic in 2018 after an investigation determined that multiple women had credibly accused him of misconduct, including sexual assault, and Wang was ultimately reinstated to the orchestra after challenging his firing in an arbitration. All parties also agree that, on April 12, 2024, *New York* magazine published an article on its *Vulture* website, authored by Sammy Sussman, entitled "A Hidden Sexual-Assault Scandal at the New York Philharmonic: two musicians were fired for sexual misconduct. Why are they back with the orchestra?" (the "Article"), disclosing for the first time that Wang's 2018 firing had been for sexual misconduct. Finally, all parties agree that after the Article was published, multiple people came forward to the Philharmonic with claims of sexual abuse against Wang, and the orchestra ultimately terminated him following an investigation that credited the accusations of eleven different people against him, including for rape, sexual assault, and grooming of a young female musician.

Wang nonetheless brings this 100-million-dollar lawsuit against Defendants-Appellees Vox Media, LLC, New York Media LLC, and Sussman (collectively, "Appellees" or "Defendants"), claiming that the Article and a subsequent podcast appearance by Sussman (the "Podcast") defamed him. Critically, Wang's Complaint

1

does not allege that the two publications contained untrue statements. Instead, Wang alleges that the publications defamed him by *implying* (1) that he was involved in an alleged sexual assault by another orchestra member, Matthew Muckey, against their fellow musician Cara Kizer; and (2) that he was fired by the Philharmonic because of that incident, not because of the "unrelated" and "separate" allegations that the Article and Podcast noted. But, as the district court correctly held, neither publication made either implication, and in any event, there was nothing in the Article or the Podcast that intended or endorsed those implications. The district court's decision granting Appellees' motion to dismiss should be affirmed.

This Court may also affirm the dismissal on a number of independent grounds the district court had no need to reach. *First*, the Article's coverage of Kizer's allegations is protected as a fair report of official proceedings under New York Civil Rights Law § 76-a. *Second*, to the extent that either the Article or the Podcast implies Wang was fired over Kizer's allegations (they do not), that implication is substantially true, since Wang was fired for sexual misconduct against multiple other female musicians. And *third*, Wang cannot allege that Appellees acted with actual malice in publishing the Article or that Sussman acted with actual malice in making his statements on the Podcast, as Wang must show under both state statutory and federal constitutional law.

2

Finally, Appellees bring a cross-appeal for their attorneys' fees under New York's substantive fee-shifting provision, New York Civil Rights Law § 70-a ("Section 70-a"). The district court denied their motion for fees under Federal Rule of Civil Procedure 54(d)(2), finding that Section 70-a did not permit for fees upon a successful motion to dismiss in federal court, and that Appellees must bring a separate, "follow-on" action seeking fees. This is incorrect under Supreme Court and New York law: Section 70-a, as a substantive fee-shifting provision that does not conflict with a Federal Rule of Civil Procedure, applies in federal diversity cases, and its plain language does not require a separate action.

## COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Did the district court correctly hold that neither the Article nor the Podcast impliedly defames Wang, either by suggesting he drugged a fellow musician or by suggesting he was fired for that incident (rather than for separate allegations of sexual misconduct)?

2. Does the substantive fee-shifting provision of the New York Civil Rights Law apply in this diversity action and require an award of attorneys' fees?

## COUNTER-STATEMENT OF THE CASE

### A. The Parties

Appellant Liang Wang was the principal oboist in the New York Philharmonic at the time the Article was published. JA16-17 (Compl. ¶ 8). In November 2024, several months after the Article was published, Wang was dismissed from the Philharmonic following an investigation into sexual misconduct claims unrelated to those described in the Article. JA215.

Appellee Sammy Sussman is a freelance investigative reporter who authored the Article and participated in the Podcast. Appellee Vox Media, LLC is the parent company of Appellee New York Media LLC and is the publisher of *New York* Magazine and its online website, *Vulture* (together, "Vox Media"), where the Article was published.

4

### B.    The Article

On April 12, 2024, Vox Media published the Article, written by Sussman. The Article itself, which is (tellingly) mostly paraphrased in the Appellant's Brief, is in the record at JA45.  Explicitly referencing both the records of a Vail Police Department investigation and an arbitration decision described below, the Article reports on allegations by Kizer that she was sexually assaulted by Muckey.  JA46-47, 51.  The Article recounts Kizer's allegations—as reported in police records—that, after a performance in Colorado, Kizer went to Muckey's rented apartment with Muckey and Wang. JA47.  The Article reports Kizer's allegations that "[w]hen they got to Muckey's condo, he and Wang got in the hot tub and tried to persuade Kizer to join them, but she declined.  Kizer alleged Wang brought her a glass of red wine.  Wang later told the police that Kizer got her own wine." *Id.*  The Article next reports Kizer's allegation that she had no memories after drinking from the glass of wine until she woke up the next morning naked in Muckey's bed, with stains of her vomit around her, a gap in her memory, and a tampon "shoved so far up inside me that I could not reach it."  JA47-48.  The Article also describes Kizer's allegation that she had been raped by Muckey (who admitted to sexual contact but insisted it was consensual) and the investigation into Kizer's allegations. *Id.*  It discusses that Kizer had a rape kit performed, and that Detective Rusty Jacobs of the Vail police conducted interviews with Kizer, Muckey, Wang, and other players and staff of the

Philharmonic. *Id.* It also chronicles Jacobs's and Kizer's efforts to test for drugs in her system at the time of the alleged assault. JA49-50. The Article also recounts that the local District Attorney "declined to prosecute Muckey," that Jacobs was told a hair-follicle test Kizer had ordered "did not meet the standards for litigation," and that a "forensic toxicologist called the practice of testing for date-rape drugs in hair follicles 'controversial.'" JA50. The Article contains denials from Wang that he handed Kizer a glass of wine or that he drugged her, as well as a denial from Muckey that he assaulted Kizer. JA47-49.

The Article next reports that in September 2018, the Philharmonic commissioned former Judge Barbara Jones to investigate "the allegations Kizer made against Muckey." JA50. As the Article states, "In addition to Kizer's claims, the orchestra learned about the earlier rape allegation against Muckey and unrelated allegations of sexual misconduct against Wang." *Id.* The Article reports that, at the end of the investigation, the Philharmonic terminated Muckey and Wang for misconduct despite their denials. *Id.* The Article goes on to report that both musicians appealed the terminations through their union, and the parties submitted to arbitration. *Id.* The Article quotes the arbitration decision's statement, in finding for Muckey and Wang, that the "events at issue occurred some 8, 10, and 12 years prior." *Id.* The Article also discusses that the arbitrator used a clear and convincing

6

evidence standard in making his ruling, rather than the preponderance standard used by Judge Jones. *Id.*

Sussman and Vox Media had contacted Wang (and his counsel, once so referred) several times in the months preceding publication both to solicit his input and eventually to seek his comment on specific statements and questions. JA23-25 (Compl. ¶¶ 30, 33); JA97. Wang would not "speak to [Sussman]" about the story, but a statement provided to Vox Media by Wang's counsel was quoted in the Article. JA47, 51.

### C. The Podcast

After the Article was published, Sussman appeared on the Inline G Flute Podcast in an episode titled "NY Philharmonic Assault Scandal with Sammy Sussman." JA80-118. The Podcast, which is, again, largely paraphrased in the Opening Brief, is an unscripted conversation between Sussman and the host of the program, Gareth Houston. Sussman stated, as relevant, that Kizer alleged she drank "a glass of red wine and remember[ed] nothing from the rest of that night," and that a rape test kit had been performed on Muckey, "who's the alleged, obviously, assailant in this case." JA84. At one point, the Podcast's host asked if Jones's recommendation to terminate Muckey and Wang from the Philharmonic was "due to the allegations of what happened in 2010." JA91. Sussman replied that it was due to "[Kizer]'s allegation and another allegation against Muckey as described, and

7

. . . separate allegations of sexual misconduct against Liang Wang." *Id.* In addition, in describing the arbitration decision, Sussman stated that it did "not comment on the underlying merit of the claims against the two men, and that the arbitrator merely note[d] that they have not met an evidentiary standard." JA93. Sussman further stated that the arbitrator "note[d], in relation to some of the allegations, that it's hard for the men to prove that they understood no to mean no, I believe is what he said. He said that it's hard for them to prove that no was said and that they did not have consent." JA94. Sussman also described "Cara's story" as "one of those rare cases where there's such substantive police evidence." JA100.

## D. Filing and Dismissal of this Action

Wang filed a complaint in the Southern District of New York on May 23, 2024, seeking $100 million in damages from Defendants. JA42-43 (Compl. ¶ 100). Wang principally alleges that the Article contained two defamatory implications: first, "that Wang put a date rape drug into Kizer's wine, so that Muckey could sexually assault her," and second, "that Wang (in addition to Muckey) was fired by the Philharmonic in 2018 for this supposed conduct against Kizer." JA15-16 (Compl. ¶ 2). Defendants moved to dismiss. After hearing oral argument, the Honorable Arun Subramanian granted Defendants' motion and dismissed the case in its entirety. *See* JA138, 211.

8

The district court first dispensed with Wang's express defamation arguments, noting Wang was unable to identify any false statements in the Article or Podcast. JA216-20. In addition, the court concluded, statements indicating "that Kizer's allegations of drugging were backed up by evidence" were "not defamatory because they're true," as Wang conceded. JA218-19.

