# 25-2487-cv(L), 25-2503-cv(XAP)

# United States Court of Appeals

*for the*

# Second Circuit

LIANG WANG,

*Plaintiff-Appellant-Cross-Appellee,*

– v. –

SAMMY SUSSMAN, VOX MEDIA, LLC, NEW YORK MEDIA, LLC,

*Defendants-Appellees-Cross-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

## REPLY BRIEF FOR PLAINTIFF-APPELLANT-CROSS-APPELLEE

ALAN S. LEWIS
MADELYN K. WHITE
CARTER LEDYARD & MILBURN LLP
*Attorneys for Plaintiff-Appellant-*
*Cross-Appellee*
28 Liberty Street, 41st Floor
New York, New York 10005
(212) 732-3200

CP COUNSEL PRESS    (800) 4-APPEAL • (392959)

Case: 25-2487, 07/01/2026, DktEntry: 42.1, Page 2 of 75

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES.................................................................. iv

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................3

I. DEFENDANTS MAKE FALSE STATEMENTS ABOUT WANG.............................................................................................3

II. THE PUBLICATIONS ARE REASONABLY SUSCEPTIBLE OF A DEFAMATORY MEANING .................................6

    A. The Defamatory Features .........................................................6

    B. Defendants Ignore the Publications' Defamatory Features.................................................................................8

    C. Defendants' Counterarguments to How the Article Was Understood Are Superficial and Legally Erroneous........................12

    D. Defendants Are Wrong that the Publications Cannot Reasonably Be Read to Intend or Endorse Their Defamatory Implications .................................................14

    E. Defendants Attempt to Distract from Wang's Arguments Regarding the Applicable Standards............................16

III. THE COMPLAINT CANNOT BE DISMISSED ON INDEPENDENT GROUNDS................................................................18

    A. Defendants Cannot Invoke the Fair Report Privilege ......................18

        1. The Defamatory Implications Are Not Attributed to the Police Records ...........................................................19

        2. The Article and Podcast Do Not Accurately Report on the Police Records ...........................................................21

    B. The Defamatory Statements Are Not Protected Opinions............................................................................24

i

C.    Wang Plausibly Pleads the Falsity of the Implication that He Was Fired Based on Kizer's Allegations ............................25

D.    The Complaint Plausibly Pleads Actual Malice ..............................31

THE CROSS-APPEAL.................................................................................36

REGARDLESS OF THE OUTCOME OF WANG'S APPEAL, DEFENDANTS ARE NOT ENTITLED TO FEE SHIFTING .............................36

COUNTER-STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ...................................................................................................36

COUNTER-STATEMENT OF THE CASE .................................................36

SUMMARY OF ARGUMENT IN OPPOSITION TO CROSS-APPEAL......................................................................................................38

STANDARD OF REVIEW ........................................................................39

ARGUMENT .............................................................................................39

I.    A MOTION FOR FEES BASED ON A RULE 12(b)(6) DISMISSAL THAT IS NOT ASSERTED IN A CAUSE OF ACTION FAILS TO SATISFY SECTION 70-A'S PROCEDURAL REQUIREMENTS .........................................................39

A.    Defendants Failed to File the Required Claim or Counterclaim to Seek Fees ............................................................40

B.    Fees Are Not Automatic Upon a Successful Rule 12(b)(6) Motion ..................................................................................45

II.    CROSS-APPELLANTS ARE NOT ENTITLED TO FEES FOR ADDITIONAL REASONS .................................................................48

A.    To Trigger a Fee Award Under Section 70-a(1)(a), an Action Must Have Been Commenced Without a Substantial Basis in Law *and* Be Frivolous....................................49

B.    Section 70-a, if Understood as Mandating Fee Shifting After the Dismissal of a Non-Frivolous Claim, Would Infringe the Constitutional Right to Petition ..............................52

ii

III. THE FEE SHIFTING PROVISION OF NEW YORK'S ANTI-SLAPP LAW IS UNENFORCABLE IN FEDERAL COURT ..................................................................54

    A. Section 70-a Answers the Same Question as the Federal Rules (But Differently) .....................................................55

    B. Section 70-a Is Tied to New York's Dismissal and Discovery Procedures ...........................................................59

CONCLUSION ..................................................................................63

CERTIFICATE OF COMPLIANCE .............................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*315 West Enterprises LLC v. Robbins*,
  171 A.D.3d 466 (1st Dep't 2019) ........................................................... 41

*Aboutaam v. Dow Jones*,
  180 A.D.3d 573 (1st Dep't 2020) ........................................................... 14

*Airlie Found., Inc. v. Evening Star Newspaper Co.*,
  337 F. Supp. 421 (D.D.C. 1972) ............................................................ 33

*Aristocrat Plastic Surgery, P.C. v. Silva*,
  206 A.D.3d 26 (1st Dep't 2022) ............................................................ 43

*Armstrong v. Simon & Schuster, Inc.*,
  85 N.Y.2d 373 (1995) ........................................................................... 17

*Aronson v. Wiersma*,
  65 N.Y. 2d 592 (1985) .......................................................................... 14

*BE&K Constr. Co. v. NLRB*,
  536 U.S. 516 (2002) .............................................................................. 53

*Berk v. Choy*,
  146 S. Ct. 546 (2026) ............................................................................ 56

*Biro v. Conde Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013) ........................................ 32, 33, 35

*Bobulinski v. Tarlov*,
  758 F. Supp. 3d 166 (S.D.N.Y. 2024) .............................................. 42, 63

*Borough of Duryea v. Guarnieri*,
  564 U.S. 379 (2011) .............................................................................. 52

*Budinich v. Becton Dickinson & Co.*,
  486 U.S. 196 (1988) .............................................................................. 43

*Burlington N. R.R. v. Woods*,
  480 U.S. 1 (1987) ............................................................................ 57, 58

iv

*CDC Newburgh Inc. v. STM Bags, LLC*,
   692 F. Supp. 3d 205 (S.D.N.Y. 2023) ....................................................61

*Cal. Motor Transport Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972)....................................................................................52

*Carroll v. Trump*,
   590 F. Supp. 3d 575 (S.D.N.Y. 2022) ....................................................60

*Chalpin v. Amordian Press*,
   128 A.D.2d 81 (1st Dep't 1987) ...............................................................24

*Chau v. Lewis*,
   771 F.3d 118 (2d Cir. 2014) ...............................................................27, 28

*Chinese Ams. Civ. Rights Coal, Inc. v. Trump*,
   2022 WL 1443387 (S.D.N.Y. May 6, 2022) ........................................42

*Coritsidis v. Khal Bnei Torah of Mount Ivy*,
   2024 WL 37122 (S.D.N.Y. Jan. 3, 2024) ..............................................61

*Crane v. New York World Telegram Corp.*,
   308 N.Y. 470 (1955)............................................................................25, 26

*Ctr. For Med. Progress v. Planned Parenthood Fed'n of Am.*,
   551 F. Supp. 3d 320 (S.D.N.Y. 2021) ...................................................42

*Da Silva v. Time Inc.*,
   908 F. Supp. 184 (S.D.N.Y. 1995) ..........................................................28

*Davis v. Brown*,
   211 A.D.3d 524 (1st Dep't 2022) .............................................................12

*Davis v. Brown*,
   2024 WL 4555128 (Sup. Ct. N.Y. Co. Oct. 11, 2024) ......................15

*Dibble v. WROC TV Channel 8*,
   142 A.D.2d 966 (4th Dep't 1988).............................................................26

*Duracraft Corp. v. Holmes Products Corp.*,
   427 Mass. 156 (1998) .................................................................................54

*Editor's Pick Luxury LLC v. Red Points Sols. SL*,
2023 WL 6385993 (S.D.N.Y. Sept. 29, 2023) ......................................62

*Ellingburg v. United States*,
146 S. Ct. 564 (2026)...........................................................................58

*Elrod v. Burns*,
427 U.S. 347 (1976). ......................................................................52, 53

*Erie R.R. v. Tompkins*,
304 U.S. 64 (1938).............................................................................55

*Fraser v. Park Newspapers of St. Lawrence Inc.*,
257 A.D.2d 961 (3d Dep't 1999)........................................................26

*Greenberg v. Spitzer*,
155 A.D.3d 27 (2d Dep't 2017)..........................................................27

*Harris v. Ward Greenberg Heller & Reidy LLP*,
151 A.D. 3d 1808 (4th Dep't June 16, 2017) ......................................43

*Hogan v. Herald*,
84 A.D.2d 470 (4th Dep't 1982) *aff'd* 58 N.Y.2d 630 (1982) .....................19, 23

*Jewell v. NYP Holdings, Inc.*,
23 F. Supp. 2d 348 (S.D.N.Y. 1998) .................................................27

*Jones v. Abel*,
2026 WL 835364 (S.D.N.Y. Mar. 26, 2026)......................................46

*Karedes v. Ackerley Group, Inc.*,
423 F.3d 107 (2d Cir. 2005) ..............................................................23

*Kesner v. Buhl*,
590 F. Supp. 3d 680 (S.D.N.Y. 2022) *aff'd sub nom. Kesner v.
Dow Jones & Co., Inc.*, 2023 WL 4072929 (2d Cir June 20, 2023) ..................62

*Kesner v. Dow Jones & Co.*,
515 F. Supp. 3d 149 (S.D.N.Y. 2021) ...............................................21

*Kuvshynov v. Fox News Network, LLC*,
87 Misc.3d 1260(A) (Sup. Ct. N.Y. Co. Dec. 29, 2025). ....................49, 50, 58

*LaNasa v. Stiene*,
    731 F. Supp. 3d 403 (E.D.N.Y. 2024) .......................................................47, 63

*LoanStreet, Inc. v. Troia*,
    2023 WL 5836237 (S.D.N.Y. 2023)..................................................................62

*Nat'l Acad. of TV Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*,
    551 F. Supp. 3d 408 (S.D.N.Y. 2021) .....................................................60, 62, 63

*November v. Time Inc.*,
    13 N.Y.2d 175 (1963) .......................................................................................11

*Olney v. Town of Barrington*,
    180 A.D.3d 1364 (4th Dep't 2020)....................................................................26

*Palin v. N.Y. Times*,
    113 F.4th 245 (2d Cir. Aug. 28, 2024) ..............................................................32

*Pirrone v. News 12 Interactive LLC*,
    2017 WL 4777072 (Queens Co. Oct. 3, 2017) ..................................................23

*Prince v. Intercept*,
    634 F. Supp. 3d 114 (S.D.N.Y. 2022) ...............................................................62

*Print v. Int'l Tel. & Tel. Corp.*,
    757 F. Supp. 87 (D.D.C. 1992).........................................................................20

*Riley v. County of Broome*,
    95 N.Y.2d 455 (2000) .......................................................................................50

*Sandholm v. Kuecker*,
    962 N.E.2d 418 (Ill. 2012).................................................................................54

*Tah v. Global Witness Publishing, Inc.*,
    413 F. Supp. 3d 1 (D.D.C. 2019) ................................................................13, 14

*The Satanic Temple, Inc. v. Newsweek Digital LLC*,
    177 F.4th 202 (2d Cir. 2026) .............................................................................55

*Scarangella v. Group Health, Inc.*,
    731 F.3d 146 (2d Cir. 2013).  .............................................................................39

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
   559 U.S. 393 (2010)..................................................................................55, 56

*Sprint Commc'ns Co., L.P. v. City of New York Dep't of Fin.*,
   152 A.D.3d 184 (2017) ......................................................................................50

*Steinhilber v. Alphonse*,
   68 N.Y.2d 283 (1986) ........................................................................................24

*Stepanov v. Dow Jones & Co.*,
   120 A.D.3d 28 (1st Dep't 2014) ..............................................................6, 13, 17

*Tannerite Sports, LLC v. NBC Universal News Grp., LLC*,
   864 F.3d 236 (2d Cir. 2017) ..............................................................................27

*United Mine Workers v. Illinois State Bar Ass'n*,
   389 U.S. 217 (1967)...........................................................................................52

*VIP Pet Grooming Studio, Inc. v. Sproule*,
   224 A.D.3d 78 (2d Dep't 2024).........................................................................41

*Veritas v. Cable News Network, Inc.*,
   121 F.4th 1267 (11th Cir. 2024) ...................................................................28, 30

*Wang v. Philharmonic, et al.*,
   24-cv-3356, ECF#124............................................................................................5

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990)...........................................................................13

## Statutes

CPLR 3211(g) ...........................................................................................*passim*

N.Y. Civ. R. Law §70-a ..............................................................................*passim*

N.Y. Civ. R. Law §74 .............................................................................18, 19, 23

## Other Authorities

New York State Legislature Press Release, "Senate and Assembly
   Majorities Advance Anti-SLAPP Legislation to Protect Free
   Speech" (July 22, 2020)......................................................................................50

Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems,* §7.3.5 (5th ed. 2017) .............................................................20

Senate Sponsor's Mem, Bill Jacket, L 2020, ch 250 .........................................50, 51

Plaintiff-Appellant-Cross-Appellee Liang Wang ("Wang") respectfully submits this combined reply/opposition brief. As detailed below, Defendants-Appellees-Cross-Appellants ("Defendants") fail to rebut the conclusion that Wang plausibly pled his defamation claims. Moreover, Defendants' cross-appeal lacks merit.