The district court then moved to Wang's claim for defamation by implication, noting that New York law requires Wang to "make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." JA221 (quoting *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37-38 (1st Dep't 2014)). Turning to the two alleged implications at issue, the Court first found that "the article can't be reasonably read to imply" that Wang drugged Kizer because it (1) took "care to note that Kizer's allegation was just that"; (2) included Wang's denials, specifically noting that "Wang told the police that Kizer got her own wine"; and (3) made "no attempt to resolve the dispute in either Wang's or Kizer's favor." JA221. Drawing on this Court's caselaw, the district court noted that, unlike cases where an implication "arises from selective juxtaposition or omission," here Wang "trie[d] to locate an implication in the article that the article's literal text—namely the inclusion of Wang's denial—refutes." JA222 (citing *Herbert v. Lando*, 781 F.2d 298, 307 n.4 (2d Cir. 1986)). The district

court additionally found that, even if the Article had suggested Wang drugged Kizer, Wang hadn't "shown that this inference is one Sussman wanted readers to draw," because the Article "reports Kizer's allegations *as allegations*—it uses the verb 'alleged' in describing them"—and "provides the reader with Wang's side of the story," which is "the opposite of 'endorsing' Kizer's version." JA222 (citing *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 173 (S.D.N.Y. 2021); *Satanic Temple, Inc. v. Newsweek Mag. LLC*, 661 F. Supp. 3d 159, 175-76 (S.D.N.Y. 2023)). The same was true of the Podcast. *Id.*

Turning to the second alleged implication—that Wang was fired because of Kizer's allegations about the events in 2010—the district court found that the plain language of the Article showed it was "not an intended defamatory innuendo" because it "refer[red] specifically to 'unrelated allegations of sexual misconduct'" against Wang as distinct from "the allegations made *against Muckey*." JA223 (emphasis in original) (quoting JA74). Reviewing New York caselaw, the Court noted that "signs of intent have been much clearer" in cases where courts have found that an implication was intended or endorsed. JA223-24. The same was true for the Podcast, which did not "indicate that Sussman wanted listeners to think Wang was investigated for Kizer's allegations." JA224. On this basis, the district court dismissed Wang's complaint in its entirety, and had no need to reach Defendants' alternate arguments regarding fair report and actual malice. JA224.

10

The district court briefly noted that the Article had been "updated on November 5, 2024 to reflect Muckey's and Wang's dismissal from the Philharmonic after a separate investigation post-dating the events at issue in this case. Wang's claims do not involve this update." JA215.

### E. Reconsideration

Wang moved for reconsideration and correction of the dismissal order, but the motion was denied. First, as to reconsideration, the district court admonished Wang for "relitigating old issues" in contravention of Second Circuit law. JA241. The court rejected Wang's suggestion that it had not considered a blog post referenced in the Complaint, or that the post's interpretation of the Article militated toward finding an endorsed implication under New York law. *Id.* The court also disagreed that it had announced a categorical rule immunizing publications including information that "undercut" a defamatory implication. JA241-42. Finally, the court found Wang's appeal to Texas law unavailing, both because it was not controlling and because closer examination of the law supported dismissal. JA242.

As to modification, Wang argued it was error to state that Wang was ultimately "dismiss[ed] from the Philharmonic after a separate investigation post-dating the events at issue in this case." JA242 (quoting JA215). Wang did not deny that the 2024 investigation had credited multiple, unrelated allegations of sexual misconduct, but he protested that "the Philharmonic did not rely on any investigative

11

findings in dismissing Wang." JA242 (quoting District Court Dkt. 82). The court rejected Wang's position, noting that the dismissal opinion had merely mentioned that Wang's claims did *not* involve that update, and in any event had not stated that the Philharmonic had relied on the investigation. *Id.*

### F. Fee Application

After the dismissal, Defendants made a motion under Federal Rule of Civil Procedure 54(d)(2) for attorneys' fees under the fee-shifting provision of New York's anti-SLAPP law. N.Y. Civil Rights Law § 70-a(1). Defendants asserted that Section 70-a applied in this federal diversity action, and that they were entitled to attorneys' fees because Wang's suit was "commenced or continued without a substantial basis in fact and law." N.Y. Civil Rights Law § 70-a(1)(a). Wang did not dispute that this is an "[a]ction involving public petition and participation," nor did he dispute that Defendants' claimed fees were reasonable. He challenged only the notion that the fee-shifting scheme applied in federal court, and that his case lacked a "substantial basis."

The district court did "not grapple with the thorny *Erie* questions concerning the application of New York's fee-shifting remedy in federal court," which is the subject of a split among the courts of the Southern District of New York. JA247 n.2 (collecting cases). But it held that Section 70-a, which mandates fee recovery "upon a determination, including an adjudication pursuant to [a motion to dismiss under

12

New York CPLR 3211(g)] or [a motion for summary judgment under New York CPLR 3212(h)] that the [action] was commenced or continued without a substantial basis in fact or law," intended to exclude other types of adjudications, including those under Federal Rule of Civil Procedure 12(b)(6).  JA244-45.  Because "Defendants did not invoke CPLR 3211(g) in this case," the district court found, "their motion must be denied."  *Id.*  At the same time, the district court held that Defendants were not barred from "pursu[ing] attorney's fees under New York's anti-SLAPP law" in "federal court"—"a defendant may" instead "file a follow-on case seeking fees."  JA247.

## SUMMARY OF ARGUMENT

As to Wang's appeal, the district court's order granting dismissal should be affirmed.  First, neither the Article nor the Podcast makes, let alone endorses, the two implications Wang alleges—that he drugged Kizer, and that he was fired because of Kizer's allegations.  Wang's arguments to the contrary, which largely seek to avoid both the actual content of the Article and the straightforward application of established defamation-by-implication law, fall short.  Second, this Court may dismiss the Complaint on independent grounds, including because (a) the Article's reporting of Kizer's allegations is absolutely privileged as a fair report of official proceedings under New York Civil Rights Law § 74; (b) any implication about Wang's firing for sexual misconduct was substantially true; and (c) the

13

Complaint cannot plead, as it must, that the Article or the Podcast was published with actual malice.

As to Appellees' cross-appeal, this Court should follow clear Supreme Court precedent to hold that New York's substantive fee-shifting provision applies in federal diversity cases and entitles Appellees to fees in this action.

## STANDARD OF REVIEW

This Court "review[s] *de novo* determinations of a district court that resolve a motion to dismiss a complaint," accepting the Complaint's factual allegations as true and drawing reasonable inferences in favor of the plaintiff. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). To survive a motion to dismiss for failure to state a claim, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In addition to the allegations in a complaint, a court may consider documents incorporated by reference or "integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). If documents contradict the plaintiff's allegations, the documents control. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) ("[W]e assume [allegations] to be true unless contradicted by more specific allegations or documentary evidence . . . .").

Orders on Rule 59 and 60 motions are reviewed "for an abuse of discretion." *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 131-32 (2d Cir. 1999). And

14

the Court "review[s] questions of law regarding the appropriate legal standard in granting or denying attorney's fees de novo." *Scarangella v. Grp. Health, Inc.*, 731 F.3d 146, 151 (2d Cir. 2013).

## ARGUMENT

### I. THE DISMISSAL ORDER SHOULD BE AFFIRMED

The district court correctly dismissed Count One of the Complaint as to the Article and Count Two of the Complaint as to the Podcast. New York law is clear: the language of a challenged publication must make *and* intend or endorse an alleged defamatory implication. Because neither the Article nor the Podcast makes or endorses the two alleged implications, both counts of the Complaint must fail.

### A. Wang Has Not Pled Defamation by Implication

#### 1. The Law of Implied Defamation

Wang's Complaint asserts only implied, and not explicit, defamation.[1] In order to prevail on his claim for defamation by implication, even at the pleading stage, Wang "must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Stepanov*, 120 A.D.3d at 37-38; *see also Biro v. Condé Nast*, 883 F. Supp. 2d 441, 466

---

[1] Although Wang (at 46–48) now argues the Podcast contained an expressly false statement, the Complaint nowhere asserts that any statement in the Article or the Podcast was expressly false, and indeed Wang does not challenge the portion of the opinion below dispensing with his express defamation arguments, therefore forfeiting them. *See* JA14-43, 216-20; *see also infra* note 5.

15

(S.D.N.Y. 2012) ("[W]here a plaintiff asserts a defamation claim based . . . on an alleged defamatory implication . . . , the Court will require an 'especially rigorous showing' that (1) the language may be reasonably read to impart the false innuendo, and (2) the author intends or endorses the inference." (citation omitted)).; *accord, e.g.*, *Kavanagh v. Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014) (applying *Stepanov* test to affirm dismissal). As the Fourth Department explained when joining the other departments to make this rule unanimous across the Appellate Division, this "heightened standard" rests on both First Amendment principles and "fairness to a declarant who intended or endorsed only the true meaning of the subject statement." *Bisimwa v. St. John Fisher College*, 194 A.D.3d 1467, 1472 (4th Dep't 2021); *see also Udell v. NYP Holdings, Inc.*, 169 A.D.3d 954, 957 (2d Dep't 2019); *Partridge v. State*, 173 A.D.3d 86, 91 (3d Dep't 2019).[2] This test is "an objective one that asks whether the plain language of the communication itself suggests that an inference was intended or endorsed." *Stepanov*, 120 A.D.3d at 37.[3] And the rule is so well accepted that courts in this district frequently dismiss claims at the pleading stage for failing to satisfy the endorsement requirement. *See, e.g.*, *Blouin v. Conde Nast*,

---

[2] Wang (at 28) attempts to rewrite this standard, claiming without support that a court must permit an implication claim against a publication if it is "even merely susceptible to the impression . . . that [the author] intended to suggest" a defamatory implication (emphasis omitted). This is simply not the law as it is clearly stated in *Stepanov*, *Udell*, *Partridge*, and *Bisimwa*.