## <u>INTRODUCTION</u>

Defendants' brief avoids confronting the features of the article and podcast identified by Wang as making those publications reasonably capable of being understood to intentionally impart defamatory implications. Defendants also ignore how the article triggered the Philharmonic's decision to *immediately* banish Wang from the orchestra—something that would not have happened if the article's telling of the Cara Kizer story was not reasonably capable of being understood to rope in Wang as one of its purported culprits. On *de novo* review, the Court should conclude that the publications *are* cognizably defamatory and reinstate the complaint.

Before the article was published, Wang stood at the pinnacle of the classical music world. Yet, as outlined in Wang's opening brief, he was banished by the Philharmonic *one day* after the article's publication. Wang suffered this precipitous fall for *one* reason: the article made Wang a pariah by portraying him as having committed misconduct against Kizer and having been terminated on that

1

basis. These defamatory implications were *obvious* to readers, including the New York Philharmonic's management and orchestra. In telling the story of Kizer's alleged drugging, the article portrayed Wang so negatively as to trigger a public relations crisis for the Philharmonic—then Wang's employer of 18 years. The Philharmonic attempted to solve that crisis by excommunicating Wang.

Defendants' contrary argument about the meaning of the article ignores how the article was widely understood within the Philharmonic community *and* the article's eight specific features (identified in Wang's brief) that cause it to suggest intended implications that defame Wang.

Unable to wash the article—or the podcast—of obvious defamatory innuendo, Defendants make a succession of alternative arguments for reversal, but none have merit. First, references in Sussman's article to a *2010* Colorado police investigation cannot immunize the article as a "fair report" in falsely implying that Wang was fired by the Philharmonic *in 2018* based on allegations from Kizer: the police investigation long preceded and had nothing to do with Wang's termination, eight years later. Furthermore, Defendants do not describe the police file fairly, and in any event, the article is ineligible for fair report immunity because it is substantially and expressly based on present day interviews by its author. Second, Defendants' contention that the challenged publications are somehow limited to non-cognizable opinion also fails, as the publications go well beyond sharing

opinions into the realm of implying defamatory accusations. Third, Defendants founder in trying to portray the false implication notion that Wang was fired by the Philharmonic because of Kizer's allegations as "substantially true," an argument that is demonstrably wrong and an inappropriate basis for dismissal on the pleadings. Finally, Wang more than plausibly pled that Defendants acted with actual malice.

## ARGUMENT

## I.   DEFENDANTS MAKE FALSE STATEMENTS ABOUT WANG

The first sentence of Defendants' brief irresponsibly proclaims that "*all parties agree*" that Wang was fired "in 2018 after an investigation determined that *multiple women had credibly accused him* of misconduct, including sexual assault." Not only does that statement baselessly attribute agreement to Wang, its claim about Wang's 2018 termination is false—and refuted by the documents that Defendants relied upon. The Philharmonic's actual reason for Wang's 2018 termination was arbitrated, and the arbitrator's decision—which Defendants attached to their motion—explains that Wang's termination was based on a *single* accusation *by someone other than Kizer*, *and* that the accusation against Wang was *not credible*:

> The case against Wang is premised on a single uncorroborated claim registered many years after the event. The complainant's testimony should be considered in the context of her conduct, including the fact she called [Wang] the day after the claimed

3

> assault, asking Wang to allow her to remain overnight in his apartment with him, then participating in consensual sex. CA79.

In the same introductory paragraph, Defendants make a different but equally pernicious misrepresentation. Specifically, Defendants reference an investigation that the Philharmonic commissioned in 2024, *after* the article was published, and falsely imply that the Philharmonic *relied on that investigation* to fire Wang in 2024—while misleadingly summarizing the accusations raised in that investigation (which the Philharmonic did not mention when terminating Wang). The problems with this attempt to distract are manifold.

First, the investigation which Defendants purport to summarize is not part of the record. That should have been enough reason for Defendants to refrain from characterizing it. Defendants not only did so, but misleadingly suggested that an investigator "credited" accusations from *eleven* persons accusing Wang of "rape, sexual assault, and grooming." Had there been anything remotely like eleven such accusations, the Philharmonic would have fired Wang for just cause, but in fact, the Philharmonic did *not* point to *any* accusation as purported just cause—or just cause itself—to terminate Wang following the 2024 investigation.

Thus, and as Judge Subramanian recently explained when *denying* the Philharmonic's motion to dismiss Wang's employment lawsuit, the Philharmonic tried to "get rid of [Wang]" following that 2024 investigation "with no showing of

just cause." Judge Subramanian went on to note it was "unclear exactly what is going on here, or why the [Philharmonic] acted in the way they did," and he held that Wang's allegations about his termination by the Philharmonic in 2024 "at least plausibly suggest[] that the fix was in" for him "at the jump." *See Wang v. Philharmonic, et al*., 24-cv-3356, ECF#124 (Order denying motion to dismiss and transcript[1] referenced therein at 11).

That "jump" was Defendants' article which was the sole trigger for the Philharmonic's 2024 banishment of Wang in the immediate wake of its publication, as Wang's banishment predated *any* new investigation. By misleadingly suggesting that the Philharmonic terminated Wang "following an investigation," Defendants falsely imply a causal connection between the 2024 investigation and Wang's termination that is refuted by the termination letter Defendants sent to Wang—which asserted *no* misconduct by Wang. *See* JA228.

In any event, because of the post-publication timing of that investigation and because it concerned events not a subject of the defamatory article or podcast, the 2024 investigation has nothing to do with the issues raised by Wang's appeal— whether he has a plausible claim that the article and podcast defamed him. Respectfully, the Court should not countenance Defendants' attempt to prejudice the Court against Wang.

---

[1] Transcript available at ECF#118 in *Muckey v. Phil., et al*. 24-cv-03348.

## II.   THE PUBLICATIONS ARE REASONABLY SUSCEPTIBLE OF A DEFAMATORY MEANING

### A.   The Defamatory Features

Wang's opening brief details eight features of the article that make it "reasonably susceptible of a defamatory connotation such that the issue is worthy of submission to a jury." *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34 (1st Dep't 2014). (internal quotation omitted). We list them below to illustrate how Defendants' brief fails to even try to reconcile these features of the article with the chimerical notion that the article is not "reasonably susceptible of a defamatory connotation." *Id*.

*First*, the article *visually* implants the idea that Wang's alleged misconduct and his 2018 termination by the Philharmonic are related to what purportedly happened to Kizer in 2010. It does this by featuring, at the top, an old photograph of the orchestra in performance, in which the faces of only Wang, Kizer (and Matthew Muckey) are circled and enlarged.  Brief[2] at 4, 30.  *Second,* directly adjacent is the article's title, stating that "two musicians [one of whom is Wang] were fired for sexual misconduct" and rhetorically asking why Wang is "back with the orchestra," Brief at 4, 30.  *Third*, on its face, and according to its author, the

---

[2] "Brief" refers to Wang's opening brief (ECF#23.1).

 "Oppo." refers to Defendants' initial brief (ECF#32.1).

"Amici" refers to the brief filed by Amici Curiae Media Organizations (ECF#35.1).

article makes *Kizer* and her purported drugging and sexual assault its "main subject"—but it does not mention *any other* purported drugging *and* mentions Wang by name in 15 distinct paragraphs. Brief at 5, 30. *Fourth*, the article quotes an unnamed person's statement that Wang is "capable" of drugging another person. Brief at 9, 32-33. *Fifth*, the *only* person that the article points to as a conceivable source of Kizer's drugging is Wang. Brief at 32. *Sixth*, the article suggests that the misconduct "issue" for Wang was Kizer's purported drugging, such as by saying that in 2010, after "no new action from the police or DA's office" (which was investigating *only* Kizer's allegations against Muckey) the Philharmonic "treat[ed] the issue as resolved" for Wang (and Muckey). Brief at 32. *Seventh*, the article reinforced its false connection of Wang's 2018 termination to Kizer by quoting a "denial" from Wang that *omitted* Wang's denial of any connection between his termination and Kizer. Brief at 40. *Eighth*, the article intentionally undermines the limited denial it published from Wang by misleadingly suggesting Wang was reinstated to the orchestra because of a questionable arbitrator—described as a "magician" who failed to apply "common workplace evidentiary standards."[3] Brief at 20.

---

[3] The arbitrator, Richard Bloch, is a highly respected labor arbitrator who used a commonly accepted standard.

7

As the complaint points out, the podcast also purports to connect Wang's purported misconduct and reason for his termination to Kizer's allegations, in almost all of the same ways. Brief at 12–13.

**B.      Defendants Ignore the Publications' Defamatory Features**

Defendants, lacking any argument for why, in combination, these features of the article and podcast are not susceptible to being understood as conveying cognizably defamatory implications, instead ignore those features. In the two sub-sections of its Argument titled "Neither the article nor the Podcast Implies Wang Drugged Kizer" and "Neither the article nor the Podcast Implies the Philharmonic Fired Wang Due to Kizer's Allegations," (Oppo. at 18–22), Defendants do not mention any of the eight features of the article that Wang's complaint and brief emphasize.

Instead, these sections of Defendants' brief are limited to three narrow arguments: (1) the publications "supplied the other side of the story: Wang's refutation," (Oppo. at 18); (2) the article uses the word "allegations" in relation to the notion that Wang drugged Kizer (Oppo. at 18-19); and (3) the article purportedly "disavows" any implication that Wang was fired based on "conduct toward Kizer." (Oppo. at 20). But as explained below, even in trying to redirect the Court's attention to the few aspects of the publications that Defendants *consider*

8

helpful (while ignoring the aspects that make the publications cognizably defamatory), Defendants still fail.

First, the notion that the article fairly supplied "Wang's refutation" of its defamatory implications is incorrect. Part of the way that the article creates the impression that Wang drugged Kizer is by creating the misimpression that the Philharmonic fired Wang on that basis. In an email, Sussman revealed his intention to portray Wang's termination *as related to Kizer's accusation*, and Wang's pre-publication responsive email to Sussman's editors refuted that notion:

> [Sussman's] questions assume, incorrectly, that Mr. Wang was accused of misconduct by Cara Kizer (or the New York Philharmonic in relation to Kizer.[)] That is demonstrably false, but yet, on the cusp of publication, New York Magazine … assumes the opposite, by, for example, asking Mr. Wang to comment on "Kizer's allegation against you" – an allegation that does not exist. JA54 (Compl. Ex. B).

But when printing Wang's "denial" in the article, Defendants omitted this essential point. As to Wang's denial, Defendants published *only* a statement culled from the 2010 Colorado police file, paraphrased as "Wang later told the police that Kizer got her own wine." And nowhere did the article include the critical components of Wang's pre-publication "denial", *viz*, that Wang had *never* been alleged to have drugged Kizer—not by the police, the Philharmonic, or Kizer herself—and indisputably was not fired for it. That is the essence of the denial provided to Defendants, which they failed to share with readers. *See* JA54. Thus,

9

contrary to Defendants' contention and to the District Court's ultimate conclusion, the article did not meaningfully include Wang's "side of the story."