[3] Wang (at 24) seems to suggest that if the court determines that the Article has a defamatory meaning, it must allow the action to proceed to discovery. This is simply incorrect in the defamation by implication context. *See supra* pp. 15-17.

2026 WL 276119, at *3 (S.D.N.Y. Feb. 3, 2026) (dismissing defamation claims where plaintiff's complaint "d[id] not support the notion that [defendant] intended or endorsed the inference [p]laintiff alleges"); *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 175 (S.D.N.Y. 2024), (dismissing defamation by implication claims where "[p]laintiff is asking the Court to take too many inferential jumps to view this social media post about the Save America PAC as evidence that [defendant] intended for her audience to interpret her comments about [plaintiff's] receipt of PAC money as an accusation of perjury"), *appeal withdrawn*, 2025 WL 1009663 (2d Cir. Mar. 31, 2025); *Lindell v. Mail Media Inc.*, 575 F. Supp. 3d 479, 488 (S.D.N.Y. 2021) ("Nowhere does the Amended Complaint allege—let alone make a 'rigorous showing'—that the Defendants intended to portray [plaintiff] as a hypocrite for dating an actress or for buying her alcohol"); *Marom v. Pierot*, 2020 WL 1862974, at *11 (S.D.N.Y. Jan. 16, 2020) (holding that "Plaintiff's defamation by implication claim regarding these statements fails because Plaintiff has not made the rigorous showing required under New York law demonstrating . . . that [Defendant] 'intended or endorsed that inference'"), *R. & R. adopted*, 2020 WL 1444938 (S.D.N.Y. Mar. 25, 2020). The district court was right to do so here.

17

### 2. Neither the Article nor the Podcast Implies Wang Drugged Kizer

First, as the district court correctly recognized, JA223, neither the Article nor the Podcast can be read to make or endorse an implication that Wang drugged Kizer.[4]

As an initial matter, the Article is largely about Muckey, not Wang. And to the extent Wang is involved, the Article "reports Kizer's allegations *as allegations*." JA222; *see, e.g.*, JA69 ("Kizer alleged that Wang brought her a glass of red wine. Wang told the police that Kizer got her own wine."); JA73 (reporting that after police-ordered drug tests provided "no evidence . . . that Kizer had been drugged," *Kizer* ordered GHB testing on her own hair). In other words, it is "clear that, in fact, [Sussman] was not himself reporting that" Wang gave Kizer a glass of wine or that the wine was drugged, but rather that Kizer "*alleged* that [Wang] had" done so. *Zeitlan v. Cohan*, 220 A.D.3d 631, 633 (1st Dep't 2023); *see, e.g.*, *Kesner*, 515 F. Supp. 3d at 173 (no implied defamation because "the article expressly attributes that accusation" to the author of a complaint).

Not only that, but the Article goes even further and "supplie[s] the other side of the story: [Wang]'s refutation." *Kesner*, 515 F. Supp. 3d at 173; *see Satanic Temple*, 661 F. Supp. at 175-76 ("[C]ourts have held that a statement contained in

---

[4] The Court must consider these two publications separately, as the district court did. JA220-22; *see Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 253-55 (2014) (evaluating individually each of several challenged statements); *Masson v. New Yorker Mag.*, 501 U.S. 496, 502, 522-25 (1991) (noting some statements were excluded from liability and evaluating remaining statements individually).

18

an article is not defamatory if the article attributes the statement to a source; makes clear that it is a mere allegation; and prints a denial of the allegation, to the extent one has been made."); *Zeitlan*, 220 A.D.3d at 633 (including denial "cuts against the allegedly defamatory implication of the article"). The Article reports that Wang "told the police that Kizer got her own wine" and "denied that he had given Kizer anything." JA69, 73. The Article further notes "[t]here was no evidence . . . that Kizer had been drugged." JA73. It also reports that a positive result Kizer received on testing she ordered herself was deemed to "not meet the standards for litigation" and that a "forensic toxicologist called the practice of testing for date rape drugs in hair follicles 'controversial.'" *Id.* Moreover, the Article explicitly discusses the idea that Kizer was *not* drugged: "Kizer added that whether or not she'd been given GHB, her clear incapacitation—she was blacked out and moments away from vomiting—left her unable to consent to sex." JA73. As the district court correctly held, this is the "the opposite of 'endorsing' Kizer's version." JA222.

"The same goes for the podcast interview"—Kizer's allegations are framed as such, and Sussman is clear to note that Wang disputes them. JA222; *see* JA84 ("[Kizer] and Wang dispute who poured a glass of wine. . . . Wang says that the glass of wine is closer to her but, um, she says that she saw him pour her the wine . . . .").[5]

---

[5] In one of many attempts to evade the strictures of defamation-by-implication law, Wang (at 46-47) says the Court should analyze the Podcast under an express defamation lens, because Sussman used the word "pour" (as opposed to "gave" or "handed") in the Podcast. This is a distinction

The district court was, therefore, correct that neither the Podcast nor the Article can be read to endorse any implication that Wang drugged Kizer.

### 3. Neither the Article nor the Podcast Implies the Philharmonic Fired Wang Due To Kizer's Allegations

The Complaint's second theory of implied defamation is that Appellees "implie[d] that Wang (in addition to Muckey) was fired by the Philharmonic in 2018 for this supposed conduct against Kizer." JA15-16 (Compl. ¶ 2). But, as the district court correctly held, neither the Article nor the Podcast implies this, nor do they endorse any such implication.[6]

Rather than suggesting that Wang was fired because of conduct toward Kizer, the Article, in fact, explicitly disavows any such implication. It reads: "In early 2018, . . . the Philharmonic returned to the allegations Kizer made *against Muckey*. The orchestra hired Barbara S. Jones, a former federal judge, to conduct an

---

without a difference, since any defamatory import to pouring Kizer's wine (just like handing it to her) comes from the purported implication that Wang drugged that wine. In any event, Wang's Complaint pleads implied, not express defamation, and does not identify this as a false statement. And what's more, Wang's rule (at 46-47) about the standard for implications "flow[ing] from a mix of true and false statements" is invented—neither case he cites states that proposition. *See Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380-81 (1995); *Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280, 297 n.7 (S.D.N.Y. 2023).

[6] Wang (at 17, 43, 53) repeatedly misrepresents the opinion below by claiming the district court "acknowledged that the article implied that Wang was terminated due to Kizer's allegations." Wang points to nothing in the opinion below suggesting this, nor could he—the district court held that "the 'plain language' of the statement and its context indicates that it is at worst a sloppy sentence, not an intended defamatory innuendo." JA223 (quoting *Stepanov*, 120 A.D.3d at 37). Nowhere in the opinion did the district court find that the Article *did* imply he was fired for Kizer's allegations. Wang's (at 43) protest that he can find "no decision where a court applying New York law" found a defamatory implication existed but was not endorsed is specious at best—preventing courts from making such a bifurcated finding would collapse the *Stepanov* standard.

20

independent investigation. In addition to Kizer's claims, the orchestra learned about the earlier rape allegation against Muckey and *unrelated allegations of sexual misconduct against Wang*. (Muckey and Wang denied the allegations.)" JA74 (emphases added). The Article, therefore, clearly disclaims the alleged defamatory implication, as the district court correctly held. There's more: In describing the arbitration, the Article notes the union's position that "two dues-paying members had the right to have a neutral arbitrator hear and decide the merits of their discharge *cases*," *id.* (emphasis added), and when recounting the arbitrator's ruling the Article quotes the arbitrator's statement that the "*events* at issue occurred some 8, 10, *and* 12 years prior," clearly indicating multiple, separate events, JA75 (emphases added).

The Podcast, too, explains the unrelated nature of Wang's firing and thus does not make or endorse an implication that Wang was fired because of Kizer's allegations. JA224 ("Sussman's statements . . . don't indicate that [he] wanted listeners to think Wang was investigated [and fired] for Kizer's allegations."). As the district court noted, JA220, in response to the podcast host asking if Wang was fired "due to the allegations of what happened in 2010," Sussman responded that Wang was fired because of "multiple allegations, separate allegations," and added that as to Kizer's allegations, he only knew that Wang "was present" but didn't "otherwise know his involvement." JA91; *see* JA220 ("Read (or rather heard) in context, Sussman's answer wasn't a 'yes.'").

21

Thus, as the district court correctly held, neither the Article nor the Podcast intends or endorses the defamatory implication that Wang was fired based on Kizer's allegations.

### 4. Wang's Counterarguments Are Unavailing

In the Opening Brief, Wang makes five dizzying arguments to avoid this obvious outcome. None are successful.

*First*, Wang's primary argument, stated a few different ways, is that the *Stepanov* test, which has been accepted by all four departments of the Appellate Division, does not apply to this action because he believes that the Court of Appeals would disagree with it. This argument—which asks this Court to overrule the decisions of New York appellate courts about New York law—is obviously incorrect.