Defendants' contention that the article reported *Kizer's allegations* "as allegations" misses the point—which is that, unbeknownst to readers, her previous allegations had never been allegations of misconduct *against Wang*. *See*, *e.g.*, JA33–34 (Compl.¶59, alleging that neither Kizer nor the Philharmonic accused Wang of drugging her). While Kizer claimed that one of the drinks she consumed in Vail had been handed to her by Wang, the article reported this to suggest Wang caused Kizer's incapacitation, *without* reporting that, as Kizer told the police, she hardly drank any of that glass and didn't see who poured it, and without the necessary context that Kizer, the police, and the Philharmonic never accused Wang of alleged complicity in *Muckey's* purported assault against Kizer.

Defendants also fail in contending that the article purportedly "disavows" that the Philharmonic accused Wang of misconduct against Kizer. For this so-called disavowal, Defendants quote two phrases that appear 2,500 words into the approximately 3,600-word article, which refer to "allegations Kizer made against Muckey" to which the Philharmonic "returned" in "*early* 2018" and to the phrase, "unrelated allegations of sexual misconduct against Wang." Plainly, neither phrase expressly *disavows* the defamatory implications of the article. The reference to *Kizer's allegations* against Muckey is not a "disavowal" of the false idea that the

10

Philharmonic, months after its early-2018 decision to "return" to Kizer's allegations, based its decision to fire Wang on the notion that Wang was also responsible for an assault against Kizer.  Nor is the isolated reference to "the orchestra" learning about "unrelated allegations" against Wang a *disavowal* of the implication that Wang's firing was based substantially on an allegation that he drugged Kizer.[4]  Moreover, these ambiguous phrases appear toward the end of an article about Kizer's drugging, after Wang has been expressly described as someone who would be willing to involuntary drug others.  In short, these isolated phrases are not a clear *disavowal* of the article's defamatory implications nor do they, as the District Court put it, "suppl[y] its readers with ready access to the truthful information." JA223. In arguing otherwise, Defendants are asking the Court to do what New York law forbids—"strain to interpret []writings in the mildest and most inoffensive sense to hold them non-libelous." *See November v. Time Inc.*, 13 N.Y.2d 175, 178 (1963) (internal quotations omitted).

Nor does the section of Defendants' brief entitled "Wang's Counter-arguments are Unavailing" meaningfully respond to Wang's actual argument as to

---

[4] Defendants assert that Wang "misrepresents" the District Court's decision with respect to whether the article implied that Wang was terminated due to Kizer's allegations.  *See* Oppo. at 20, n.6.  But the decision speaks for itself and shows that the court relied on the "intend" element rather than the defamatory meaning element of the *Stepanov* two-part test.  *See* JA223 (finding defamatory implication that Wang was terminated due to Kizer's allegations "was at worst a sloppy sentence, not an intended defamatory innuendo").  In any event, Wang's appeal is subject to *de novo* review and therefore the Court must decide for itself whether the article can be read to imply that Kizer's allegations were a basis for Wang's firing.

why the article is defamatory. Nowhere do Defendants acknowledge any of the eight above-described features of the article that create its defamatory innuendo.

### C. Defendants' Counterarguments to How the Article Was Understood Are Superficial and Legally Erroneous

Wang's complaint pointed to *three* examples of readers who interpreted the article to accuse Wang of misconduct against Kizer and/or to suggest that the Philharmonic based Wang's 2018 termination on Kizer. *See* Brief at 36 (referring to Violin Channel article, reader comments, and Philharmonic). Wang also emphasized recent New York appellate authority reinstating a claim of defamation by implication because "other [reader] sources" of the challenged publication had "interpret[ed]" it as "placing the blame on plaintiff." *See* Brief at 35 (*quoting Davis v. Brown*, 211 A.D.3d 524, 525 (1st Dep't 2022)).

Defendants' response fails to acknowledge what the Philharmonic said about the article, the negative public perception of Wang it created and inflamed, or the Philharmonic's banishment of Wang one day after the Kizer-focused article. Nor do Defendants acknowledge that in *Davis*, the First Department, in allowing a defamation by implication claim to proceed, relied on how "other sources" understood the defamatory publication to impart defamatory implication.

Instead, Defendants erect a straw man, mischaracterizing Wang's position as that a single reader reaction "is dispositive of" defamatory meaning. Oppo. at 24. But Wang's position is not that any single reader reaction should be "dispositive,"

12

but instead, that when an article is widely understood to convey defamatory meaning it makes little sense, in the words of *Stepanov*, to say that such an article is not even "reasonably susceptible of a defamatory connotation such that the issue is worthy of submission to a jury." *Stepanov*, 120 A.D.3d at 34. This is Wang's central point—which Defendants ignore.

Defendants also cherry-pick law from other jurisdictions, ignoring decisional language that hurts them, even when citing those same cases. For example, Defendants cited *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) as an example of another court with a "*Stepanov* standard" for defamation by implication. Oppo. at 23. Yet Defendants do not try to contend with *White's* specific language, quoted by Wang, that "when one uses language, one is held to the construction placed on it by those who hear or read, if that construction is a reasonable one." Brief at 35. Here, to echo *White* (and as pled in detail in the complaint), "the construction [reasonably] placed on" the article by many of "those who []read" it was that Wang's termination was tied to Kizer's claims, and under *White*, Defendants should therefore be "held to" that construction. Defendants fare no better attempting to distinguish *Tah v. Global Witness Publishing, Inc.*, which held that how the pertinent foreign government body had "actually understood the [challenged] report was "compelling evidence" that "the Report could reasonably be read to suggest" defamatory meaning. 413 F. Supp. 3d 1, 10 (D.D.C. 2019).

Contrary to the suggestion made by Defendants (and the lower court), *Tah* is not a "far cry" from this case. If anything, this case presents a stronger basis for treating as "compelling evidence" of defamatory meaning the actual reactions of readers, as the Philharmonic, one of those readers, is *at least* as good of an example of the "reasonable reader" as the reader the *Tah* court mentioned—the "committee formed by the Government of Liberia." *Id.* at 11. That Wang also pointed to additional music industry readers reinforces that this case is not a "far cry" from *Tah*.

Defendants also cite *Aboutaam v. Dow Jones*, but as the thin opinion in that case revealed, its single sentence deferring to the lower court's treatment of a "survey" (not described in the opinion) relied exclusively on a New York Court of Appeals case, *Aronson v. Wiersma*, 65 N.Y. 2d 592, 593 (1985). *Aboutaam*, 180 A.D.3d 573, 575 (1st Dep't 2020). But *Aronson* says nothing about how actual reader understanding of an article informs the legal question of whether the article is reasonably capable of conveying intended defamatory meaning. In any event, the appellate division's more specific holding in *Davis v. Brown* post-dates *Aboutaam*.

D.      **Defendants Are Wrong that the Publications Cannot Reasonably Be Read to Intend or Endorse Their Defamatory Implications**

Lacking a persuasive argument that neither publication can reasonably be read to impart defamatory innuendo, Defendants argue alternatively that they cannot be read to convey "intended" (or endorsed) defamatory innuendo. But

14

having failed to grapple with the aspects of the article that Wang's brief emphasized, Defendants fail to explain why those eight editorial choices do not also reasonably permit the conclusion that Defendants intended their publications to suggest defamatory innuendo. It is entirely logical to conclude that Defendants intended or endorsed the actual defamatory meanings of their publications. To instead assume, as Defendants implicitly suggest, that Sussman stumbled into conveying defamatory innuendo rather than doing so intentionally, ignores the ways in which the article conveys its defamatory innuendo. In short, those editorial choices reasonably suggest to readers that Sussman intended his article to suggest about Wang what it did suggest.

Furthermore, and as Wang's opening brief pointed out, New York law generally allows *a jury* to decide whether the author of an article that arguably conveys defamatory innuendo intended to convey that innuendo. Thus, in *Davis v. Brown,* on remand from the appellate division*,* the court held that where a publication may be read to suggest defamatory inference, "a jury may [] reasonably conclude that the defendants intended the average reader to make that inference or otherwise endorse[] that inference." Brief at 38 (*quoting Davis v. Brown*, 2024 WL 4555128, at *3 (Sup. Ct. N.Y. Co. Oct. 11, 2024)). Defendants ignore this holding, which when applied here, dooms Defendants' contention that a jury should not be allowed to determine if Defendants intended their defamatory implications. In

15

sum, Defendants fail to overcome the conclusion that it is *at least* plausible to conclude that the article's publishers intended (or endorsed) its defamatory innuendo, which is all that is required for Wang's case to proceed.

### E. Defendants Attempt to Distract from Wang's Arguments Regarding the Applicable Standards

Attempting to distract, Defendants characterize "Wang's *primary* argument" as being that the Court should not apply *Stepanov* because "the [NY] Court of Appeals would disagree with it." Oppo. at 22. While Wang explained why the Court of Appeals *might not* ratify the *Stepanov* standard[5], he also explained that because Wang's "Complaint easily satisfies the test for defamation by implication as articulated by *Stepanov*, it is unlikely that the Court will need to reach this point." Brief at 49.

Defendants also take issue with Wang's articulation of the deferential standard his complaint faces on a motion to dismiss. Thus, Defendants contend it

---

[5] Defendants argue that the elements of a claim of defamation by implication as elaborated in *Stepanov* and related cases "rests on [] First Amendment Principles" (Oppo. at 16)—but no court has held that the First Amendment *requires* that a claim of defamation by implication include an "intended or endorsed" element. *Stepanov* elaborated that element based on a policy choice made in the context of then existing law. But the legal landscape has since been altered by New York's anti-SLAPP law. Given that the policy basis of the *Stepanov* test was to get the *balance* right between plaintiffs' first amendment right to petition and defendants' speech, the New York Court of Appeals, if asked to weigh in on the *Stepanov* test, would have to confront whether that test is sound policy in the context of the current legal landscape. The Court of Appeals might hold that a combination of an anti-SLAPP statute like New York's that subjects essentially all defamation cases to expedited dismissal, on a summary judgment standard but with limited discovery, and which includes mandatory fee shifting only in favor of Defendants, *combined with the Stepanov test*, would tilt the balance too far toward defendants' speech and away from the important First Amendment petitioning rights of plaintiffs.

16

is "not the law" that defamatory meaning is a jury question where a publication is merely susceptible to having defamatory meaning. *See, e.g.*, Oppo. at 16, n.2. But that *is* the law, as documented in cases quoted by Wang. *See* Brief at 24–25. Moreover, that precise demarcation of responsibility between courts and juries is stated clearly in *Stepanov*, which expressly frames the issue as whether a publication is "reasonably susceptible of a defamatory connotation such that the issue is worthy of submission to a jury." *Stepanov*, 120 A.D.3d at 34.

Finally, Defendants take issue with Wang's argument that since the podcast's defamatory implication flows in part from false statements of fact it should be assessed under an express defamation standard. Oppo. at 19, n.5. In this vein, Defendants contend that the distinction between whether Wang was alleged to have poured the wine versus merely giving it to Kizer is "without a difference," but this is not correct; given Wang was not the only person at the condo, a reader who heard the truth—that Kizer did not see who poured the wine—might not conclude that Wang (as opposed to Muckey) added something to Kizer's glass. Defendants also claim that the cases cited by Wang do not support his argument, but that is incorrect. In *Armstrong v. Simon & Schuster, Inc.*, the New York Court of Appeals clearly held that a case involving "inferences flowing from" "allegedly false statements of verifiable fact[s]," is assessed under the test for express defamation. 85 N.Y.2d 373, 381 (1995). Here, since Sussman is plausibly alleged to have made

17

false statements during the podcast, the elements of that portion of Wang's claim are the same as express defamation.

## III. THE COMPLAINT CANNOT BE DISMISSED ON INDEPENDENT GROUNDS

### A. Defendants Cannot Invoke the Fair Report Privilege

Advancing a theory asserted below but *not* endorsed by the court, Defendants argue that their publications are privileged as "fair reports" (N.Y. Civ. R. Law §74) of a 2010 Colorado investigation. This fails for two reasons. *First*, the defamatory aspects of the publications—implications that Wang drugged Kizer and was fired by the Philharmonic on that basis in 2018—are the independent product *of the publications themselves*. That is, the defamatory innuendos are not repeated or sourced from the police investigation and most certainly are not clearly attributed to the police investigation. *Second*, the police records, when fairly considered, do not support the accuracy of the implications. For example, with regard to the defamatory implication that Wang drugged Kizer to help Muckey sexually assault her, the police investigation did not find that Kizer was drugged, let alone that Wang conspired with Muckey to drug her. And as to the implication that *in 2018* the Philharmonic fired Wang based on misconduct against Kizer, that cannot logically be derived from police records created eight years earlier.