Wang (at 48-53) claims that the case in which the Court of Appeals first recognized implied defamation, *November v. Time*, 13 N.Y.2d 175, 179 (1963), created a rule different than *Stepanov* because it did not contain the requirement of endorsing or intending the defamatory implication. Initially, *November* was decided *before* the tort of defamation was constitutionalized by the United States Supreme Court in *New York Times v. Sullivan,* 376 U.S. 254 (1964). In addition, and tellingly, Wang omits critical language from *November* that in fact suggested intent was relevant. In particular, *November* held that determining whether there is a

defamatory implication "depends not on isolated or detached statements but on the whole apparent scope and intent." 13 N.Y.2d at 178. *November* is, therefore, entirely consistent with the First Department's decision in *Stepanov*. Further, the Court of Appeals revisited the issue of defamation by implication in *Armstrong v. Simon & Schuster, Inc.*, noting the various standards adopted by various jurisdictions for defamation by implication claims and ultimately holding "that the appropriate test for claims of defamation by implication claims must . . . await another day." 85 N.Y.2d 373, 381 (1995). In the intervening decades, all four departments of the Appellate Division accepted *Armstrong*'s invitation and adopted the "heightened" *Stepanov* standard requiring both implication and intent or endorsement. *Bisimwa*, 194 A.D.3d at 1472; *see Udell*, 169 A.D.3d at 957; *Partridge*, 173 A.D.3d at 91. So too have the courts within this Circuit, as well as the D.C., First, Fourth, Sixth, Seventh, and Ninth Circuits. *See, e.g., Biro*, 883 F. Supp. 2d at 466 ("In light of these authorities, the [c]ourt joins the other courts applying New York law and adopts the Fourth Circuit's approach to defamatory implication claims . . . ."); *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990); *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993); *Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520, 528-29 (6th Cir. 2007); *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 487 (7th Cir. 1986); *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988);

23

*Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998). Wang's belief that the Court of Appeals would return to an understanding of defamation of implication *less* protective of speech than the *Stepanov* standard is simply wrong, and this Court should decline his request to rewrite New York substantive law.[7]

*Second*, Wang (at 34-37) argues that the district court erred by failing to give more weight to his allegation that someone else's reporting in "The Violin Channel" is dispositive of what the Article meant and what the Appellees intended as a matter of law. This argument is flatly incorrect. *Even if* the Article could be read to imply (as Wang claims the Violin Channel read it) that Wang was fired because of Kizer's allegations, it would not disturb this Court's conclusion that the Article lacked any intent or endorsement of such implication. In addition, whether a statement is susceptible of a defamatory interpretation is a question of law for the Court, and an "objective" inquiry. JA241; *see Stepanov*, 120 A.D.3d at 37 (explaining this is "an objective [test] that asks whether the plain language of the communication itself suggests that an inference was intended or endorsed"). This determination cannot

---

[7] Wang (at 51) concedes this unanimity would "ordinarily be persuasive evidence that the Court of Appeals would adopt the *Stepanov* test." (citing *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000)). But, he says, we must throw out this ringing consensus—and its broad acceptance by federal courts—because the 2020 amendments to New York's anti-SLAPP law broadened the reach of the *actual malice* standard in defamation cases. *See* N.Y. Civil Rights Law § 76-a. This argument is nonsensical. That the New York legislature saw fit to *heighten* protections for defamation defendants in one area of defamation law is hardly evidence that it intended to *lower* protections for defamation defendants who made no explicitly false statements. This is particularly true because the Fourth Department adopted the intent-or-endorse standard *after* the 2020 amendments. *Bisimwa*, 194 A.D.3d 1467.

24

be made by external evidence. *See Aboutaam v. Dow Jones & Co.*, 180 A.D.3d 573, 575 (1st Dep't 2020) ("The motion court properly declined to consider the survey proffered by plaintiff. Whether a statement is defamatory is a legal question to be determined by the court, not by survey participants." (citation omitted)); *Metabolife Int'l, Inc. v. Wornick*, 72 F. Supp. 2d 1160, 1173 n.17 (S.D. Cal. 1999) (declining to consider survey evidence offered to show defamatory implication, since it "does not assist the Court in making the threshold determination of law" of "whether a statement carries an alleged implication"), *aff'd in relevant part*, 264 F.3d 832 (9th Cir. 2001); *Tomblin v. WCHS-TV8*, 434 F. App'x 205, 212 (4th Cir. 2011) (affirming exclusion of third parties' opinions regarding the alleged defamatory meaning of a broadcast, and noting that such opinions are "unhelpful"). Even the case on which Wang purports to rely acknowledges that "the test is not whether some actual readers were misled, but whether the hypothetical reader could be (after time for reflection)." *Tah v. Glob. Witness Publ'g*, 413 F. Supp. 3d 1, 11 (D.D.C. 2019) (cleaned up) (quoting *Farah v. Esquire Mag.*, 736 F.3d 528, 537 (D.C. Cir. 2013), *aff'd,* 991 F.3d 231 (D.C. Cir. 2021)). And the "reader" interpretation considered in *Tah*, which was "not dispositive," was "the considered views of the investigatory committee formed by the Government of Liberia—which investigation the Report had urged." *Id.* As the district court agreed, "[t]hat's a far cry from this case." JA241. The district

25

court was, therefore, correct in refusing to take as dispositive the stray comments of a reporter on the Violin Channel.  This Court should do the same.

*Third*, Wang (at 39-41) argues that the district court interpreted defamation-by-implication cases to "immunize[]" publications that include denials.  But, as the district court already found when addressing this argument on reconsideration, "That's not what the Court said.  Rather, it did what New York law requires.  It applied the law's framework to the particular statements in the article and podcast interview at issue, and compared the communications here with others where courts recognized a potential claim."  JA241 (citation omitted).

In addition, Wang's efforts to distinguish this case from those relied on by the district court fall flat.  He (at 41) first argues that *Stepanov* is distinguishable because the plaintiff there was less "central" to the challenged article than Wang is here.  But the *Stepanov* court did not discuss, let alone emphasize, the importance of the plaintiff's role in the challenged article when determining that none of the alleged implications were intended or endorsed.  *See* 120 A.D.3d at 38-40.

Next, Wang (at 39-40) tries to distinguish *Kesner* and *Satanic Temple*, by claiming that those cases rely on "more than just the inclusion of a denial" to conclude there was no endorsed defamatory implication.  Instead, he argues, the publications in *Kesner* and *Satanic Temple* crafted the alleged defamatory implications as allegations.  But this is neither a distinction nor a difference.  As the

26

district court held, the Article does the same. The Article says "Kizer *alleged* that Wang brought her a glass of red wine. Wang told the police that Kizer got her own wine," JA69 (emphasis added), and "Kizer *told* her husband about the glass of wine," JA70 (emphasis added). The Article further reports that after police-ordered drug tests provided "no evidence . . . that Kizer had been drugged," *Kizer* ordered GHB testing on her own hair. JA73. In short, the Article, just as those in *Kesner* and *Satanic Temple*, "reports Kizer's allegations *as allegations*." JA222 (emphasis in original). Wang's efforts to distinguish *Kesner* and *Satanic Temple*, therefore, fall flat. [8]

So do Wang's efforts to liken this case to *Partridge,* 173 A.D.3d 86, and *Watson v. NY Doe 1*, 439 F. Supp. 3d 152 (S.D.N.Y. 2020), both of which survived a motion to dismiss. Wang (at 43-44) first claims the placement of the plaintiff's photo in *Partridge* is like the placement of Wang's photograph under the headline of the Article. But as the district court held, the defendants in *Partridge* did not

---

[8] Here, Wang (at 40) also makes the head-scratching argument that "the lack of weight accorded to denials in the context of assessing actual malice is instructive of the weight that denials should be afforded when assessing defamatory meaning." (citing *Coliniatis v. Dimas*, 965 F. Supp. 511, 519 (S.D.N.Y. 1997) for the proposition that publishing in the face of a denial "does not establish clear and convincing evidence of malice"). Wang is mistaken that denials hold no "weight" in the actual malice context—in fact, including a denial in a publication is powerful evidence in rebutting an inference of actual malice. *See, e.g.*, *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 283 (S.D.N.Y. 2013) (collecting cases), *aff'd,* 807 F.3d 541 (2d Cir. 2015), *aff'd,* 622 F. App'x 67 (2d Cir. 2015); *infra* pp. 43-44. Publishing a denial, then, consistently weighs against the plaintiff in a defamation claim.

"suppl[y] [their] readers with ready access to truthful information," as Appellees did here. JA223.[9] Indeed, in *Partridge*, the "additional, affirmative evidence suggesting that the defendant intend[ed] or endorse[d] the defamatory inference" was "the use of a small, unreadable label listing the crime for which claimant was actually arrested." 173 A.D.3d at 95. Here, by contrast, the Article and the Podcast both explicitly describe Wang being fired over "unrelated" and "separate" allegations. And *Watson*, which involved a statement on a Facebook page posted in response to speculation about sexually harassing behavior, has little relevance here. 439 F. Supp. 3d at 162. Unlike in *Watson*, the Article, in addition to characterizing Kizer's allegations as just that, allegations, also included multiple denials from the plaintiff, and even included other information undercutting the reported allegations. In short, *Partridge* and *Watson* have little bearing on the facts of this case, which is much more akin to *Kesner* and *Satanic Temple.*

*Fourth*, Wang (at 41-42) purports to cite three cases "allow[ing] defamation claims to proceed even without making any express finding that the defamatory implication was intended or endorsed." But this, too, is unpersuasive. One of these

---

[9] Wang's complaints about the Article's headline are a dead end: it is undisputedly true that Wang was "fired for sexual misconduct," including sexual assault, and then subsequently was "back with the orchestra." App. Br. at 21, 30, 39, 41, 44-45. To refer to Muckey's and Wang's simultaneous firing (both for sexual assault) and then rehiring as a "sexual-assault scandal" is accurate and does not imply Wang was fired because of Kizer's allegations. Moreover, the headline, along with the picture, is "a fair index of the truthful matter contained in the related news article and is therefore not actionable." *Gunduz v. N.Y. Post Co.*, 188 A.D.2d 294, 294 (1st Dep't 1992); *accord, e.g.*, *Kesner v. Dow Jones & Co.*, 2023 WL 4072929, at *1-2 (2d Cir. June 20, 2023).