### *1.* ***The Defamatory Implications Are Not Attributed to the Police Records***

The fair report privilege is an exception to New York's republication doctrine under which someone who republishes a defamatory statement is liable to the same extent as if he made the statement first. As explained in *Hogan v. Herald*, 84 A.D.2d 470, 477 (4th Dep't 1982) *aff'd* 58 N.Y.2d 630 (1982): "one who repeats a libel is normally responsible even though the republication consists only of a quotation…. There is a notable exception to this rule, however, known as the rule of fair report."

Section 74 provides fair report immunity *only* if the defamatory statement (1) was "a part" of and attributed by the publication to an official proceeding; and (2) the publication describes the proceeding fairly and accurately. *See* Civ. R. Law §74. Attempting to invoke immunity, Defendants portray the article as if its substance was to report to readers on the 2010 Vail police investigation. *See* Oppo. at 32-33. However, the article does not attribute its defamatory suggestion that Wang drugged Kizer to the police (and as described below, the article is not an accurate description of the police investigation insofar as implying Wang drugged Kizer and was fired on that basis.)

Defendants argue that the article "explicitly attributes *its account*" to the Vail police investigation, and that it "accurately reports" on those records. Oppo. at 33. The "account" that matters here, per Section 74, *is the suggestion Wang drugged*

19

*Kizer*, which "account" (or finding) is *not* attributed to the police. Nor is the implication that Wang was fired for that alleged misconduct *attributed to the police file*. The only statements "explicitly" attributed to the police reports in the article were (1) after the concert a different orchestra member invited 10 of his colleagues to his apartment; (2) descriptions of Mucky and Wang as immature and "sleazy"; and (3) Wang's statement that Kizer got her own wine. Otherwise, the article explains that it is based on *recent* interviews conducted by Sussman.[6]

Especially since the article *fails* to attribute its defamatory implications to the Vail Police file, reasonable readers could conclude that *in suggesting Wang drugged Kizer* and was fired for such, the article was not essentially characterizing police records and that its defamatory implications are substantially Sussman's and not those of the police. Defendants' efforts to hide behind "fair report" must therefore fail. As Judge Sack explains, "to enjoy the protection of the [fair report] privilege, the publication in issue must clearly attribute the [defamatory] statement in question to the official proceeding or document on which it is reporting or from which it is quoting." Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems,* §7.3.5, at 7–25 (5th ed. 2017); *see also Print v. Int'l Tel. & Tel.*

---

[6] Defendants attempt to connect more statements in the article to the Vail police records. *See* Oppo. at 33–34. However, the article did not attribute any of these additional statements to the police records, so an ordinary reader would not understand that these statements are attributed to the official records as opposed to Sussman's independent investigation.

*Corp.*, 757 F. Supp. 87, 93 (D.D.C. 1992) (fair report privilege "applies only if the report properly *attributes the allegedly defamatory statement to the official government record or proceeding*").

Defendants rely on *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149 (S.D.N.Y. 2021) in arguing that the defamatory statements are privileged. Oppo. at 33–34. But in *Kesner*, the defamatory statements were "explicitly attribute[d] [] to the MabVax Complaint [the litigation the publication was reporting on]." *Id.* at 175. In contrast, here, the defamatory implications do not result from the article's selective references to the Vail Police records.

### 2. *The Article and Podcast Do Not Accurately Report on the Police Records*

Even if Defendants had purported to attribute the defamatory implications to the police records, their invocation of "fair report" would still fail because the defamatory implications of the article and podcast are not fair and accurate depictions of the Vail police file's content. Defendants do not pretend that the notion that Wang was fired due to Kizer's allegations is an accurate report on the Vail Police investigation, as Wang's 2018 termination occurred long *after* the police investigation. As to the defamatory implication that Wang drugged Kizer, there is nothing in the police records concluding that Kizer was drugged, or if she was, that Wang conspired with Muckey to drug her so that Muckey could assault

21

her. There is no police record showing that any person made such a claim to the police, or that Wang was ever treated as a target or suspect by the police.

The Vail police records show that Kizer believed she might have been drugged, but that there was no valid scientific or other corroborating proof of this and that in any event she had only a "couple of sips" of wine at the condo and did not see who poured the wine. Moreover, the police records show that Wang fell asleep on the sofa and expressed surprise the next day that Muckey would have had sex with Kizer—the antitheses of a plan to drug her for Muckey's benefit (*see, e.g.*, CA35). Defendants omitted all of these important facts. Additionally, the article misleadingly characterized the police file by suggesting that Wang *had* been a suspect of the police, by stating, for example, that "no [police] charges had been filed and Muckey *and Wang* left town." The implication of that statement is that Wang had been under police investigation, but the records reveal no such thing.

An accurate report *about the content of the Vail police records*—which is the extent of fair report privilege—would not have implied that Wang's firing was related to Kizer or that he drugged Kizer at Muckey's behest to enable Muckey to sexually assault her. Thus, Defendants' argument that they can still invoke Section 74's privilege even if they "omitted" certain facts, *see* Oppo. at 35-36, is off the mark because the thrust of Wang's complaint is not that Defendants omitted minor

22

details from the Vail police records, but rather that the article falsely implies Wang committed misconduct—an innuendo which does not come from the records.

The omission and mischaracterization of key facts, individually and combined, enables readers to think that Wang was suspected by the police of drugging Kizer and was a target of the investigation. Accordingly, Defendants have forfeited any protection they theoretically might have been able to claim from the fair report privilege. *See Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) ("Section 74 does not afford protection if the specific statements at issue, considered in their context, suggest more serious conduct than that actually suggested in the official proceeding.") (quotation omitted); *accord Pirrone v. News 12 Interactive LLC*, 2017 WL 4777072, at *3 (Queens Co. Oct. 3, 2017) (rejecting attempt to rely on fair report privilege where publication "omitted certain crucial information").

The conclusion Defendants cannot invoke Section 74 is reinforced by its policy rationale: "the publisher acts as the agent of the public, reporting only that which others could hear for themselves *were they to attend the proceedings*." *Hogan*, 84 A.D.2d at 477–78. Indeed, Defendants acknowledge that the fair report privilege "concerns itself only with the accuracy of the report as compared to the relevant official proceeding." Oppo. at 35. Here, Defendants did not publish a substantially true report about Wang that merely omitted a few inconsequential

23

details.  Rather, Defendants published an article implying Wang committed bad acts against Kizer and was fired for such—but the police records say neither of those things.  Accordingly, Defendants' effort to invoke the fair report privilege should be rejected, just as it was implicitly rejected by Judge Subramanian.

## B.     The Defamatory Statements Are Not Protected Opinions

Defendants also argue that the defamatory implications are protected as opinions.  Oppo. at 35.  It is unclear what "opinions" Defendants are referring to since the defamatory implications at issue—that Wang drugged Kizer and was fired for doing so—are suggestions of facts that are capable of being proven true or false.

Even if Defendants could construe the defamatory suggestions as "opinion," the innuendo is still actionable because it is not based on fully disclosed facts.  To not be actionable, a "pure opinion" must be "accompanied by a recitation of the facts upon which it is based."  *See Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986).  Here, the disclosed facts are "either falsely misrepresented or grossly distorted" and therefore not exempt from defamation law as pure opinion.  *Chalpin v. Amordian Press*, 128 A.D.2d 81, 85 (1st Dep't 1987).

Contrary to Defendants' argument, their innuendos about Wang do not flow from the police reports.  The Vail Police did not treat Wang as a suspect in the alleged assault on Kizer, and the Philharmonic never terminated Wang based on

24

Kizer's accusations, and therefore there are no disclosed facts supporting those statements. It is inexplicable, as Defendants would suggest, that those defamatory implications flow from the Vail Police records.

### C. Wang Plausibly Pleads the Falsity of the Implication that He Was Fired Based on Kizer's Allegations

Retreading a theory argued below but which the District Judge did not adopt, Defendants proclaim that Wang "cannot plead" falsity of the defamatory implication Wang was fired for drugging Kizer. Oppo. at 36–38. However, Defendants do *not* dispute that Wang's complaint *pleads* the falsity of this allegation. Moreover, Defendants seemingly *agree* with Wang that he was *not* fired by the Philharmonic because of Kizer's allegation. Defendants nevertheless theorize that because the Philharmonic fired Wang based on *a different* sexual assault claim (which the Philharmonic failed to prove), the false implication that Wang was fired *based on Kizer's accusation* is "substantially" true. Oppo. at 36. This argument does not fully grapple with New York's law on substantial truth and ignores crucial facts about the accusation, not detailed in the article, that Wang did face and defeat.

"[A] plea of truth as justification must be as broad as the alleged libel and must establish the truth *of the precise charge therein made." Crane v. New York World Telegram Corp.*, 308 N.Y. 470, 475, 479 (1955) (emphasis added) (holding "that the defense, aimed at establishing the truth of a charge different from that

made in the publication, cannot stand."). New York courts have relied on *Crane* to reject arguments similar to that advanced by Defendants. *See, e.g., Fraser v. Park Newspapers of St. Lawrence Inc.*, 257 A.D.2d 961, 961-962 (3d Dep't 1999) (affirming denial of summary judgment where, even if defendant could prove plaintiff engaged in lewd conduct or had been so accused, that would not prove truth of defamatory statement that plaintiff had pled guilty to "public lewdness"); *Dibble v. WROC TV Channel 8*, 142 A.D.2d 966, 967 (4th Dep't 1988) (rejecting substantial truth defense where plaintiff was indicted for grand larceny for using fraudulent letter of credit, but article stated he was indicted for "fraud, embezzlement and securities violations" and misusing client escrow funds). *See also Olney v. Town of Barrington*, 180 A.D.3d 1364, 1364–65 (4th Dep't 2020) ("the 'entire thrust and purport' of defendants' defense of truth in this case 'is to establish ... the truth of a *different* charge than the one [alleged in the second amended complaint],'") (*quoting Crane*, 308 N.Y. at 475–76). Here, there is no question that the "thrust" of Defendants' purported truth defense "is to establish … the truth of a different charge." Given that New York's highest court has held that the defense of truth applies only where a defendant can "establish the truth of the precise charge made" and Defendants do not argue that Wang was fired for misconduct against Kizer, their defense must fail. *Crane*, at 479.

Defendants skip over the "precise charge" requirement and instead argue that the only applicable test is whether the defamatory innuendo—that Wang was fired for a sexual assault against Kizer "*could have* produced no worse an effect on the mind of the reader than the truth [about the accusation Wang actually faced]." Oppo. at 37 (quoting *Chau v. Lewis*, 771 F.3d 118, 131 (2d Cir. 2014)). To be sure, "it is not necessary to demonstrate complete accuracy to defeat a charge of libel." *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998). Courts regularly consider whether the pled truth "would have a different effect on the mind of the reader" than what was published. *Greenberg v. Spitzer*, 155 A.D.3d 27, 41 (2d Dep't 2017). But Defendants ignore that this standard is applied primarily, if not exclusively, to determine whether a publication's discussion *of the facts that are the subject of the defamation allegation*, not a separate allegation, conveys the same gist as the pled truth. *See, e.g.*, *Jewell*, 23 F. Supp. 2d at 367-68 (finding news story declaring plaintiff a "prime" or "main" suspect in bombing where Jewell was a suspect under investigation by the FBI "substantially true" and collecting cases, none of which involved a different allegation than the focus of the defamation claim); *Greenberg*, 155 A.D.3d at 52 (passage substantially true where it accurately stated plaintiff had been charged with specific acts of fraud but misstated which federal agencies brought charges). *See also Tannerite Sports, LLC v. NBC Universal News Grp., LLC*, 864 F.3d 236, 243 (2d Cir. 2017) (description

27

of exploding targets as "bombs" substantially true, "[w]hen the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done."); *Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1279 (11th Cir. 2024) (applying New York law and rejecting argument that being suspended for spreading misinformation was the same as being suspended for doxxing); *Da Silva v. Time Inc.*, 908 F. Supp. 184 (S.D.N.Y. 1995) (identifying plaintiff as prostitute not substantially true where plaintiff had been a prostitute for six years but was not at time of publication).