28

cases predates *Stepanov*. *See Cianci v. New Times Pub. Co.*, 639 F.2d 54 (2d Cir. 1980). And that the other two do not use the terms "intend" or "endorse" does not lessen the effect of the rule in New York. *See Davis v. Brown*, 211 A.D.3d 524 (1st Dep't 2022); *Elias v. Rolling Stone LLC*, 872 F.3d 97 (2d Cir. 2017). That is particularly true because (as Wang fails to mention), this Court has applied the *Stepanov* test to dismiss an implication claim. *Kavanagh*, 578 F. App'x at 24.

Finally, Wang spends pages quibbling over how the Article and Podcast describe the wine that Kizer consumed before her alleged assault. Specifically, Wang (at 9, 36 n.6) tries to manufacture a controversy as to the amount of wine that Kizer consumed, suggesting that the Article omitted that "Kizer said she drank only one or two sips." But as the district court held, the publications "never say[] that Kizer drank a significant amount of the wine that Wang purportedly gave her." JA217. Fundamentally, Judge Subramanian was correct when he concluded that "[r]ead in any context, [Defendants' statements] say that [Kizer] *did* drink from the glass of wine—which Wang doesn't say is false." *Id.*[10]

---

[10] Wang (at 36 n.6) argues that "omissions" in the Article "leave intact" an "impression" that "the only possible reason for Kizer's lack of memory was that Wang drugged her." At the outset, the Article explicitly disavows any such impression by acknowledging that Kizer's blackout may not have been drug-induced. JA73 ("Kizer added that whether or not she'd been given GHB, her clear incapacitation—she was blacked out and moments away from vomiting—left her unable to consent to sex."). Consistent with that, and as Wang concedes, the Article nowhere says that glass of wine was Kizer's only drink that evening. That the Article didn't report Kizer's statement that she had "very little of the wine, probably a couple sips" does not help Wang, since this information in the mind of a reasonable reader would certainly not *lessen* the likelihood that she was drugged. CA9. And that Kizer did not see who poured the glass of wine she claimed Wang gave her also

Ultimately, Wang cannot escape a straightforward application of the widely accepted *Stepanov* test, which dooms his claims. Neither the Article nor the Podcast can be understood to make or endorse Wang's alleged implications. For that reason, this Court should affirm.

## B.    THE COMPLAINT MAY BE DISMISSED ON INDEPENDENT GROUNDS

This Court "can affirm the dismissal of a complaint on any basis supported by the record." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 117 (2d Cir. 2013); *accord, e.g.*, *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006) ("The district court did not provide this as a basis for dismissing [plaintiff]'s claim, but we are free to affirm a decision on any grounds supported in the record, even if it is not one on which the trial court relied."). Here, this Court can affirm because, as fully briefed below, the Article is a fair report of official proceedings,

---

does not change that the Article did not imply Wang drugged her, since, contrary to Wang's claim, the Article did not itself "allege[] that Wang gave her" the wine. App. Br. at 36 n.6. Moreover, Wang's reliance on "omissions" caselaw is misplaced: In *Armbruster Capital Management, Inc. v. Barrett*, 243 A.D.3d 1356 (4th Dep't 2025), the court not only noted (without elaboration) that the challenged statements not told the "whole story," but it also emphasized that "the plain language of the statements suggested that the individual parties intended that false suggestion and impression." *Id.* at 1360. Such is not the case here. And in *Davis*, 211 A.D.3d 524, the article "implied that plaintiff was responsible for [a fashion] show," had knowledge of its offensive content, and failed to respond to student concerns, but it omitted that plaintiff did not participate in the production, direction, or management of the show, was not aware of the offensive content planned for the show, was in fact prohibited by school policy from censoring the show, and promptly worked to address concerns that arose from the show. *Id.* at 525-26. This is a far cry from the purported "omissions" here, which are at most editorial decisions about the amount of detail to include in an article. As the district court correctly noted, "Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors. It is not the business of government." JA221 (quoting *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1306 (8th Cir. 1986)).

30

the second alleged implication—*i.e.*, that Wang was fired for sexual misconduct— is substantially true, and Wang did not plead actual malice as to the Article or the Podcast.

### 1. The Article is a Fair Report of Official Proceedings

First, the Article's coverage of Kizer's sexual assault allegations, including statements about Wang, are not actionable because they are a fair report of official proceedings. *See* N.Y. Civ. Rights Law § 74.

Section 74 of the Civil Rights Law provides, in relevant part, that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding." *Id.* "New York courts adopt a 'liberal interpretation of the "fair and true report" standard of § 74 so as to provide broad protection to news accounts of [official] proceedings.'" *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2017) (quoting *Becher v. Troy Publ'g Co.*, 183 A.D.2d 230, 233 (3d Dep't 1992)). "When determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision." *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 68 (1979). Rather, "[a] statement is deemed a fair and true report if it is substantially accurate, that is if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the

31

precise truth." *Friedman*, 884 F.3d at 93 (cleaned up). Where, as here, the "essential" documents of the proceeding are before the Court, "it is for the Court, in the first instance, to decide whether a publication is protected under section 74." *Karp v. Hill & Knowlton, Inc.*, 631 F. Supp. 360, 363 (S.D.N.Y. 1986) (collecting cases). Courts therefore regularly apply the privilege at the dismissal stage. *See, e.g.*, *id.*; *Cummings v. City of New York*, 2021 WL 1163654, at *14-15 (S.D.N.Y. Mar. 26, 2021), *aff'd*, 2022 WL 2166585 (2d Cir. June 16, 2022); *BYD Co. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821-22 (S.D.N.Y. 2021), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022).

The police investigation into Kizer's allegations against Muckey is an "official proceeding" within the scope of Section 74, which applies to both "ongoing investigation[s]" and "completed investigation[s]," whether or not "the activities of the [investigating] agency [are] public." *Freeze Right Refrigeration & Air Conditioning Servs. v. City of New York*, 101 A.D.2d 175, 182 (1st Dep't 1984); *see, e.g.*, *Rodriguez v. Daily News, L.P.*, 142 A.D.3d 1062, 1063 (2d Dep't 2015) ("[T]he police investigation of the attempted rape constituted an 'official proceeding' under the statute."). The privilege shields "statements made by those connected to the" proceeding, *Daleiden v. Planned Parenthood Fed'n of Am.*, 2022 WL 1013982, at *2 (2d Cir. Apr. 5, 2022), and information derived from "secondary sources," *Cholowsky v. Siviletti*, 69 A.D.3d 110, 115 (2d Dep't 2009), as well as "the release

32

of background material with regard to the case," *Kesner*, 515 F. Supp. 3d at 172

(citation omitted).  There is "no requirement that the publication report the plaintiff's

side of the controversy" to apply the privilege.  *Cholowsky*, 69 A.D.3d at 115.

Here, the Article explicitly attributes its account to "documents from the Vail

Police Department."  JA70.  And the Article accurately reports on the police records.

For example:

- The Article states: "Kizer alleged that Wang brought her a glass of red wine." JA69; *see* JA28 (Compl. ¶ 44).  The Police Report says Kizer told the police that "Wang gave her a glass of red wine," CA9, "Wang handed [Kizer] a glass of wine," CA13, and "[Kizer] said Wang had handed her a glass of wine," CA39.

- The Article reports "Wang later told the police that Kizer got her own wine." JA69.  In a police interview, Wang said he believed "[Kizer] was pouring wine for herself."  CA35.

- The Article states it "is not disputed . . . that Kizer has no memories of what happened after she drank from that glass."  JA69; *see* JA28 (Compl. ¶ 44). The Police Report says Kizer told the police "she had very little of the wine, probably a couple of sips. . . .  The next thing she remembers is waking up on 07/25/10 at about 7:30 a.m."  CA9; *see also* CA20 ("The last thing she remembered was sitting next to the hot tub before waking up naked in bed the next morning."); *see also* CA11 ("She had no memory of a large period of time from about 0100hrs until she woke up around 0800hrs."); CA39 ("[Kizer] could not remember anything after sitting by the hot tub until about 7:30 a.m. the next morning.").

- The Article states: "Kizer sent a sample of her hair to a private lab. . . . A six-centimeter hair sample was 'positive for the presence of GHB.'  Later testing suggested the exposure occurred around the month of the alleged assault." JA73; *see* JA28 (Compl. ¶ 43).  The Police Report says Jacobs received "a copy of the lab report for the hair sample [Kizer] sent," which "showed positive for the presence of GHB," and had a "length of 6 cm."  CA46; *see also* CA48 (describing report dating increased GHB to time of alleged

33

assault).

- The Article states that, "[i]n later police interviews," "one colleague described Wang as 'sleazy.'" JA68; *see* JA28 (Compl. ¶ 44). The Police Report recounts that a witness "described Wang as 'sleazy' and believes that everyone should bow down to him." CA36.

- The Article states: "Jacobs asked whether [Muckey and Wang] would be capable of drugging someone to commit a crime. 'Yes,' the man replied, 'I could see that.'" JA71; *see* JA28 (Compl. ¶ 44). Detective Jacobs "asked [another witness] if he thought Muckey or Li[a]ng Wang would be capable of drugging someone to commit a crime. The witness said, 'I believe they think everything i[n] the world is theirs for the taking. Yes, I could see that.'" CA24.

All of these facts in the Article are thus privileged as a fair report of the police report.

Additionally, even if the Article implied Wang drugged Kizer *and* endorsed that implication, *but see supra* pp. 18-20, the Article would still be a fair report of the police investigation. When facts are privileged, "any defamatory implication that follows from" them is likewise privileged. *Kesner*, 515 F. Supp. 3d at 174. In *Kesner*, the plaintiff alleged that an article impliedly defamed him by accusing him of failing to act as a "gatekeeper" and letting his client violate securities laws. The court dismissed the claim because that alleged implication was a "fair synopsis" of pleadings in a litigation involving the plaintiff. As the court held, because "components of the article . . . were absolutely privileged, [so too was] any defamatory implication that follows from these allegations." *Id.* Similarly here, the factual components of the Article are privileged, and so too would be any implication arising therefrom.