Notably, Defendants do not cite any case applying New York law where a court did what Defendants propose—dismiss for substantial truth based upon the truth of an entirely separate allegation. Oppo. at 37 (citing cases applying Colorado and Illinois law).

Even if Defendants' narrow reading of the law were accurate, Defendants' substantial truth defense would still fail. Defendants' article had such effect on the mind of readers that it led to Wang's immediate excommunication from his tenured position, whereas, to paraphrase *Chau*, it is *impossible* to say that a hypothetical accurate article about the different accusation Wang actually faced from the Philharmonic (and defeated in the arbitration) would have caused Wang identical reputational harm.

28

Pages 5–7 of Wang's brief detail many important differences between the Kizer-related events that are the article's focus and theme—and the unproven, unreported details of the accusation against Wang. For example, the article reports that Kizer *never* consented to sex with Muckey, immediately suspected involuntary drugging, and immediately reported Muckey to the police. These reported aspects of Kizer's story made it sound persuasive. In contrast, an accurate article about Wang's accuser would have had a different effect: it would have stated that she *waited years* to allege sexual assault, admitted to consensual sexual activity with Wang, including on the night after the alleged assault (after she reached out to Wang and asked if she could stay in his apartment). Accordingly, as the arbitrator found, the case against Wang was based on a "single uncorroborated claim registered many years after the event." CA79. A hypothetical and substantially truthful story about Wang's accuser and Wang's success in the arbitration *could have* had a less pernicious effect on how Wang was perceived by readers—which is all that is required under *Chau v. Lewis* to require rejection of a motion to dismiss premised on purported "substantial truth."[7]

---

[7] Unable to mount a viable argument for a "substantial truth" dismissal, Defendants attack as "outdated" the arbitrator's explanation that a person can act volitionally in a state that Defendants refer to as "blacked out." But as the arbitrator explained, blackout means *memory loss, not unconsciousness*, and an expert had persuasively testified how "it is possible, in a blackout state, for a person to engage in a variety of volitional behaviors, carry on a conversation, answer and respond to questions, perform physical tasks or functions and, significant to this case, 'deciding to have sex or not have sex.' Moreover, [the expert] stated, other than the normal signs that someone has consumed alcohol, there are no observable effects

Defendants urge the Court to apply the *Chau* test without regard to these details, on the basis that the false statement and the pled truth are at the broadest level, similar in kind. *See* Oppo. at 2, 37 (arguing that it is substantially true that Wang was fired for sexual misconduct). But the legal standard is not whether two accusations are at the broadest level similar in kind. Details matter. *See*, *e.g.*, *Veritas*, 121 F.4th at 1284 (rejecting substantial truth defense where twitter suspension was true but details were misstated).

Moreover, the Kizer story could be understood to imply that Wang was fired not only for the accusation he actually faced, but also for involvement in Kizer's alleged assault. Such false suggestion that Wang was terminated over alleged involvement in not one, but two alleged sexual assaults, could have had a more pernicious effect on the minds of readers, and thus Defendants' "substantial truth" defense should be rejected for that additional reason.

In sum, the effect of implying that Wang was terminated as a result of Kizer's allegations "could have" had a different effect on the ordinary reader than an article that reported fairly about the accusation Wang faced and defeated. Accordingly, this theory for dismissal must be rejected.

---

that could indicate to someone else that the person is in an alcohol–based [memory] blackout." CA92–93. *See also* CA111.

### D. The Complaint Plausibly Pleads Actual Malice

The Complaint more than plausibly alleged actual malice, contrary to Defendants' contention. For example, it pleads that *prior* to publishing, Defendants had access to information (from the arbitration decision and police reports) that *explicitly* refutes the defamatory implications that Wang drugged Kizer and was fired on that basis. *See* JA15 (Compl.¶4) ("Defendants *knew* their story was false because two sets of documents that the article identifies as having been 'reviewed' to prepare the article … each make it clear that there was *no* evidence supporting the notion that Wang drugged Kizer – or that she was drugged by anyone."); *see* JA24 (Compl.¶31) (Sussman claimed to have read arbitration decision which revealed that Kizer's allegation was not against Wang). Additionally, the Complaint pleads how Defendants made dubious editorial choices whose purpose was to cause the article to fit a preconceived narrative.

Defendants' protestation that "Wang was required to plead more than just a preconceived storyline: he was required to, and did not, plead deliberate falsification," (*see* Oppo. at 41), is nonsensical because Wang *pled deliberate falsification*. A sub-section of the Complaint is entitled "Sussman and New York Magazine Knew that the article's Defamatory Claims Were False Because the Defamatory Theme of the article is Refuted by the Vail Police Reports and Arbitration Decision that Sussman Claimed to Have Reviewed." *See* JA30. There,

31

Wang explicitly pled ways in which the documentary evidence Sussman claimed to have reviewed contradicted the defamatory implication that Wang drugged Kizer by showing that there was no credible evidence that Kizer was drugged. *See* JA30–31 (Compl.¶¶49–51). Later, the Complaint alleges that the arbitration decision that Sussman claimed to have reviewed made it "abundantly clear" that Wang was not accused by the Philharmonic or Kizer of drugging her, and that the Philharmonic's 2018 decision to terminate Wang was based on "wholly independent events." *See* JA33–34 (Compl.¶59). Thus, Wang pled deliberate falsification and that Defendants published the article despite having evidence that the defamatory statements were false – that is more than adequate to plausibly allege actual malice. *See, e.g., Palin v. N.Y. Times*, 113 F.4th 245 (2d Cir. Aug. 28, 2024) (pre-publication receipt of information inconsistent with the theme of the subsequently published editorial permitted an inference of actual malice); *see also Biro v. Conde Nast*, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013) (actual malice may be inferred where "the words or acts of the defendant before, at, or after the time of the communication indicate that the defendant knew that his or her statement was or may well have been false").

While Defendants claim that the "thrust" of the allegations concerning actual malice are that Sussman had a preconceived narrative and bias, *see* Oppo. at 41, these allegations merely add to those that Defendants published the article despite

32

having evidence *prior to publication* that the defamatory statements were false. While bias alone is insufficient by itself to establish actual malice, the law is clear that its pleading, combined with other relevant facts, can help a complaint get past the threshold of plausibly pleading actual malice. *See*, *e.g.*, *Biro*, 963 F. Supp. 2d at 277 (listing among circumstantial evidence which is relevant to actual malice, when "defendant has a motive for defaming plaintiff"); *Airlie Found., Inc. v. Evening Star Newspaper Co.*, 337 F. Supp. 421, 429 (D.D.C. 1972) ("There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity."). The cases cited by Defendants are not to the contrary, (*see* Oppo. at 41-42), as they merely stand for the uncontested principles that bias *alone* is insufficient to establish actual malice.

Similarly, Defendants' arguments that Wang's allegations regarding their failure to investigate are insufficient, *see* Oppo. at 42, miss the mark. It is not Wang's position that a failure to investigate standing alone constitutes actual malice. Instead, the Complaint alleges that Defendants *knew* that the defamatory statements were false, not just that Defendants failed to investigate in the face of evidence that the defamatory statements were false. *See* JA15 (Compl.¶4) ("Defendants *knew* that their story was false because two sets of documents that the article identifies as having been 'reviewed' to prepare the article … each make

33

it clear that there was *no* evidence supporting the notion that Wang drugged

Kizer….”); JA18 (Compl.¶13, n.3) (“Sussman claimed to have reviewed the

arbitration decision,” and “portions of the arbitration decision that the article did

*not* quote refute the article’s defamatory implication”); JA30 (Compl.¶49) “while

the article portrays Kizer’s purported drugging as incontrovertible fact, … law

enforcement records and the arbitration reveal instead that there was *no credible*

*scientific basis* for the purely speculative notion that Kizer was drugged”); JA31

(Compl.¶51) (“Sussman and his editors at New York Magazine *knew* these facts

(from the police records and arbitration decision) that *debunked* the notion of any

credible scientific support for the idea Kizer was ‘exposed’ to GHB ‘around the

month of the alleged assault’ – yet excluded these facts from the article in the

service of its preconceived narrative”); JA31 (Compl.¶52) (“The article clearly

suggests that Kizer’s drinking of the glass of wine that Wang purportedly brought

her is the only known explanation for her loss of consciousness…. But the Vail

police records tell a different story.”); JA33–34 (Compl.¶59) (“the arbitration

decision makes it obvious that Wang was not accused in connection with

Kizer/Vail, [but] the article deliberately created the false contrary impression–that

Wang had been accused by Kizer and the Philharmonic of drugging Kizer in

2010”). Even if Wang had merely pled a failure to investigate in light of the

evidence that Defendants had showing that their allegations were false, this would

34

be sufficient since, as Defendants concede, a failure to investigate "in the face of actual, subjective doubts as to the accuracy of the story" suffices to allege actual malice. *See* Oppo. at 42 (quoting *Biro*, 963 F. Supp. 2d at 278).

Finally, Defendants' publication of Wang's denial is insufficient, by itself, to defeat an inference of actual malice, as publication of a denial is simply one factor in the analysis of whether actual malice has been adequately pled. *See Biro*, 963 F. Supp. 2d at 283. While Defendants cite *Biro* for the proposition that including a denial can rebut an inference of actual malice, in *Biro* the defendant "published a second article *focusing* on Biro's denial of the accusations." *Id.* Here, the purported publication of Wang's "denial" which was referenced in passing in an otherwise lengthy article devoted to explaining Wang's culpability is insufficient to defeat actual malice. Additionally, as set forth above, *see* Section II.B., Defendants *did not accurately or completely publish Wang's denial* as they failed to include Wang's denial that the Philharmonic had attempted to terminate him in 2018 as a result of Kizer's allegations.

Defendants' failure to include that aspect of Wang's denial is especially noteworthy since Defendants *knew* (from reading the arbitration decision) that Wang had not been terminated as a result of Kizer's allegations. Thus, not only did the article fail to mention that Wang denied being terminated due to Kizer's allegations, but Defendants deliberately omitted this denial while knowing that the

35

article's defamatory implication that Wang was fired due to Kizer's allegations was false. Accordingly, Wang has more than adequately pled that Defendants published the defamatory statements with at least a reckless disregard as to their truth or falsity.

## THE CROSS-APPEAL

## REGARDLESS OF THE OUTCOME OF WANG'S APPEAL, DEFENDANTS ARE NOT ENTITLED TO FEE SHIFTING

Defendants have cross-appealed from the District Court's denial of their motion for fee shifting. It is unlikely the Court will reach this issue, given the merit of Wang's argument that his complaint plausibly pleads his claims. But, for the reasons stated by the District Judge as well as several other independent grounds, the cross-appeal lacks merit.

## COUNTER-STATEMENT OF THE ISSUE PRESENTED FOR REVIEW[8]

1.    Did District Court correctly reject Cross-Appellants' motion for fee shifting?

## COUNTER-STATEMENT OF THE CASE

After District Court granted Defendants' Rule 12(b)(6) motion, Defendants moved for fee shifting, theorizing that under New York Civil Rights Law §70-a, the Rule 12(b)(6) dismissal made fee shifting automatic.

---

[8] Given that Cross-Appellants did not include a jurisdictional statement, neither does Wang. *See* Rule 28.1(c)(2). In any event, Wang agrees that the Court has jurisdiction over the cross-appeal.

36

In opposing that motion, Wang identified multiple independent bases for his argument that Section 70-a does *not* compel automatic fee shifting here. *First*, Wang argued that Section 70-a requires a cause of action and does not authorize fee shifting by mere motion, and that even *if* there is a narrow exception to the cause of action requirement, a motion made under Rule 12 does not fit within it. *Second*, Wang relied on New York authority and legislative history for the point that Section 70-a does not mandate fee shifting against plaintiffs who, like Wang, file unsuccessful but non-frivolous lawsuits[9], and relatedly, that mandating fee shifting against plaintiffs who brought suit in good faith would unconstitutionally deter petitioning that is within the First Amendment's protection. *Third*, Wang argued that for reasons sounding in the Supreme Court's *Shady Grove* and *Erie* doctrines, Defendants' fee shifting motion was not cognizable in federal court.