34

It would also be protected as opinion. "[T]he extent to which a reader may draw any inference about [plaintiff]'s culpability [from facts privileged by § 74] is a reflection of the author's opinion based on fully disclosed facts." *Biro*, 883 F. Supp. 2d at 481; *accord* Restatement (Second) of Torts § 566 cmt. c(2) (1977) ("If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of facts that are not defamatory, he is not subject to liability for the factual statement—nor for the expression of opinion . . . . The same result is reached if the statement of facts is found to be privileged."). Thus, even if the Article made and could be read to intend or endorse an implication that Wang drugged Kizer (it cannot), that implication would nevertheless be protected as an opinion based on the privileged facts contained in the police report.

To the extent the Complaint claims that "the arbitration decision reveals" facts different from those reported from the police report, JA30-31, 33 (Compl. ¶¶ 49-50, 57), these allegations do nothing to defeat the fair report privilege, which concerns itself only with the accuracy of the report as compared to the relevant official proceeding. *See Cummings*, 2021 WL 1163654, at *14 ("The question is not whether or not the statement is true. The question is whether it is a substantially accurate description of the claims made in the proceeding." (cleaned up)).

Finally, to the extent the Complaint alleges (and Wang again argues) that the Article "omitted" parts of the police report about (1) the amount of wine Kizer drank

35

from the glass at Muckey's condo, and (2) the amount of alcohol Kizer drank at the party beforehand, JA31-33 (Compl. ¶¶ 52-56), that argument is also unsuccessful. The fair report privilege is not defeated by claims that an article omitted facts from the proceeding, so long as "those omissions did not alter the substantially accurate character of the article." *McDonald v. E. Hampton Star*, 10 A.D.3d 639, 640 (2d Dep't 2004). Here, Wang (at 36 n.6) claims the Article was inaccurate by suggesting Kizer's memory loss was attributable *only* to the wine she drank at Wang and Muckey's condo. But that allegation is implausible on its face. The Article quotes Kizer discussing an alternative possibility: "Kizer added that whether or not she'd been given GHB, her clear incapacitation—she was blacked out and moments away from vomiting—left her unable to consent to sex." JA73. The Article, therefore, fairly reports on the police report.

### 2. Wang Cannot Plead Falsity as to the Firing Implication

Second, Wang's claims that the Article and Podcast defamed him by implying he was fired because of sexual misconduct against Kizer could also be dismissed because Wang cannot plausibly allege such an implication is materially false: Wang was undisputedly terminated in 2018 for allegedly drugging and sexually assaulting a different woman.

"Because falsity is an element of New York's defamation tort, and 'falsity' refers to material not substantially true, the complaint in this case must plead facts

36

that, if proven, would establish that the defendant's statements were not substantially true." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017). A statement is substantially true if it "could have produced no worse an effect on the mind of the reader than the truth." *Chau v. Lewis*, 771 F.3d 118, 131 (2d Cir. 2014).

Here, even if the Article or Podcast implied that Wang was terminated because he was accused of drugging Kizer, it would be substantially true because Wang was terminated for an earlier alleged incident, in which he was accused of drugging another musician with a glass of wine and then having anal, oral and vaginal sex with her without her consent. CA104-05. (The termination was also based on a more recent incident when Wang was alleged to have behaved in a "gross and inappropriate and uncomfortable" manner. CA112-13.) Thus, even if the Article or Podcast did imply Wang was fired for sexual misconduct with Kizer (they did not), that would still be substantially true because the alleged defamatory sting is that he was fired for sexual misconduct, not the identity of the woman or the date of the assault. *See, e.g.*, *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993) (statement that plaintiff mistreated his children not materially false when plaintiff took other actions that made him an unreliable father); *Bustos v. A&E Television Networks*, 646 F.3d 762, 765 (10th Cir. 2011) (referring to plaintiff as "member" of Aryan Nation not materially false when plaintiff provided assistance to gang).

37

To avoid this result, Wang (at 5-7, 53) argues that that the unrelated sexual assault allegations against him were "substantially dissimilar to the Kizer story" because his accuser's allegations were "far more dubious." *See also* JA203 (Wang's counsel describing rape allegation as "a laughable accusation"). Wang (at 7) wistfully asserts that any reputational harm from the sexual assault allegation against him "would have been comparatively minor," but the alleged facts speak for themselves. CA104 (describing allegation of "sex that was aggressive, brutal and wholly non-consensual"). Put simply, questioning a woman's credibility because she also engaged in consensual sex with her alleged assailant on other occasions is a similarly outdated notion to Wang's and the arbitrator's contention that someone can consent to sex while blacked out. JA148 (Wang's counsel stating at oral argument: "Being blacked out doesn't leave anyone unable to consent to sex or to do anything because they're blacked out."); CA92 (arbitrator relying on testimony that "it is possible, in a blackout state, for a person to engage in . . . deciding to have sex or not have sex" (citation omitted)). In any event, as the district court noted, the pleaded truth here would be "equally devastating" to Wang. JA154.[11]

---

[11] Wang also does not dispute that the Philharmonic has now *again* fired him after crediting allegations of sexual misconduct against him. To be clear, he disputes that the Philharmonic invoked this investigation in its actual termination of him, JA242, but not that the Philharmonic player's union reached a non-reengagement recommendation about him based on the investigation, in which "11 [new] witnesses . . . testified to specific instances of rape, sexual assault, grooming of a young female musician, inappropriate touching and comments, unwelcome kissing, and other sexually harassing behavior" by Wang. Exhibit D at 7, *Wang v. Philharmonic*, No. 24-cv-3356

38

### 3. Wang Cannot Plead Actual Malice as to the Article or the Podcast

Finally, both counts of the Complaint may independently be dismissed, because Wang does not and cannot plead actual malice as to either the Article or the Podcast.

Wang's claims are subject to New York's anti-SLAPP law, which was amended in 2020 by the New York Legislature to "broaden" its scope. *Sweigert v. Goodman*, 2021 WL 1578097, at *1 (S.D.N.Y. Apr. 22, 2021). The amendment "substantially broadened the reach of the actual malice rule," *Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 25 (S.D.N.Y. 2020), such that it applies to cases arising from "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a(1)(a)(2). Section 76-a applies to this diversity action. *See, e.g.*, *Palin*, 510 F. Supp. 3d at 25; *cf. La Liberte v. Reid*, 966 F.3d 79, 86 n.3 (2d Cir. 2020).[12]

The "public interest" provision "shall be construed broadly, and shall mean any subject other than a purely private matter." N.Y. Civ. Rights Law § 76-a(2)(d).

---

(S.D.N.Y. June 9, 2025), ECF No. 107-4. (Wang is engaged in litigation over his employment status with the Philharmonic. JA16 (Compl. ¶ 5 n.2).

[12] In any event, Wang, who describes himself as "one of the world's most accomplished classical musicians," JA16 (Compl. ¶ 8), is a public figure who is required to prove actual malice. *See James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 422 (1976) ("The essential element underlying the category of public figures is that the publicized person has taken an affirmative step to attract public attention.").

It is beyond dispute that an article and podcast concerning the alleged sexual misconduct of members of the New York Philharmonic are matters of public concern. *Cf., e.g.*, *Coleman v. Grand*, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021) (holding that communications sent by a young saxophonist, which contained allegations of sexual misconduct against a more senior, prominent saxophonist, "indisputably" involved an issue of public interest—"sexual impropriety and power dynamics in the music industry"), *aff'd*, 158 F.4th 132 (2d Cir. 2025); *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 595 (1989) (book discussing sexual relationship between woman and psychiatrist concerned matter of public interest); *Shuman v. N.Y. Mag.*, 211 A.D.3d 558, 558 (1st Dep't 2022) (article about woman's extortion of men, including via accusations of rape, assault, and sexual harassment, involved matter of public concern).

Wang must, therefore, plausibly allege that Appellees acted with actual malice. To do so, he "must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro*, 807 F.3d at 546 (alteration in original) (quoting *Twombly*, 550 U.S. at 556). Actual malice requires "clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984). Allegations of actual malice that

40

are no more than "pure speculation" and are "supported not by facts but by only conclusory statements" are insufficient grounds to infer actual malice. *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 185 (S.D.N.Y. 2020) (dismissing defamation claim because plaintiff's allegations of personal bias were insufficient to show actual malice). Wang's conclusory allegations do not meet this high standard as to either the Article or the Podcast.

First, the thrust of the Complaint's actual malice allegations as to both the Article and the Podcast is that "Sussman and New York Magazine, in the service of their preconceived narrative, included only dubious claims selectively manipulated to appear to support the notion of Wang drugging Kizer, while deliberately not reporting the actual facts that revealed strong reasons to doubt how the article portrays the drugging allegation." JA33 (Compl. ¶ 58); *see* JA31-33 (Compl. ¶¶ 52-57). This theory is neither legally sufficient nor factually plausible. "[P]reconceived notions or suspicions usually do little to show actual malice" because "virtually any work of investigative journalism begins with some measure of suspicion." *Tah*, 991 F.3d at 241. Wang was required to plead more than just a preconceived storyline: he was required to, and did not, plead deliberate falsification. Nor is Wang's allegation that Appellees omitted facts sufficient to plead malice. Courts applying New York law have rejected the "contention" that "selective omission of relevant data provides circumstantial evidence of defendants' actual malice." *Reliance Ins.*

41

*Co. v. Barron's*, 442 F. Supp. 1341, 1352 (S.D.N.Y. 1977); *see Biro*, 963 F. Supp. 2d at 285 ("Obviously the author of an article will have to choose which facts to include and which to omit." (quoting *Reliance*, 442 F. Supp. at 1341)).