District Court denied fee-shifting. Reasoning that even if Section 70-a contained an exception to its "action or claim" requirement for fee shifting, it held that at the motion to dismiss stage, the *only* exception is for motions that are made after the grant of a N.Y. CPLR 3211(g) motion to dismiss—a motion that cannot be made in federal court. Having rejected Defendants' motion on this ground, the court did not consider the other challenges Wang made to Defendants' fee request. JA244-47.

---

[9] Defendants did not argue that Wang's case was frivolous or brought in bad faith.

37

## SUMMARY OF ARGUMENT IN OPPOSITION TO CROSS-APPEAL

Framing a cross-appeal that the Court is unlikely to reach, Defendants characterize Wang's position as challenging "only the notion that the fee-shifting scheme applied in federal court, and that his case lacked a substantial basis." Oppo. at 12. But as detailed above, Wang challenged fee shifting on several other grounds. In short, there are an abundance of reasons why, even in the unlikely event Wang's lawsuit is not reinstated, Defendants may not obtain fee shifting:

(a) First, Section 70-a requires fee shifting to be sought by a formal cause of action, not by motion, and here Defendants proceeded only by motion;

(b) Second, even if there is an exception to Section 70-a's cause of action requirement allowing fees to be sought by motion after *certain* dismissals, federal Rule 12(b)(6) dismissals do not trigger this narrow exception, as Judge Subramanian correctly determined;

(c) Third, both the legislative history of Section 70-a and its language limit the cases in which fee shifting is mandatory to lawsuits that are frivolous or brought in bad faith, exceptions that do not apply to Wang's lawsuit;

(d) Fourth, if Section 70-a were interpreted to impose fee shifting automatically on all Plaintiffs who suffer dismissal of an action that fits into the broad statutory definition of an action involving public petition and participation—*without making an exception for good faith non-*

38

*frivolous lawsuits* (like this case)—Section 70-a would infringe upon the

constitutional right to petition;

(e) Fifth, under the *Shady Grove* doctrine, New York's Section 70-a may not

be applied in federal court because a valid federal rule (FRCP Rule 11) is

broad enough to apply to the question here: what are the rules for when a

party who files a meritless lawsuit is required to reimburse the Defendant

for the costs of defense; and

(f) Sixth, Section 70-a may not be applied to mandate fee shifting in this

case because, applying the *Erie* doctrine, at the motion to dismiss stage

its application is inextricably intertwined with a state procedural rule

(CPLR 3211(g)).

## STANDARD OF REVIEW

This Court reviews a district court's denial of attorney's fees for abuse of

discretion, while deciding questions of law pertinent to the availability of a fee

award *de novo*. *Scarangella v. Group Health, Inc.*, 731 F.3d 146, 151 (2d Cir.

2013).

## ARGUMENT

**I.     A MOTION FOR FEES BASED ON A RULE 12(b)(6) DISMISSAL THAT IS NOT ASSERTED IN A CAUSE OF ACTION FAILS TO SATISFY SECTION 70-A'S PROCEDURAL REQUIREMENTS**

The plain language of Section 70-a authorizes only one *procedure* that may

be used to seek fees—the filing of a formal cause of action (i.e., a claim or

39

counterclaim)—and a fees-motion is not that. Alternatively, even if fees *could* be sought *by motion* without filing a cause of action, the only kind of motion to dismiss that could even arguably permit fee shifting to be sought by follow on motion without a fee-seeking cause of action is a CPLR 3211(g) motion—a state procedure unavailable in federal court.

## A. Defendants Failed to File the Required Claim or Counterclaim to Seek Fees

The content and structure of Section 70-a underscore that it authorizes *actions and claims*, exclusively, as the necessary procedural mechanism to recover fees. There are three enumerated paragraphs of Section 70-a, the first of which authorizes defendants in "actions involving public participation and participation" to "maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees." Civil Rights Law § 70-a(1). *Absent* from the list of ways a defendant may seek fees is any reference to a motion. Underscoring that Section 70-a does not authorize fee motions, paragraph 2 states that "[t]he right to bring *an action* under this section can be waived only if it is waived specifically." *Id.* § 70-a(2). If Section 70-a authorized fee motions, it would be illogical for the statute to limit the bounds of this waiver to *actions* for fees, as it does.

Crucially, the formal claim requirement was *not* a new feature of the 2020 statutory amendments but was part of the original version of Section 70-a, which

40

New York's Appellate Division required to be "strictly construed." *See 315 West Enterprises LLC v. Robbins*, 171 A.D.3d 466, 467 (1st Dep't 2019) (provision of Section 70-a authorizing recovery of attorney's fees by maintaining "an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees" "must be strictly construed").

To be sure, amended Section 70-a makes reference to successful 3211(g) motions to dismiss as one way in which fee claimants can establish their substantive right to fee shifting. But the motion to dismiss referenced by Section 70-a is best understood as an example of how a defendant can show their *substantive* entitlement to fees, and not a substitute for the strictly construed and longstanding *procedural* requirement that a defendant seek fees through a formal claim, asserted in a cause of action. Moreover, the examples provided in Section 70-a(1)(a) of how a fee claimant prevails, such as through 3211(g) motions, are located in a *subparagraph* of paragraph (1)—they are not part of and independent of that paragraph, which only authorizes fee shifting by the making of formal claims.

Several courts have thus recognized that Amended Section 70-a fees may *not* be sought without the filing of a fee cause of action. *See VIP Pet Grooming Studio, Inc. v. Sproule*, 224 A.D.3d 78, 92 (2d Dep't 2024) (defendants not entitled to an award of attorney's fees and costs, because they "[had] not asserted a

41

counterclaim for an award of attorney's fees and costs"); *Chinese Ams. Civ. Rights Coal, Inc. v. Trump*, 2022 WL 1443387, at *6 (S.D.N.Y. May 6, 2022) (statute "requires that an applicant for attorney's fees 'maintain an action, claim, cross claim, or counterclaim,' and not simply assert a request as part of a motion to dismiss"); *Ctr. For Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 333 (S.D.N.Y. 2021) ("The statute requires that *a pleading* of some sort be filed in order to collect attorney's fees; even a cross-motion for fees would appear to be inadequate under Section 70-a(1).") (emphasis in original).

Defendants and amici place particular emphasis on one contrary decision, *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166 (S.D.N.Y. 2024), in which Judge Oetken awarded Section 70-a fees sought only in a motion. But to do so, Judge Oetken *did not* hold that the cause of action requirement had somehow been excised from Section 70-a. Instead, and as amici accurately describe, Judge Oetken perceived that the Defendants had somehow asserted a fee claim or *action*, theorizing that Section 70's requirement to maintain a fee seeking "action … *include[s]* continuing an existing [defamation] action … by seeking costs and attorney's fees after obtaining a dismissal in the case." Amici at 17. But there are two fundamental flaws in that logic. First, the idea that continuing "the action" *after it was dismissed* by making a motion for fees is not consistent with the Supreme Court's holding under which an action is finally over after dismissal *even while a*

42

*post-dismissal fee application is made.* *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 201 (1988) (holding that "an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final"). Applying *Budinich*, since Defendants obtained a judgment of dismissal *befor*e making their fee application, they could not, as Judge Oetken posited, continue *the dismissed* action by making a collateral post-dismissal motion for fee shifting. Second, Judge Oetken's treatment of the fees motion as if it were an action is not consistent with the Appellate Division's holding that "a motion to dismiss … is not a … pleading." *Harris v. Ward Greenberg Heller & Reidy LLP*, 151 A.D. 3d 1808, 1809 (4th Dep't June 16, 2017).[10]

Pivoting to policy, amici argue that strictly construing the statutory claim or action requirement would "implicitly weaken" New York's anti-SLAPP act. *See* Amici at 19. Amici never explain how the legislative choice to retain certain statutory language "weakens" other legislative amendments (which are not at issue in this appeal), but the Court's obligation is to give the legislative language its plain meaning, and not to further expand the already broad reach of New York's legislation.

---

[10] Some state courts have deviated from the statutory language and allowed fee requests made by motion (though they have generally not discussed the issue). *See, e.g., Aristocrat Plastic Surgery, P.C. v. Silva*, 206 A.D.3d 26 (1st Dep't 2022).

43

Having failed to make a persuasive argument that the longstanding "action or claim" language in the amended statute should be construed differently from the identical (and strictly construed) language of the predecessor statute, Defendants and amici focus on a particular amendment to Section 70-a, which states that "an adjudication pursuant to subdivision (g) of rule thirty-two hundred eleven" is a way in which a defendant may satisfy the substantive standard for fee shifting. In effect, Defendants appear to argue that the use of the 3211(g) example somehow eliminated Section 70-a's procedural "claim or action" requirement, as if Section 70-a was transformed by the 2020 amendments into a *purely* substantive statute containing *no* mandated procedures. This argument cannot be squared with the retention of the statute's longstanding procedural claim requirement.

Indeed, even before the statute was amended in 2020 to include a successful 3211(g) motion as an example of how the substantive standard for fee shifting could be satisfied, the statute required both a fee claim and a demonstration that an action was lacking in a "substantial basis," etc. Thus, the *lack of a "substantial basis,"* etc. test was [and is] the *substantive* standard for awarding fees, which has long *coexisted* alongside Section 70-a's independent procedural requirement of a fee *action or claim*. By providing examples of how fee-seekers might establish their *substantive* right to a fee award (i.e., a successful 3211(g) motion), the

44

legislature did not obliterate the statute's unchanged procedural language authorizing *only fee claims* and not fee motions.

In sum, the statute is clear about the specific *procedures* that it authorizes as the *means* to seek fee shifting, and those procedures do not include motions. Because Defendants have not filed the required "action, claim, cross claim or counterclaim" for fees, under the plain statutory language they are not entitled to fees.[11]

### B.     Fees Are Not Automatic Upon a Successful Rule 12(b)(6) Motion

The District Court recognized that before Section 70-a was amended it had been interpreted to allow fees sought by claim but "not on a motion at all." JA245. Giving a somewhat expansive interpretation to the amendment that referenced 3211(g) motions (and 3212(h) motions) as warranting fee awards, District Court concluded that the statutory purpose was to add "dismissals under CPLR 3211(g) and CPLR 3212(h)" to the existing statutory allowance of fee shifting "made in the context of actions for fees or counterclaims." But the District Court declined to treat the statute's references to 3211(g) and 3212(h) as obliterating entirely the

---

[11] If fee shifting were automatic upon the granting of any motion to dismiss (or summary judgment motion), the statutory language authorizing fee actions or claims would be almost superfluous, as every defendant who made a successful dismissal or summary judgment motion would obtain fee shifting without filing a claim.

45

procedural requirement to seek fees by action or claim in the absence of such a motion. As Judge Subramanian explained:

> If the legislature wanted to further broaden the statute's reach to federal dismissals under Rule 12 (or Rule 56), it could and would have said so. To that end, when the CPLR 3211(g) language was added to the statute, the New York legislature was aware that SLAPP actions may proceed in both state and federal court, and that motions to dismiss would come up in both. The legislature decided not to refer to all dismissals of a complaint, or specifically to Rule 12 dismissals, but to solely refer to CPLR 3211(g). (JA245).

Further explaining that Section 70-a's reference to 3211(g) and 3212(h) motions—and not Rule 12(b)(6) motions—was not an oversight, Judge Subramanian explained why the legislature could have rationally made that distinction, emphasizing the different discovery rights that plaintiffs in state and federal court would have as a tool to oppose dismissal on the pleadings:

> it would be strange if in state court, a plaintiff facing a motion to dismiss can try to shore up their case through discovery, but in federal court, no discovery can be taken and any dismissal triggers mandatory fee-shifting. (JA246).