As to the Article in particular, Wang's nebulous allegation that Sussman failed to investigate information in the Article about the police report or an alleged GHB drugging, *see* JA32 (Compl. ¶ 55), is insufficient. Failure to investigate, "even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *BYD*, 531 F. Supp. 3d at 826 (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)). Indeed, "the operative question is whether a defendant failed to investigate in the face of actual, subjective doubts as to the accuracy of the story." *Biro*, 963 F. Supp. 2d at 278 (citation omitted). Wang has not alleged any such doubts.

Equally unavailing is the Complaint's assertion that Vox Media "revealed its malice and bias" by "refusing to revise the article" after receiving correspondence from Wang's counsel asserting the Article was false and defamatory. JA35 (Compl. ¶ 64); *see* JA 35-36 (Compl. ¶¶ 62–64). As Wang (at 40) concedes, "liability under the [actual malice standard] cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d

42

Cir. 1977). In addition, to the extent Wang is referring to *post-publication* correspondence from Wang's counsel, that correspondence is irrelevant to the actual malice analysis, which is judged "at the time of publication." *Bose*, 466 U.S. at 512.

Even taken together, these factors do not constitute allegations of purposeful avoidance of the truth. In *Brimelow v. New York Times Co.*, 2021 WL 4901969 (2d Cir. Oct. 21, 2021), the plaintiff alleged that the New York Times acted with actual malice based on a list of factors almost identical to those at issue here, including that the defendant allegedly ignored plaintiffs' denials, acted with ill will or a preconceived narrative, failed to investigate, and failed to act impartially. *See id.* at *3. This Court considered these factors and concluded they did not add up to actual malice, holding there was "no combination of allegations from which one could plausibly infer that the Times was purposely avoiding the truth." *Id.* Using the same analysis, Wang has not alleged actual malice here.

This is particularly true because both the Article and the Podcast included Wang's denials. "[I]ncluding denials of a plaintiff rebuts [an] inference of actual malice." *Biro*, 963 F. Supp. 2d at 283. Here, the Article includes several: it reports that (1) Wang "told the police that Kizer got her own wine," JA69; (2) "Wang denied that he had given Kizer anything," JA73; (3) "Wang denied the allegations" that led to his 2018 firing, JA74; and (4) "[a] lawyer for Wang stressed that [the arbitrator] is 'one of the most highly respected labor arbitrators' and the hearing he conducted

43

'finally allowed all of the facts to be fully examined, and after the hearing, Arbitrator Bloch concluded that the Philharmonic had simply failed to prove any misconduct' by Wang," JA75. Likewise, the Podcast relayed Kizer's and Wang's "dispute" over the glass of wine, JA84. And far from presenting a one-sided account of any implication of drugging, the Article specifically notes that police-ordered testing produced "no evidence . . . that Kizer had been drugged" and that Kizer's private testing was deemed to "not meet the standards for litigation" and was called "controversial" by a forensic toxicologist. JA73. In short, Appellees made efforts throughout the Article to include Wang's side of the story. Wang has simply failed to allege actual malice.

## II.  CROSS-APPEAL:  SECTION 70-A ENTITLES APPELLEES TO ATTORNEYS' FEES

The district court incorrectly denied Appellees' motion under Rule 54 of the Federal Rules of Civil Procedure to recover attorneys' fees under the substantive fee-shifting provision of New York's anti-SLAPP law, New York Civil Rights Law § 70-a.

By way of background, the New York anti-SLAPP law was amended in 2020 to broaden free speech protections under New York law. The New York "Legislature specifically intended [the amendments] to enhance protections for defendants and thereby minimize litigation that chills free speech." *Gottwald v. Sebert*, 40 N.Y.3d 240, 264 (2023). The statute contains two sets of provisions:  its

44

substantive provisions, found in the Civil Rights Law chapter of the Consolidated Laws of New York, *see* N.Y. Civil Rights Law §§ 70-a, 76-a, and its procedural provisions, found in New York's Civil Practice Law & Rules, *see* CPLR 3211(g), 3212(h). In the Civil Rights Law, Section 76-a defines a SLAPP action (an "action involving public petition and participation") and requires that a plaintiff in a SLAPP action show actual malice, *i.e.*, "that any communication which gives rise to the action was made with knowledge of falsity or with reckless disregard of whether it was false." *Id.* § 76-a(2). Section 70-a, in turn, provides for, among other things, a mandatory award of attorneys' fees and costs in an action involving public petition and participation:

> [C]osts and attorney's fees shall be recovered upon a demonstration, including an adjudication pursuant to subdivision (g) of rule thirty-two hundred eleven or subdivision (h) of rule thirty-two hundred twelve of the civil practice law and rules, that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law . . . .

*Id.* § 70-a(1)(a).

### A. Section 70-a Applies in Federal Diversity Cases

As a growing number of courts have recognized, New York's substantive fee-shifting provision applies to this federal diversity action. *See Richey v. Showtime Networks Inc.*, 2026 WL 867264, at *4-5 (D. Del. Mar. 30, 2026) (Bibas, J., sitting by designation); *Grifols, S.A. v. Yu*, 2026 WL 836657, at *3-6 (S.D.N.Y. Mar. 26,

45

2026) (Liman, J.); *Bobulinski*, 758 F. Supp. 3d at 182-89.  This Court should follow suit.

"The Rules of Decision Act directs federal courts to apply state substantive law, leaving federal law to cover the rest." *Berk v. Choy*, 146 S. Ct. 546, 552 (2026) (citing 28 U.S.C. § 1652); *see Hanna v. Plumer*, 380 U.S. 460, 465 (1965); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  And "determining whether a state law is substantive requires a court to enter '*Erie*'s murky waters." *Berk*, 146 S. Ct. at 552 (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)).  This determination is avoided only if a Federal Rule of Civil Procedure (or other federal law) "answers the question in dispute." *Shady Grove*, 559 U.S. at 398; *accord Berk*, 146 S. Ct. at 552. Here, there is no federal rule that answers the question of whether Defendants are entitled to fees under the anti-SLAPP law, and the fee provision is substantive such that New York law applies.

First, there is no Federal Rule of Civil Procedure that answers the question in dispute:  whether Appellees are entitled to attorneys' fees.  That is, no Federal Rule determines whether a party is entitled to attorneys' fees upon prevailing in the lawsuit.  For example, despite Wang's arguments to the contrary, Rule 11, which includes attorneys' fees as one example of a "sanction" imposed upon a party, Fed. R. Civ. P. 11(c)(4), does not answer this question, because the fee award in anti-SLAPP cases is not a sanction.  *See Bobulinski*, 758 F. Supp. 3d at 189 n.24 ("New

46

York courts have treated [Section 70-a] not as a 'sanction,' but rather as a mandatory award of attorneys' fees to the prevailing defendant in a SLAPP suit." (citation omitted)).  Indeed, Judge Liman of the Southern District, who had previously denied a party's fee application under Section 70-a on the basis that it conflicted with Rule 11, has since changed position and ruled that Section 70-a "creates a substantive right that does not conflict with the Federal Rules of Civil Procedure and is thus applicable in federal court."  *Grifols, S.A.*, 2026 WL 836657, at *6 (Liman, J.).

Likewise, Rule 12 does not answer the question of whether Defendants are entitled to fees: it answers the question of what standard governs motions to dismiss, and what procedures are available as part of that motion practice.  This Rule does not conflict with Section 70-a, which does not answer those questions.  Indeed, as Third Circuit Judge Bibas recently found when sitting by designation, Section 70-a is distinct from a procedural provision of the anti-SLAPP amendments, CPLR 3211(g), which provides for a different standard on a motion to dismiss (including some consideration of facts outside the pleadings), and which requires the plaintiff to show "that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law."  As Judge Bibas explained, CPLR 3211(g) and Civil Rights Law Section 70-a are separate provisions:  one provides "a procedural mechanism to dismiss the complaint unless the plaintiff can show that his claim has a substantial basis in fact and law,"

47

and the other "gives the defendant a substantive right to costs and attorney's fees after showing that the plaintiff's claim lacks a substantial basis." *Richey*, 2026 WL 867264, at *5; *accord* Grifols, 2026 WL 836657, at *5 ("The fact that procedural provisions of the New York anti-SLAPP statute might conflict with the Federal Rules of Civil Procedure does not deprive the party on the opposite end of a SLAPP lawsuit from the substantive rights that New York intended to provide."); *Bobulinski*, 758 F. Supp. 3d at 183 ("Here, however, the operative rule is not procedural."). Decisions of the lower courts finding otherwise are thus incorrect. *See, e.g.*, *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 430-32 (S.D.N.Y. 2021); *accord, e.g.*, *Carroll v. Trump*, 590 F. Supp. 3d 575, 585 (S.D.N.Y. 2022). Indeed, even Wang (at 52) concedes that Section 76-a, the other substantive provision of the anti-SLAPP law also found in New York's Civil Rights Law, applies to federal actions.

For that reason, this Court's decision in *La Liberte*, 966 F.3d 79, does not guide the outcome here. In *La Liberte*, the Court found that a special motion to strike under California law, which required dismissal unless the plaintiff could establish a probability she would prevail on the claim, conflicted with Rules 12 and 56 because, like those Rules, it answered the question of "the circumstances under which a court must dismiss a plaintiff's claim either before trial." *Id.* at 87 (quoting *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015)). But Section 70-

48

a does not present the same issue: it does not dictate the circumstances under which dismissal is appropriate. *Bobulinski*, 758 F. Supp. 3d at 185-86. *La Liberte*, therefore, is inapplicable.