Severing the fee award from the statute's cohesive procedural mechanism would create a free-floating fee remedy that the Legislature never intended. Cross-Appellants do not point to any evidence to the contrary. Indeed, Judge Subramanian is not alone in holding that New York anti-SLAPP fee shifting is not available via motion in federal court. *See Jones v. Abel*, 2026 WL 835364, at *15, n.4 (S.D.N.Y. Mar. 26, 2026) ("anti-SLAPP attorneys' fees are not available by

motion in an action in federal court, and must be brought as a distinct cause of action"); *LaNasa v. Stiene*, 731 F. Supp. 3d 403, 417 (E.D.N.Y. 2024) ("anti-SLAPP statute makes costs and fees available only when the court dismisses an action based on *the statue's* dismissal provision and does not purport to make them available to parties who obtain a dismissal under Federal Rule of Civil Procedure 12(b)(6)") (emphasis in original).

Cross-Appellants attempt to dismiss the equitable chasm that would exist if mandatory fee shifting automatically followed federal dismissals, *without* the balancing procedural protections designed by the State Legislature. In doing so, Cross-Appellants essentially ask this Court to legislate a New York law statutory scheme for defamation defendants *in federal court* whereby plaintiffs would face automatic fees at the pleading stage *without* the right to seek discovery to oppose a pleading stage motion, provided by CPLR 3211(g)(3) in state court. New York's legislature did not enact such a scheme.

Amici's emphasis on the point that Section 70-a uses the word "shall" misses the point. *See* Amici at 20. Even *assuming* that Section 70-a fees are mandatory (a point rebutted below), that nature of a fee shifting award does not obliterate the requirement to use one of the *procedure*s that Section 70-a identifies (the filing of a fee seeking action, claim, counterclaim or cross claim) as the authorized *means* to request a fee shifting award.

47

As Judge Subramanian and others have emphasized, had New York's legislature intended for Section 70-a to mandate fee shifting after *any* successful motion to dismiss on the pleadings, state or federal, it would have said so. Respectfully, this Court should not disturb Judge Subramanian's sound conclusion on that point. Indeed, the idea that New York's legislature intentionally authorized a federal court version of its anti-SLAPP legislation whereby its mandatory fee shifting provision would operate after a Rule 12(b)(6) dismissal just as it operates in state court after a CPLR 3211(g) is unsound: the state court statutory right to seek discovery to defeat the "substantial basis" standard for fee shifting is not available to oppose a 12(b)(6) motion—a difference that may explain why the legislature expressly referenced CPLR 3211(g) motions but not Rule 12(b)(6) motions in Section 70-a as an example of a fee qualifying motion.

## II. CROSS-APPELLANTS ARE NOT ENTITLED TO FEES FOR ADDITIONAL REASONS

Cross-Appellants' fee motion fails for additional reasons: first, as explained below, the text and legislative history of Section 70-a make clear that fee shifting does not apply to non-frivolous lawsuits, brought in good faith, like the instant action. Second, penalizing a good faith litigant under such circumstances would improperly infringe on the first amendment right to petition the courts for redress of grievances.

48

**A.     To Trigger a Fee Award Under Section 70-a(1)(a), an Action Must Have Been Commenced Without a Substantial Basis in Law *and* Be Frivolous**

To obtain fees under Section 70-a, a defendant must show two things: (1) the action was "commenced or continued without a substantial basis in fact and law," and (2) the lawsuit "could not be supported by a substantial argument for the extension, modification or reversal of existing law."  As recently noted by a New York court, the second requirement is "almost verbatim, the standard for imposing sanctions for frivolous conduct as found in 22 NYCRR 130-1.1(c)(1)."  Hence, that court held that to obtain fees under Section 70-a, a defendant "must not only demonstrate[] that the action was commenced without a substantial basis in law, but that the action was in and of itself frivolous."  *Kuvshynov v. Fox News Network, LLC*, 87 Misc.3d 1260(A), at *8 (Sup. Ct. N.Y. Co. Dec. 29, 2025).

In *Kuvshynov*, the court looked beyond the question of whether the pleading standard had been met and analyzed whether plaintiffs had made a good faith argument. The court explicitly found that even though plaintiffs failed to state a claim, because they made a good faith, non-frivolous argument in defense of the viability of the lawsuit, defendants had failed to show that plaintiffs' claim "could not be supported by a *substantial argument for the extension, modification or reversal of existing law*."  *Id*. at *9.  In other words, even a plaintiff who has failed

49

to state a claim can avoid fee shifting if he maintained a "substantial argument" in support of his claim for relief.

The court's analysis in *Kuvhsynov* is further bolstered by legislative history. The New York Legislature's goal in amending the anti-SLAPP Act was to discourage and penalize "large corporations and other powerful forces" who abuse the "legal system by attempting to harass, intimidate and impoverish their critics with strategic lawsuits against public participation." New York State Legislature Press Release, "Senate and Assembly Majorities Advance Anti-SLAPP Legislation to Protect Free Speech" (July 22, 2020).[12] The 2020 amendments were designed to address the "*frivolous* lawsuits [] filed each year that are calculated *solely* to silence free speech and public participation," and intended to apply punitive fee shifting where a "defendant [was] found to have been victimized by a *frivolous* lawsuit intended only to chill free speech." *Kuvshynov*, 87 Misc. 3d 1260(A), at *9; *see also* Senate Sponsor's Mem, Bill Jacket, L 2020, ch 250 ("a court 'shall' impose an award of costs and fees, *but only if the court finds that the case has been*

---

[12] New York courts consider the legislative history in assessing statutory meaning, even where the statute seems clear on its face. *See, e.g.*, *Sprint Commc'ns Co., L.P. v. City of New York Dep't of Fin.*, 152 A.D.3d 184, 189 (2017) ("Although the language of the respective statutes appears at first glance to be unambiguous, it is nevertheless appropriate to review the legislative history behind their adoption. "The primary consideration of courts in interpreting a statute is to 'ascertain and give effect to the intention of the Legislature'" (quoting *Riley v. County of Broome*, 95 N.Y.2d 455, 463 (2000)).

*initiated or pursued in bad faith"*) (emphasis added). As set forth in the sponsor memo:

> This amendment to Section 70-A of the Civil Rights Law makes clear that a court "shall" impose an award of costs and fees, but only if the court [finds] that the case has been initiated or pursued in *bad faith*. Together, the two amendments will protect citizens against the threat – and financial reality – of abusive litigation, but will not discourage meritorious litigation.

*Id.* (emphasis added).

Here, there was no argument, much less a judicial finding, that Plaintiff brought his claim to harass or intimidate defendants, to chill free speech, or with any other nefarious intent. To strip this nuance out of the analysis when deciding whether to impose significant punitive fees on litigants operating in good faith would deviate from the legislative intent. The Legislature's intent was not to allow large corporations—like the corporate defendants here—to extract pecuniary benefit from individuals whose claims, while not successful, were neither frivolous nor made in bad faith. In that regime, which New York did not enact, powerful corporations could chill good faith litigation with the coercive deterrent threat of having to pay the corporation's legal fees as the price of bringing an unsuccessful but legitimate and non-frivolous lawsuit.

51

Accordingly, this Court should refuse to penalize or deter Plaintiff's good faith litigation and may affirm the district court's denial of fees on that alternative basis.

**B. Section 70-a, if Understood as Mandating Fee Shifting After the Dismissal of a Non-Frivolous Claim, Would Infringe the Constitutional Right to Petition**

The application of mandatory fee shifting in the context of a non-frivolous suit such as this one, would impermissibly violate the First Amendment and the New York State Constitutional rights to petition which afford constitutional protection to even unsuccessful lawsuits.

The right "to petition for a redress of grievances [is] among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967). Included within that right is the "right of access to the courts." *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (citation omitted); *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("This Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."). Any significant impairment of First Amendment rights must survive "exacting scrutiny," even if any deterrent effect arises "'indirectly as an unintended but inevitable result." *Elrod v. Burns*, 427 U.S. 347, 362 (1976). The party defending

52

a statute's constitutionality must demonstrate that, even when it advances an interest of vital importance, it does so using the least burdensome means available. *Elrod*, at 363. The New York anti-SLAPP law, if interpreted to automatically impose fee shifting on plaintiffs who file good faith/non-frivolous lawsuits, fails that test.

While it is constitutionally permissible to deter lawsuits brought to harass, intimidate, or punish others, the anti-SLAPP law (under Cross Appellants' interpretation as a mandatory fee shifting statute) violates the First Amendment because it casts a much wider net. Instead of limiting itself to deterring frivolous, harassing litigation brought in *bad* faith, under Cross-Appellants' interpretation of the statute, it would chill litigants like Wang from bringing non-frivolous claims in *good* faith, by assessing one-sided punitive fee shifting on *any* plaintiff who does not get past both motions to dismiss and summary judgment motions. This is not the *least burdensome* means of deterring litigation brought to harass and intimidate others from exercising their constitutional rights. The Supreme Court has stressed that unsuccessful lawsuits can fall within the scope of the First Amendment's protection because "the genuineness of a grievance does not turn on whether it succeeds," and that "even unsuccessful but reasonably based suits advance some First Amendment interests." *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 532 (2002).

53

The protection of free speech and a plaintiff's petition rights are not mutually exclusive. States have adopted anti-SLAPP procedures that give weight to *both* First Amendment goals—the right to free speech as well as the concomitant right to petition. *See, e.g., Sandholm v. Kuecker*, 962 N.E.2d 418, 430 (Ill. 2012) ("[W]here a plaintiff files suit genuinely seeking relief for damages for the alleged defamation … the suit would not be subject to dismissal under the Act."); *Duracraft Corp. v. Holmes Products Corp.*, 427 Mass. 156, 167–68 (1998) (construing anti-SLAPP Act to require movant "to make a threshold showing … that the claims against it are 'based on' the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities" ). The Court should likewise interpret New York's fee shifting statute as not applying when the plaintiff is "genuinely seeking relief for damages for the alleged defamation" because otherwise, the statute strikes an unconstitutional balance.

There is no evidence in the record, nor have Defendants argued, that Wang's case was frivolous or commenced in bad faith. To award fees here, without a judicial finding that Wang's lawsuit was frivolous or brought in bad faith would infringe Wang's First Amendment and related state constitutional right to petition.

## III. THE FEE SHIFTING PROVISION OF NEW YORK'S ANTI-SLAPP LAW IS UNENFORCABLE IN FEDERAL COURT

Cross-Appellants are not entitled to fees for the additional reason that the fee shifting provision of New York's anti-SLAPP statute is inapplicable in federal

court. [13]  When asked to apply state law, a federal court sitting in diversity must first determine whether there is a valid federal rule on the same subject.  If there is, then the court must apply the federal rule.  If not, the court must ask whether the state law is substantive or procedural and whether a federal rule of procedure already answers the question.  *See Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 398–99 (2010). Here, as discussed below, many district courts in this Circuit have determined Section 70-a cannot be applied in federal court for two reasons. First, the federal rules and Section 70-a provide different answers to the same question—when are fees available following a meritless lawsuit?  Second, Section 70-a cannot be separated from New York's anti-SLAPP dismissal and discovery provisions, which are indisputably procedural and thus under *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), Section 70-a cannot be applied.

### A.  Section 70-a Answers the Same Question as the Federal Rules (But Differently)

As recently stated by the Supreme Court, "when a Federal Rule of Civil Procedure is on point, a federal court bypasses *Erie's* inquiry altogether.  That is

---

[13] This Court recently held that a different and clearly substantive provision of New York's anti-SLAPP Act, Section 76-a which applies a higher standard of fault, applies in federal court.  *See The Satanic Temple, Inc. v. Newsweek Digital LLC*, 177 F.4th 202 (2d Cir. 2026).  But that decision did not address whether other, procedural aspects of New York's anti-SLAPP Act apply in federal court.

because the Rules of Decision Act dictates that state substantive law must yield if the Constitution, a treaty, or a statute otherwise requires or provides." *Berk v. Choy*, 146 S. Ct. 546, 562 (2026) (quotation and punctuation omitted). The first step in deciding whether a federal rule is "on point," is determining what question is being asked. Here, the question is when a court can impose fee shifting on a plaintiff for bringing a lawsuit that lacked merit.