In short, no federal procedural rule answers the question of a defendant's entitlement to fees after prevailing against a SLAPP suit.

The Rules of Decision Act, therefore, requires this Court to take the second step to determine whether Section 70-a is substantive—and it is. Both the Supreme Court and this Court have held that state-law attorneys' fees provisions are substantive and should be applied in federal diversity cases. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975) ("In an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed." (cleaned up)); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 52 (1991) ("[A] statute which permits a prevailing party in certain classes of litigation to recover fees" "embod[ies] a substantive policy" of the state. (citation omitted)); *see, e.g.*, *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 177 (2d Cir. 2005) ("We apply New York substantive law to resolve the dispute regarding plaintiff's entitlement to attorney's fees."). Indeed, this Court has specifically determined that applying another state's anti-SLAPP fee-shifting provision in a diversity case was

49

"unproblematic." *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014). These cases should be dispositive of the question here.

Applying Section 70-a also accords with the "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna*, 380 U.S. at 468. *See Guaranty Trust Co. v. York*, 326 U.S. 99, 109 (1945) ("[T]he outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court."). "If federal courts refuse to apply [Section 70-a], defendants in state and federal court defending SLAPP suits will have very different outcomes." *Bobulinski*, 758 F. Supp. 3d at 186. Defendants hailed into federal court would have no means of recovering their fees and expenses in SLAPP suits, whereas state court defendants would. Not only that, but the prospect of paying fees acts as a deterrent to would-be plaintiffs considering bringing suits without a substantial basis, as the New York legislature intended. *See, e.g.*, *Swiezy v. Investigative Post, Inc.*, 87 Misc. 3d 1209(A), at *4 (Sup. Ct. Erie Cnty. 2025) (explaining that 2020 amendments "robustly empowered and mandated the courts to award the recovery of costs and attorney's fees to a successful defendant" because "an effective anti-SLAPP law requires a plaintiff whose SLAPP is dismissed to pay the defendant's attorney fees" as a "crucial deterrent" (emphasis and citation omitted)). But if different substantive laws apply in New York's state and federal

50

courts, plaintiffs who can find a hook for diversity jurisdiction could shop their way to a friendlier forum, where the protections intended for New York's citizens, and its many news organizations, would cease to apply. This difference in outcome is intolerable to the principles underlying *Erie*.

In short, Section 70-a applies in federal court, and in this case.

## B. The District Court's Analysis Is Mistaken

The district court's conclusion to the contrary was erroneous. Rather than "grapple with the thorny *Erie* questions concerning the application of New York's fee-shifting remedy in federal court," the district court purported to decide the issue "on state-law grounds," holding that Section 70-a *only* provides for attorney's fees on the basis of a dismissal under CPLR 3211(g), but not a federal dismissal, for example under Federal Rule 12(b)(6). JA243-47, 247 n.2. This conclusion is doubly flawed: not only does the plain language of Section 70-a contradict the district court's interpretation, but the district court's analysis also skirts an *Erie* analysis that cannot and should not be avoided.

As a straightforward matter of statutory interpretation, Section 70-a explicitly does not limit recovery to dismissals under CPLR 3211(g). Section 70-a provides that "costs and attorney's fees shall be recovered upon a demonstration, *including* an adjudication pursuant to [CPLR 3211(g)] or [CPLR 3212(h)], that the action involving public petition and participation was commenced or continued without a

51

substantial basis in fact and law." N.Y. Civil Rights Law § 70-a(1)(a) (emphasis added). By its terms, the statute does not limit its application to *only* dismissal under CPLR 3211(g) or summary judgment under CPLR 3212(h)—those are merely examples. *See, e.g.*, *Carroll v. Trump*, 49 F.4th 759, 769 (2d Cir. 2022) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." (quoting *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941))). As Judge Bibas explained, Section 70-a "does not dictate how the defendant must demonstrate that deficiency to get fees, nor does it condition fee recovery on dismissal under the anti-SLAPP mechanism." *Richey*, 2026 WL 867264, at *5; *accord, e.g.*, *Bobulinski*, 758 F. Supp. 3d at 189 n.23 ("Though this case was not adjudicated pursuant to CPLR Section 3211(g), that avenue is enumerated as merely one way the attorney's fees provision can be triggered."); *Cheng v. Neumann*, 106 F.4th 19, 24 n.2 (1st Cir. 2024) ("We note that Section 70-a does not condition an award of attorneys' fees solely upon prevailing under the procedural provisions of New York's anti-SLAPP statute, as opposed to under federal law."); *Goldman v. Reddington*, 2021 WL 4099462, at *5 (E.D.N.Y. Sept. 9, 2021) ("[T]he provision creating a cause of action also makes clear that an anti-SLAPP litigant may obtain costs and attorney's fees without using [CPLR § 3211(g)]."). Section 70-a is thus unlike the fee-shifting provision of California's anti-SLAPP law, which "awards attorneys' fees *only* to 'a prevailing

52

defendant on a special motion to strike.'" *La Liberte*, 966 F.3d at 88-89 (emphasis in original) (quoting Cal. Civ. Pro. Code § 425.16(c)(1)). The district court failed to acknowledge this straightforward reading of the text.[13]

Not only that, but the district court's conclusion seemed to rest on policy considerations that are necessarily bound up in the *Erie* analysis it avoided: the court worried that "[a]utomatically shifting fees on a Rule 12(b)(6) dismissal creates anomalies between the treatment of § 70-a in state and federal court," because CPLR 3211(g) allows for additional procedures that Rule 12(b)(6) does not. JA246. But that is the balance that Congress, and the Supreme Court, have chosen to strike—there may be some incongruity between the procedures of state and federal courts. There should not, however, be a disparity between a state's substantive law as applied in federal versus a state court.

In sum, the district court skipped the necessary *Erie* analysis, and ultimately misread the underlying state statute, whose clear text does not preclude fees based on a Rule 12(b)(6) dismissal. This Court should instead follow the clear text of the

---

[13] The district court found that Appellees could bring a separate, "follow-on case" seeking fees in order to take advantage of Section 70-a in federal court. JA247. But the district court did *not* find that fees could not be sought in the original action (merely that a CPLR 3211(g) dismissal was required to do so, which as explained is incorrect). Indeed, Section 70-a's language explicitly allows litigants to seek fees by "maintain[ing]" an action, and New York courts have found that this permits fees to be sought by motion in the original action. *See, e.g.*, *Aristocrat Plastic Surgery, P.C. v. Silva*, 206 A.D.3d 26, 32 (1st Dep't 2022); *Golan v. Daily News, L.P.*, 214 A.D.3d 558, 559 (1st Dep't 2023); *215 W. 84th St. Owner LLC v. Bailey*, 217 A.D.3d 488, 488 (1st Dep't 2023).

law, and award fees if Wang's case lacks "a substantial basis in fact and law." N.Y. Civ. Rights Law § 70-a(1)(a).

### C. Appellees Are Entitled To Fees Under Section 70-a

Because Section 70-a should apply here, this Court should award Defendants their claimed fees, which Wang concedes are reasonable.

Section 70-a provides that if a case lacks "a substantial basis in fact and law," "costs and attorney's fees shall be recovered." N.Y. Civ. Rights Law § 70-a(1)(a). A case dismissed for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), necessarily lacks a substantial basis in fact or law. *Bobulinski*, 758 F. Supp. 3d at 184 ("Logically, a complaint that fails to state a claim is, a fortiori, 'without a *substantial* basis in fact and law and could not be supported by a *substantial* argument for the extension, modification or reversal of existing law.'" (emphases in original) (quoting N.Y. Civ. Rights Law § 70-a(1))). This conclusion is bolstered by the fact that New York courts have resoundingly found that the state standard for dismissal of a SLAPP action automatically entitles a defendant to fees under Section 70-a. *See, e.g.*, *Reeves v. Associated Newspapers, Ltd.*, 232 A.D.3d 10, 21 (1st Dep't 2024); *215 W. 84th St Owner LLC*, 217 A.D.3d at 488-89; *Goldman v. Abraham Heschel Sch.*, 227 A.D.3d 544, 545, (1st Dep't 2024); *Aristocrat Plastic Surgery*, 206 A.D.3d at 29.

54

In short, because Section 70-a applies in federal court, and because Appellees successfully moved to dismiss Wangs' claims under Rule 12(b)(6), they are entitled to reasonable attorneys' fees. Because Wang has not contested that the claimed fees were reasonable, this Court should reverse the decision below and award Defendants their fees.

## CONCLUSION

For the reasons set forth above, Appellees respectfully request that the Court affirm the district court's January 13, 2025 order granting their motion to dismiss, affirm the portion of the district court's September 9, 2025 order denying reconsideration or modification of its dismissal order, and reverse the portion of the district court's September 9, 2025 order denying their motion for attorneys' fees.

Dated: April 22, 2026

Respectfully submitted,

By:    /s/ *Katherine M. Bolger*
Katherine M. Bolger
Mary E. Goetz
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 42nd Floor
New York, NY  10020-1104
Phone: (212) 489-8230
Fax:   (212) 489-8340
Email: katebolger@dwt.com
            marygoetz@dwt.com

*Attorneys for Defendants-Appellees-Cross-Appellants*

55

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that the foregoing Brief of Defendants-Appellees-Cross-Appellants complies with the requirements of Fed. R. App. P. 32, because it uses a proportionately spaced font, has a typeface of 14 points or more, and contains 14,372 words, excluding those portions of the brief exempted by Fed. R. App. P. 32(f), as determined by the word-count function of Microsoft Word.

Dated: April 22, 2026

*/s/ Katherine M. Bolger*
Katherine M. Bolger

56