Defendants would frame the question as whether "Defendants are entitled to fees *under the [New York] anti-SLAPP law*." *See* Oppo. at 46. But framing the question so narrowly as to limit it to a specific entitlement under state law creates a situation in which federal rules will almost never be on point. Instead, the Court must pose the question more generally, in line with Supreme Court precedent, to capture the broad scope of the Federal Rule at issue. *See, e.g., Berk*, 146 S. Ct. at 553, n. 1 (rejecting concurrence's attempt to phrase question as "what is required to start a medical malpractice claim," and instead phrasing it as whether "lawsuit may be dismissed" due to lacking affidavit"); *Shady Grove Orthopedic Assocs.*, 559 U.S. at 393 (question was whether "suit may proceed as a class action," where applicable state law precluded suits to recover a "penalty" from proceeding as class action).

Once the question is posed correctly, it is readily apparent that there is a federal rule "on point"—Rule 11. Like the anti-SLAPP Act's fee-shifting

56

provision, Rule 11 deters and punishes litigants who bring unmeritorious lawsuits, and thus displaces Section 70-a's fee shifting provisions in federal court. Indeed, the Supreme Court has held that the appellate corollary to Rule 11—Fed. R. App. P. 38—precludes the application in federal court of an Alabama state penalty statute which required an unsuccessful appellant to pay an affirmance penalty of 10% of the judgment. *Burlington N. R.R. v. Woods*, 480 U.S. 1, 3 (1987). Just as the Alabama statute at issue in *Burlington* served to deter certain appeals from being taken, Section 70-a was enacted to deter certain lawsuits from being brought—as amici note in their brief by quoting from the legislative history. *See* Amici at 9. Thus, just as Appellate Rule 38 displaced the application of the Alabama statute in federal court, Rule 11 displaces the application of Section 70-a in federal court. To the extent Defendants argue that discretionary fee awards under Rule 11 and mandatory fee awards under Section 70-a do not conflict, *Burlington* also requires the rejection of that notion. *See Burlington*, 480 U.S. at 7 (holding that "the Rule' discretionary mode of operation unmistakably conflicts with the mandatory provision of Alabama's affirmance penalty statute").

Defendants do not dispute that Rule 11 is valid. Instead, they argue that Rule 11 "does not answer" the same question as Section 70-a because the latter is purportedly "not a sanction." But a federal and state rule can have slightly different purposes and yet the federal rule can still displace the state statute by

answering the same question. All that is required is for the state and federal rules to have sufficiently "coextensive" purposes for the federal rule to displace the state rule. *See Burlington*, 480 U.S. at 7 (holding that "the purposes underlying the Rule are sufficiently coextensive with the asserted purposes of the Alabama statute to indicate that the Rule occupies the statute's field of operation so as to preclude its application in federal diversity actions").

In any event, the idea that Section 70-a fee shifting is not in any respect a "sanction" is dubious. In *Kuvshynov*, the court pointed out that "[t]he third requirement in Civil Rights Law §70-a(1)(a) cites, almost verbatim, the standard for imposing sanctions for frivolous conduct as found in 22 NYCRR 130-1.1(c)(1)." 87 Misc. 3d 1260(A) at *7. The court denied the defendants' fee request because it found that plaintiffs' complaint was not frivolous and was made in good faith. Part of the court's analysis was a review of the legislative history, which supported its "finding that the *punitive* fee provision was not meant to apply" where a plaintiff commenced the action in good faith. *Id*. (emphasis added). Thus, Section 70-a *is* a sanction, as revealed by the legislative history.[14]

---

[14] Even if the legislature also intended Section 70-a to be compensatory, that does not take away from the punitive nature of fee shifting which can serve both punitive *and* compensatory purposes. *See, e.g., Ellingburg v. United States*, 146 S. Ct. 564, 568 (2026) (holding that restitution is criminal *punishment* even though Congressional intent was also to "compensate").

58

The fact that Rule 11 and Section 70-a answer the same question also shows why Cross-Appellants' and amici's arguments that disallowing fees would result in forum shopping and inequitable results between federal and state court, *see* Oppo. at 50; Amici at 8, lack merit.  While Section 70-a fees might be unavailable to a federal defendant, fee shifting under Rule 11 is available.  Thus, the threat of punitive fee shifting also exists in federal court and would serve a similar deterrent function for a bad faith plaintiff considering bringing a SLAPP suit in federal court as it would in state court. In short, the federal courts are not at risk of becoming a safe haven for bad faith SLAPP plaintiffs as Cross-Appellants and amici suggest.

### B.     Section 70-a Is Tied to New York's Dismissal and Discovery Procedures

Even if Rule 11 were not on point, thereby precluding application of Section 70-a, Section 70-a still could not be applied in federal court because its application is intertwined with CPLR 3211(g), a procedural provision governing an anti-SLAPP motion to dismiss.  While Section 70-a gives examples of how anti-SLAPP movants can prevail on their fee claims at different stages of a lawsuit, it gives only a single example of a motion to dismiss can support a fee claim—when the motion to dismiss is granted pursuant to CPLR 3211(g).

It is no accident that among the twelve different grounds for dismissal set forth in CPLR 3211, Section 70-a references only CPLR 3211(g)'s substantial basis standard.  CPLR 3211(g) is conceptually different than the other grounds for

dismissal, because it requires a plaintiff to satisfy a summary judgment-like standard with an evidentiary showing, and allows a plaintiff resisting such a motion to obtain targeted discovery. Had the drafters of Section 70-a intended to require a mandatory fee award for dismissals for failure to state a claim or other grounds that, unlike CPLR 3211(g), do not involve an evidentiary test or a right to seek discovery, the drafters would presumably have said so. It should not be assumed that the legislature's choice to limit its example of dismissals qualifying for fee shifting to adjudications on the merits was accidental.[15]

Not only does Section 70-a tie its authorization of fee awards at the motion to dismiss stage to CPLR 3211(g), but the discovery provisions related to anti-SLAPP motions to dismiss reinforce how procedures inconsistent with the federal rules are inherent to the overall statutory scheme. Under 3211(g), a motion to dismiss "shall be granted" unless the plaintiff demonstrates "that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law." In recognition of the challenges plaintiffs face in meeting the heightened "substantial basis standard" at

---

[15] Many courts have held, and Cross-Appellants have not disputed, that CPLR 3211(g) is procedural and inapplicable in federal court. *See Nat'l Acad. of TV Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 431–32 (S.D.N.Y. 2021) ("CPLR provisions [CPLR 3211(g) and 3212(h)] directly conflict with their federal counterparts and cannot be applied in federal court under the *Erie* doctrine."); *Carroll v. Trump*, 590 F. Supp. 3d 575, 584 (S.D.N.Y. 2022) ("Subdivisions 1 and 2 of CPLR 3211(g) thus are inapplicable in federal court by parity of reasoning with *La Liberte*").

the pleading stage, CPLR 3211(g) affords courts discretion to give plaintiffs access to early discovery targeted to satisfying the standard. *See* CPLR 3211(g)(3). Plainly, CPLR 3211(g)(3) is a state procedural provision in conflict with the Federal Rules and thus unenforceable in federal court. Thus, if federal courts allowed anti-SLAPP movants to obtain fees under the "substantial basis" standard of Section 70-a, *without* affording the concomitant right to seek discovery to meet that standard, federal courts would be chopping up New York's statute in a fashion that was unintended by its drafters. The substantial basis standard of Section 70-a is not independent of the specific procedures enacted in CPLR 3211(g) that are necessary to enable non-movants to meet their burden of demonstrating a substantial basis. Since those provisions of CPLR 3211(g) cannot be applied in federal court, neither can Section 70-a.

Unsurprisingly, many courts in this Circuit have concluded that the fee-shifting provision of New York's anti-SLAPP act is inapplicable in federal court. *See Coritsidis v. Khal Bnei Torah of Mount Ivy*, 2024 WL 37122, at *6 (S.D.N.Y. Jan. 3, 2024) ("recent decisions from courts within this Circuit have concluded that New York's anti-SLAPP law does not apply in federal courts" and denying request for attorneys' fees and costs under New York's anti-SLAPP law); *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 223 (S.D.N.Y. 2023) ("Court agrees with Plaintiff that it should deny Defendant's request to file an anti-SLAPP

61

counterclaim. Numerous other courts in this Circuit have concluded that New York's anti-SLAPP law does not apply in federal court"); *LoanStreet, Inc. v. Troia*, 2023 WL 5836237, *6 (S.D.N.Y. 2023) ("Multiple courts in this district have concluded that "§70-a is inapplicable in federal court"); *Editor's Pick Luxury LLC v. Red Points Sols. SL*, 2023 WL 6385993, at *6 (S.D.N.Y. Sept. 29, 2023) (finding New York's anti-SLAPP law inapplicable in federal court and denying request for attorneys' fees under the statute); *Kesner v. Buhl*, 590 F. Supp. 3d 680, 701 (S.D.N.Y. 2022) ("granting relief under §70-a would require the Court to apply a state procedural standard that conflicts with the Federal Rules of Civil Procedure"), *aff'd sub nom. Kesner v. Dow Jones & Co., Inc.*, 2023 WL 4072929 (2d Cir. June 20, 2023); *Prince v. Intercept*, 634 F. Supp. 3d 114, 142 (S.D.N.Y. 2022) ("Plaintiff opposes Defendants' position, arguing that §70-a does not apply in federal court. The Court agrees.").

The opinion in *Nat'l Acad.* is instructive. 551 F. Supp. 3d 408. There, the court examined the anti-SLAPP statute, which it noted allows a defendant to "recover 'damages, including costs and attorney's fees,' by bringing a special motion to dismiss pursuant to CPLR 3211(g)." 551 F. Supp. 3d at 430. Pursuant to 3211(g), a motion to dismiss must be granted unless the plaintiff can show their complaint had a "substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law." N.Y. Civ. Rights. L.

§70-a (citing CPLR 3211(g)). The court found that the substantial basis standard and burden shifting in the anti-SLAPP statute conflicts with FRCP 12 and 56. *Nat'l Acad.*, 551 F. Supp. 3d at 432. Upon finding that FRCP 12 and 56 answer the same question as the anti-SLAPP statute's dismissal procedures—and thus it has no application in federal court—the court also concluded that the anti-SLAPP law's fee shifting provision which relies on those dismissal procedures as a predicate for fee shifting, has no application in federal Court. *Id.*; *see also LaNasa*, 731 F. Supp. 3d at 417 (holding that a "federal court [] cannot grant costs or fees under New York's anti-SLAPP law").

Relying on *Bobulinski*, Cross-Appellants erroneously proclaim the fee shifting provision to be substantive and suggest that it can be isolated from the other procedural components of the anti-SLAPP statute with which Section 70-a is intertwined. 551 F. Supp. 3d 408. But *Bobulinksi* unpersuasive on this point as well, largely because it fails to acknowledge the inherently procedural components of Section 70-a—its procedure for awarding fees incurred to defend against meritless lawsuits—or the extent to which Section 70-a is intertwined with the procedural provisions of CPLR 3211(g).

## CONCLUSION

For the reasons set forth herein, Wang respectfully requests that the Court reverse the Decision and the Rule 59 Order, and reinstate the Complaint. In the

63

unlikely event the Court dismisses Wang's complaint, it should affirm the district

court's denial of Appellees' motion for attorneys' fees.

Dated: New York, New York
      July 1, 2026

                    Respectfully submitted,

                    CARTER LEDYARD & MILBURN LLP

By:      */s/ Alan S. Lewis*
                    Alan S. Lewis
                    Madelyn K. White
                    28 Liberty Street
                    New York, NY 10005
                    (212) 732-3200

                    *Attorneys for Plaintiff-Appellant-*
                      *Cross-Appellee*

64

## <u>CERTIFICATE OF COMPLIANCE</u>

This document contains 15,382 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). This exceeds the 14,000-word limit of Local Rule 32.1(a)(4) (A).  Contemporaneously with the filing of this brief, Appellant is moving for permission to exceed the type-volume limits by 1,400 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Time New Roman.

Dated: New York, New York
      July 1, 2026

CARTER LEDYARD & MILBURN LLP

By:      */s/ Alan S. Lewis*
          Alan S. Lewis
          Madelyn K. White
          28 Liberty Street
          New York, NY 10005
          (212) 732-3200

          *Attorneys for Plaintiff-Appellant-*
           *Cross-Appellee*